No. 2015-1648

# United States Court of Appeals
# for the Federal Circuit

————————

SOFTWARE RIGHTS ARCHIVE, LLC,
*Appellant*,

v.

FACEBOOK, INC., LINKEDIN CORPORATION, TWITTER, INC.,
*Appellees*.

————————

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2013-00478.

## APPELLANT OPENING BRIEF

Martin M. Zoltick
Rothwell, Figg, Ernst & Manbeck, P.C.
607 14th Street, N.W., Suite 800
Washington, DC 20005
Phone:  202-783-6040

Victor Hardy
Minghui Yang
DiNovo Price Ellwanger & Hardy LLP
7000 North MoPac Expy, Suite 350
Austin, TX 78731
Phone:  512-539-2626

July 27, 2015                     *Attorneys for Appellant*

## <u>CERTIFICATE OF INTEREST</u>

I, Minghui Yang, counsel for Appellant Software Rights Archive, LLC, certify the following:

1.    The full name of the party represented by me is Software Rights Archive, LLC.

2.    Software Rights Archive, LLC is the real party in interest.

3.    SRA, LLC is the parent company of Software Rights Archive, LLC.

4.    All parent corporations and publicly held companies that own 10 percent or more of the stock of this party are:  None

5.    The law firms and the partners and associates that appeared for this party in the *Inter Partes* Review case at the U.S. Patent and Trademark Office, Patent Trial and Appeal Board, or are expected to appear in this Court are:

ROTHWELL, FIGG, ERNST & MANBECK, P.C.
Martin M. Zoltick
Nancy J. Linck
Soumya P. Panda
607 14th Street, N.W., Suite 800
Washington, DC  20005
Phone:  202-783-6040

DINOVO, PRICE, ELLWANGER & HARDY, LLP
Victor G. Hardy
Minghui Yang
7000 North MoPac Expy, Suite 350
Austin, TX 78731
Phone:  512-539-2626

Date:  July 27, 2015                    Respectfully submitted,

                                        */s/Minghui Yang*_____
                                        Minghui Yang
                                        DiNovo Price Ellwanger & Hardy LLP
                                        7000 North MoPac Expressway
                                        Suite 350
                                        Austin, Texas 78731
                                        Telephone:  512-539-2626
                                        Facsimile:  512-539-2627
                                        E-mail:  myang@dpelaw.com

# **TABLE OF CONTENTS**

CERTIFICATE OF INTEREST ............................................................. i

TABLE OF CONTENTS ................................................................... iii

TABLE OF ADDENDA ....................................................................v

TABLE OF AUTHORITIES ............................................................. vi

TABLE OF ABBREVIATIONS ........................................................ ix

STATEMENT OF RELATED CASES ................................................ xi

I.     STATEMENT OF JURISDICTION ....................................1

II.    STATEMENT OF THE ISSUES .......................................1

III.   STATEMENT OF THE CASE ...........................................2

     A.    Preliminary Statement ..................................................2

     B.    Factual Statement ........................................................5

          1. The Fox Papers .....................................................9

          2. The Fox Papers, When Fairly Considered as a Whole,
             Teach Using BC and CC Harm Search Results..................10

          3. Fox's Methods Using Indirect Relationships Suffer from a
             Reliability Problem that Makes them Unfit for their
             Intended Purpose................................................17

          4. The Art of Record as a Whole Confirms that It Was Not
             Obvious to Use Indirect Relationships for Search...............21

          5. The Objective Evidence Confirms that the Fox Methods
             Concerning *bc* and *cc* did Not Render Searching with
             Indirect Relationships Obvious............................................25

          6. *Bc* and *cc* Alone Without Higher-Order Relationships
             Have Never Been Proven Effective for Improving Search .29

          7. The Fox Papers Fail to Disclose an Analysis of
             Relationships in a Computer Database ...............................30

    IV.   SUMMARY OF THE ARGUMENT...............................32

    V.    ARGUMENT .......................................................33

A.      Standard of Review ................................................................33

B.      The Board Erred by Failing to Provide an "Explanation" as to Why One Skilled in the Art Would Use Indirect Relationships to Search in View of the Empirical Evidence and Explicit Teachings that Demonstrate Such Relationships Harm Search Results ................................................................34

C.      The Board also Erred by Failing to Consider the Prior Art as a Whole and by Failing to Conduct a Weighing Analysis as to the Degree One Teaching May Discredit Another ...............38

D.      Had the Board Complied with its Duty to consider the Prior Art as a Whole It Would Have Found All Claims Nonobvious ..............................................................................41

E.      The Board Erred by Failing to Analyze Important Objective Evidence of Nonobviousness ....................................................45

F.      The Board Erred by Finding that All the Elements of Claim 26 Are Suggested .....................................................................51

G.      The Board Erred by Finding Claim 32 Obvious .......................53

H.      The Board Erred by Finding Claim 34 Obvious .......................56

I.      The Board Erred by Concluding that SRA Failed to Provide a Nexus ....................................................................................59

CONCLUSION ...............................................................................................65

## <u>TABLE OF ADDENDA</u>

1.   Final Written Decision – 35 U.S.C. § 318(a) and 37 C.F.R. §
     42.73, *Facebook, Inc. et al. v. Software Rights Archive, LLC*,
     Case IPR2013-00478 (P.T.A.B. February 2, 2015) (Paper 58) .........JA0001-42


2.   U.S. Patent No. 5,544,352 ................................................................JA05000-42

# <u>TABLE OF AUTHORITIES</u>

Cases

*Alco Standard Corp. v. Tenn. Valley Auth.*,
  808 F.2d 1490 (Fed. Cir. 1986)........................................................ 37, 38, 44, 50

*Apple Inc. v. Int'l Trade Comm'n*,
  725 F.3d 1356 (Fed. Cir. 2013).................................................................. 37, 39

*Ashland Oil, Inc. v. Delta Resins & Refractories*,
  776 F.2d 281 (Fed. Cir. 1985)............................................................................47

*Broadcom Corp. v. Emulex Corp.*,
  732 F.3d 1325 (Fed. Cir. 2013)..........................................................................39

*Consol. Edison Co. v. N.L.R.B.*,
  305 U.S. 197 (1938).............................................................................................34

*Crocs, Inc. v. ITC*,
  598 F.3d 1294 (Fed. Cir. 2010)........................................................ 60, 61, 64, 65

*DePuy Spine, Inc. v. Medtronic SofamorDanek, Inc.*,
  567 F.3d 1314 (Fed. Cir. 2009)............................................................. 42, 43, 46

*Ecolochem, Inc. v. S. Cal. Edison Co.*,
  227 F.3d 1361 (Fed. Cir. 2000)..........................................................................13

*Eli Lilly & Co. v. Teva Pharm USA, Inc.*,
  619 F.3d 1329 (Fed. Cir. 2010)................................................................. 44, 45

*Ex parte Katz*,
  2010 WL 1003878 (P.T.A.B. 2010) ....................................................................35

*Ex parte Papst-Motoren*,
  1 U.S.P.Q.2d 1655 (B.P.A.I. 1986) .....................................................................35

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
  676 F.3d 1063 (Fed. Cir. 2012).................................................................. 42, 50

*In re Dow Chemical Co.*,
  837 F.2d 469 (Fed. Cir. 1988)...........................................................................49

*In re Gartside*,
  203 F.3d 1305 (Fed. Cir. 2000)........................................................................34

*In re Hedges*,
  783 F.2d 1038 (Fed. Cir. 1986).........................................................................40

*In re Kahn*,
  441 F.3d 977 (Fed. Cir. 2006)...........................................................................38

*In re Klein*,
  647 F.3d 1343 (Fed. Cir. 2011).........................................................................34

*In re Kotzab*,
  217 F.3d 1365 (Fed. Cir. 2000)................................................................. passim

*In re Rambus Inc.*,
  694 F. 3d 42 (Fed. Cir. 2012)...........................................................................35

*In re Rouffet*,
  149 F.3d 1350 (Fed. Cir. 1998).........................................................................38

*In re Sullivan*,
  498 F.3d 1345 (Fed. Cir. 2007).........................................................................37

*In re Young*,
  927 F.2d 588 (Fed. Cir. 1991)...........................................................................41

*Institut Pasteur & Universite Pierre et Marie Curie v. Focarino*,
  738 F.3d 1337 (Fed. Cir. 2013).........................................................................51

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
  688 F.3d 1342 (Fed. Cir. 2012).........................................................................49

*KSR Int'l Co. v. Telefex Inc.*,
  550 U.S. 398 (2007) ...........................................................................................2

*Leo Pharm.  v. Rea*,
  726 F. 3d 1346 (Fed. Cir. 2013)................................................................. 46, 47

*Phillips v. AWH Corp.*,
    415 F. 3d 1303 (Fed. Cir. 2005)..........................................................35

*Plantronics, Inc. v. Aliph, Inc.*,
    724 F.3d 1343 (Fed. Cir. 2013).........................................................46

*Rambus Inc. v. Rea*,
    731 F.3d 1248 (Fed. Cir. 2013).........................................................51

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*,
    617 F.3d 1296 (Fed. Cir. 2010).........................................................47

Statutes

28 U.S.C. § 1295(a)(4)(A) ......................................................................1

35 U.S.C. § 141(c) ...................................................................................1

35 U.S.C. § 314 ........................................................................................1

35 U.S.C. § 318 ........................................................................................1

35 U.S.C. § 319 ........................................................................................1

Regulations

37 C.F.R. § 42.73 .....................................................................................1

# TABLE OF ABBREVIATIONS

**Parties**

Petitioners          Facebook, Inc., LinkedIn Corp., and Twitter Inc.

SRA                  Software Rights Archive, LLC

**Prior Art**

Fox Papers           Fox Thesis, Fox SMART, Fox Collection

Fox Thesis           Edward A. Fox, Extending the Boolean and Vector Space Models of Information Retrieval with P-Norm Queries and Multiple Concept Types, (Aug.1983) (Ph.D. dissertation, Cornell Univ. Dept. of Comp. Sci.)

Fox SMART            Edward A. Fox, Some Considerations for Implementing the SMART Information Retrieval System under UNIX, (Sept. 1983) (Ph.D. dissertation, Cornell Univ. Dept. of Comp. Sci.)

Fox Collection       Edward A. Fox, Characterization of Two New Experimental Collections in Computer and Information Science Containing Textual and Bibliographic Concepts, (Sept. 1983) (Ph.D. dissertation, Cornell Univ. Dept. of Comp. Sci.)

Tapper Papers        Colin F.H. Tapper, *Citation Patterns in Legal Information Retrieval*, 3 Datenverarbeitung im Recht 249-75 (1976) and Colin Tapper, *The Use of Citation Vectors for Legal Information Retrieval*, 1 J. of Law and Info. Sci. 131-61 (1982)

Kambayashi           Yahiko Kambayashi et al., *Dynamic Clustering Procedures for Bibliographic Data*, Kyoto University, Department of Inf. Sci., 90-99 (1981)

**Terms**

'352 Patent          U.S. Pat. No. 5,544,352

Reviewed Claims      Claims 26, 28-30, 32, 34, and 39 of the '352 Patent

ix

| | |
|---|---|
| Board | Patent Trials and Appeal Board |
| CACM | Communications of the Association of Computing Machinery |
| IPR | *Inter Partes* Review |
| IR | Information Retrieval |
| ISI | Institute for Scientific Information |
| *au* | author |
| *bc* | bibliographic coupling |
| *cc* | co-citation |
| *cd* | co-citation direct |
| *cr* | *Computer Review* categorization |
| *ln* | direct links |
| *tm* | terms |

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Rule 47.5 of the Federal Circuit Rules, SRA states that no other appeal in or from the *Inter Partes* Review proceeding, No. IPR2013-00478, before the Patent Trial and Appeal Board of the U.S. Patent and Trademark Office (the "Board") has been before this or any other appellate court.  This appeal is a companion case to Consolidated Cross-Appeal Nos. 15-1649, 1650, and 1651 and Consolidated Cross-Appeal Nos. 15-1652, 1653.  The three appeals have been assigned to the same merits panel pursuant to D.I. 2.

## I.     STATEMENT OF JURISDICTION

This appeal is from an IPR for US Patent 5,544,352 (the "'352 Patent") instituted by the Board under the American Invents Act ("AIA"). On July 27, 2012, SRA filed its complaint in the United States District Court for the Northern District of California against Facebook, Inc., LinkedIn Corp., and Twitter Inc. (the "Petitioners"), asserting infringement of the '352 Patent, among other patents.  On July 30, 2013, the Petitioners filed a Petition for *inter partes* review of claims 26, 28-30, 32, 34, and 39 of the '352 Patent. JA01000.  The Board had jurisdiction over the IPR pursuant to 35 U.S.C. § 314.

The Board issued its Final Written Decision ("decision") on February 2, 2015, pursuant to 35 U.S.C. § 318 and 37 C.F.R. § 42.73. JA00001.  In its decision, the Board found all the Reviewed Claims patentable over Kambayashi and Tapper, but found the Reviewed Claims unpatentable as obvious in view of the Fox Papers.  JA00012; JA00032; JA00016.  SRA timely filed its Notice of Appeal on April 1, 2015. JA01538.  This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. § 319, and 35 U.S.C. § 141(c).

## II.     STATEMENT OF THE ISSUES

In finding the Reviewed Claims obvious, whether the Board erred by:

1.    failing to provide an "explanation" as to why one skilled in the art would use indirect relationships to search in view of experimental results that overwhelmingly demonstrate indirect relationships harm search results?

2.    failing to consider the prior art as a whole?

3.    failing to consider objective evidence of nonobviousness?

4.    failing to properly arrive at the ultimate conclusion of nonobviousness?

5.    finding all elements of dependent claims 32 and 34 to be suggested in the Fox Papers?

## III.    STATEMENT OF THE CASE

### A.    Preliminary Statement

The Board erroneously invalidated claims 26, 28-30, 32, 34, and 39 in view of the Fox Papers.  All claims require searching objects using an analysis of indirect relationships of a computer database.  JA05042.  The Supreme Court in *KSR Int'l Co. v. Telefex Inc.*, 550 U.S. 398, 401 (2007)  explains that an obvious combination is one that seeks to take (1) "familiar elements" and use them in (2) "known methods" to (3) "yield predictable results."  Here, the prior art as a whole demonstrates that the Fox experiments on indirect citations involved using (1) only experimental elements that (2) yielded highly unpredictable and harmful results (3)

in a method that's empirically shown not to work for the intended purpose of computerized search.  JA12751-JA12764; JA15042-JA15046; JA12702(¶212).

The Board found the Reviewed Claims obvious based upon experiments performed on printed documents in the early 1980s to determine the utility of citation relationships and other factors for searching, even though the results of those experiments overwhelmingly demonstrated that the claimed use of indirect relationships was too harmful and too unreliable for computerized search.  Indeed, with respect to "*cc*" and "*bc*" (the only indirect relationships relied upon by Petitioners), Fox concludes that "*cc* is not really needed and *bc* is probably not either." JA12761.

These widely published studies did not make obvious using citation relationships to enhance search.  Rather, for decades these experiments and other publications discouraged the IR field from using non-semantical relationships (i.e., citation or referential relationships) for search.  JA12707-JA12723.  Indeed, three years <u>after</u> the Fox Papers (*i.e.*, the prior art that allegedly rendered use of citation relationships obvious), Gerard Salton, Fox's thesis advisor, stated:

> Since no obvious way exists for distinguishing the positive from the negative effects, the citation methodology cannot be recommended for inclusion in practical retrieval environments.

JA12702.  Consequently, early search engines relied exclusively on semantical relationships (i.e., relationships based upon the meaning of words).  There was a

3

complete absence for 15 years of any use of indirect relationships in a non-experimental search system after these experiments in the early 1980s.  JA12718.

Fifteen years after the Fox experiments, in 1998, Google became the first non-experimental search engine that analyzed indirect relationships to enhance search through its PageRank algorithm—a licensed embodiment of the '352 Patent.  JA12846-JA12851.  PageRank was considered a major technological breakthrough that revolutionized the search industry because it recognized that these types of relationships were "meaningful" for search.  JA12722-JA12723; JA12875-JA12884; JA12865-JA12866; JA12870-JA12871 (breakthrough); JA12860-JA12861; JA12857; JA12851-JA12861 (meaningful).  By 2003, all major search engines were using citation link analysis for search.  JA12873-JA12874.  Significantly, for 15 years after Fox's work, the very idea that one could analyze and process hyperlink citation relationships in computer databases to enhance search in "any" "meaningful" way was considered a revolutionary idea:

> We originally developed page rank[] kind of playing around with studying all the links on the web.  And that too was a pretty ***revolutionary idea*** though it seems very simple that you could even just collect [the links of the web and] ***do <u>anything</u> meaningful*** ….
> I really credit Larry pursuing ***that idea that it's even worth collecting the graph.*** And then that you could ***run <u>any</u> kind of processing*** on it.

JA11280; JA12722; JA12860.

SRA presented compelling evidence that using indirect relationships in search, particularly as arranged in the claimed method, was nonobvious.  The

Board simply ignored it and never addressed the merits.  Rather, the Board used the Reviewed Claims as a road map to select various steps present among the Fox Papers with hindsight bias to arrive at the claimed invention—while ignoring the results of those experiments that both empirically and explicitly teach not to use indirect relationships at all within the claimed method steps. Had the Board properly conducted its required analysis, it would have concluded that that the Reviewed Claims are nonobvious.

### B.    Factual Statement

The '352 Patent relates to using direct and indirect referential relationships (i.e., citations) to search for objects in a database.  Since these relationships are based upon a referential nature of a citation, rather than the occurrence or meaning of words, they are non-semantical.  The terms "direct" and "indirect" refer to the type of reference of a citation relationship.  A direct relationship is when one object directly cites or refers to another object (A contains a citation that refers to B).  An indirect relationship refers to two objects being connected by a chain of citation references, and therefore being "indirectly" referenced.  JA12626-JA12628; JA01194-JA01195.



The '352 Patent teaches a system that analyzes the contents of an existing computer database to determine the citation relationships that exist between the objects contained within the database. JA05026(3:51-53). The disclosed system employs an automated extractor that "extracts" citation relationships from the textual content of database objects and prepares them for data analysis. JA05004; JA05031-JA05032(14:39-15:17).

The Patent further discloses a novel "patterner," which examines the extracted citations for empirically useful indirect relationships. JA05032(15:19-16:6). Unlike the experimental prior art systems, which analyzed only two indirect relationships (*bc* and *cc*), the patterner recognized 18 different patterns of empirically useful citation relationships that may be embodied into a single numerical representation for searching:

6



JA05024; JA05030(12:32-61).  The indirect relationship patterns are weighted using various IR metrics and then used to generate multiple proximity and similarity matrices. JA05031(13:34-52).  These different matrices support the

seven different Patent search routines:



JA05016.  The system marks paragraphs and uses a novel "paragraph patterner" that numerically represents the citation relationships of individual paragraphs so that individual paragraphs are returned as search results. J A05030(12:7-30); JA05031-JA05032(14:51-52,14:65-15:6); JA05032-JA05033(16:44-17:9); JA05037(25:6-24, 26:18-37).  This differed from the prior art because it analyzed the specific relationships of a specific portion of text rather than the document as a whole.

Claim 26, the only independent claim challenged, requires:

A non-semantical method for numerically representing objects in a computer database and for computerized searching of the numerically represented objects in the database, wherein direct and indirect relationships exist between objects in the database, comprising:

8

creating a first numerical representation for each identified object in the database based upon the object's direct relationship with other objects in the database;

analyzing the first numerical representations *for indirect relationships existing between or among objects in the database*;

*generating a second numerical representation of each object based on the analysis of the first numerical representation;*

*searching the objects in the database using a computer and the stored second numerical representations,* wherein the search identifies one or more of the objects in the database.

JA05042(35:28-53). Thus, claim 26 and its dependents require searching a database based on an analysis of indirect relationships of objects in the database.

### 1.    The Fox Papers

The Fox Papers published in 1983 comprise of Fox Thesis, Fox SMART, and Fox Collection. The Petitioners rely upon the Fox Papers' experiments with two collections: CACM and ISI. These experiments were methods applied, by hand, to printed bibliographies and were not performed on any computer database of objects with relationships, as claimed. JA12596-JA12598.

Fox SMART describes the SMART system created by Gerard Salton used to test IR methods. JA05230. Fox Collection described the collections available for study. JA015163. Fox Thesis reported on the experimental results of Fox SMART on the available collections. JA05578-JA05605.

The experiments used a number of data types including: terms [in titles of documents only] (*t*), *Computer Review* subject matter categories (*cr*); co-citations

(*cc*); co-citation direct (*cd*); direct citations (*ln*); authors (*au*); and bibliographic couplings (*bc*).  JA05594.  The *ln* subvector represents direct relationships between two articles that cite each other.  The *bc* subvectors represents two articles citing a common article, and the *cc* subvectors represents two documents cited by another document:



### 2.  The Fox Papers, When Fairly Considered as a Whole, Teach Using BC and CC Harm Search Results

Petitioners rely upon the *cc* and *bc* subvectors as the claimed "analysis of indirect relationships."  JA01016-JA01017.  However, one would not have used *bc* and *cc* in the claimed arrangement to search a database because the Fox Papers' experimental results demonstrate that such use is far more likely to harm search results than to improve them. JA12751-JA12764; JA15042-JA15046; JA12702(¶212).

Fox Thesis (Chapter 8) details nine experiments using *bc*, *cc* and other subvectors to determine whether these subvectors would lead to any

improvement in search.  JA12752.  Many of Fox's tests are directed towards

combined subvectors for which *bc* and *cc* are just two of many data types

included within a single subvector.  The Fox experiments are directed to using

subvectors generally, with no particular focus on indirect relationship subvectors,

thus many of Fox's tables do not report directly on the specific impact that *bc*

and *cc* may have on the results.  JA12752-JA12757.  Since the issue here is

whether it was obvious to use the claimed indirect relationships, Dr. Jacobs

analyzed the data of these tables to determine the specific impact that can be

attributable to *bc* and *cc* (as opposed to other data types in the combined

vectors).[1]  By using terms and direct links as a comparison, the *specific*

contribution of indirect relationships on search results can be determined.

Whereas the combined subvector including *bc* or *cc* may at times show an

improvement, the specific contribution of *bc* and *cc* to that improvement is

almost always negative.  Neither Petitioner nor the Board has challenged the

accuracy of Dr. Jacobs's analysis on the specific impact that *bc* and *cc* had on

search results.  Dr. Jacobs's analysis of all nine experiments are set forth below:

---

[1] By examining the results of each table, the specific impact of a given variable can be isolated.  For example, if "*tm+ln+bc*" results in a precision of .3187 which is a 1.1% improvement over terms and if "*tm+ln*" by itself results in a precision of .3431 which is a 8.8% improvement, the incremental improvement of *bc* by itself can be calculated by subtracting the former average precision by the latter and then dividing by the latter again (approximately (1.1%-8.8% ) or -7.7%). JA15045-JA15046;JA05598.

| Experiment | Result | Experiment | Result |
|---|---|---|---|
| 8.2-ISI (cc) | -37% (vs terms) | 8.11-CACM (bc) | -6.3% (vs terms) |
| 8.2-ISI (cd) | -54% (vs terms) | 8.11-CACM (cc) | -1.4% (vs terms) |
| 8.3-ISI (cc+terms) | -6.2% (vs terms) | 8.11-CACM (bc+cc) | -2.9% (vs terms) |
| 8.3-ISI (cc+other subvectors) | -7.8% (vs terms) | 8.11-CACM (bc) | -7.4% (vs ln) |
| 8.3-ISI (cc+terms emphasized) | +4.5 to 6.1% (vs terms) | 8.11-CACM (cc) | -6% (vs ln) |
| 8.7-ISI (cc+terms regression) | +5 to 6% (vs terms) | 8.11-CACM (bc+cc) | -4.1% (vs ln) |
| 8.8-CACM (bc) | -62% (vs terms) | 8.12-CACM (bc) | -26.5% (vs terms) |
| 8.8-CACM (cc) | -51% (vs terms) | 8.12-CACM (cc) | -29% (vs terms) |

| Experiment | Result |
|---|---|
| 8.13-CACM (bc) | -11.1% (vs ln) |
| 8.13-CACM (cc) | -3.7% (vs terms) |
| 8.13-CACM (bc+cc) | -11.5% (vs ln) |
| 8.13-CACM (all subvectors regression) | undetermined but less than +2.1% divided among au, cr, bc, and cc (no positive contribution from indirect relationships because bc and cc weighed at less than 1% and 0% respectively) |

JA12987-JA12988; JA12752-JA12757.  When the specific contribution of *bc* and *cc* is isolated, 7 of 9 experiments show *only* deterioration from their use. JA12752-JA12758; JA12760-JA12764.  The remaining experiments show either a neutral impact or an insignificant improvement that does not establish a connection between these citation relationships and search improvement.  *Id*.

Although Petitioners invited the Board to seize on a few results that showed some slight improvement (ISI in Table 8.3;8.7), the table above  shows

that when all the Fox Papers' teachings are fairly considered, they overwhelmingly demonstrate that use of *bc* and *cc* harms search results for the vast majority of queries. A skilled artisan would thus understand that using *bc* and *cc* is far more likely to hurt search results than to help and would not be motivated to use Fox's methods regarding *bc* and *cc* on any collection, much less the claimed computer database. *Id.*

Dr. Salton is considered the "father of information retrieval" and was the Thesis Advisor on the Fox Papers. JA12708. He also conducted tests using bibliographic subvectors on the same CACM and ISI collections as Fox. Dr. Salton stated that a 10% improvement is the "normal" threshold for determining significant results. JA12762. Importantly, <u>none</u> of Fox's test results come close to Salton's 10% improvement threshold. JA12752-JA12757; JA12761-JA12764.

Furthermore, there "must be evidence that 'a skilled artisan… would select the elements from the cited prior art references for combination <u>in the manner claimed</u>.'" *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1375 (Fed. Cir. 2000); *see also In re Kotzab*, 217 F.3d 1365, 1371 (Fed. Cir. 2000). Claim 26 requires the creation of a direct link numerical representation and storing that representation for use in searching:

> creating a first numerical representation for each identified object in the database ***based upon the object's direct relationship with other objects*** in the database;

13

> storing the first numerical representations *for use in computerized searching*;

JA05042(35:36-40). After a first numerical representation that's available "for use in computerized searching" is created, the claimed method then requires a second numerical representation based upon the analysis of indirect relationships be created and then used for searching:

> *analyzing* the first numerical representations *for indirect relationships* existing between or among objects in the database;
>
> generating a second numerical representation of each object *based on the analysis of the first numerical representation…*;
>
> *searching the objects in the database using a computer and the stored second numerical representations…*

JA05042(35:41-51). Thus, the claimed method requires one to use indirect relationships for searching when one has direct links information available for use in searching. JA12764.

Fox's experiments unequivocally demonstrate that, after creating the first numerical representation and making it available for use in searching, a skilled artisan would have no motivation to perform the additional steps pertaining to creating and using a second numerical representation based upon the *bc* and *cc* indirect relationships for search. These additional steps would involve not only an extreme multi-year effort using Fox's hand methods, but would actually harm the search results. JA150065-JA15066; JA12713-JA12714; JA12752-JA12764; JA15047-15048; JA15057-JA15059. Although there are two cases that show a

14

slight improvement of indirect relationships over terms only, **there is no case** where the Fox Papers show using *bc* and *cc* improves search results when direct links (*ln*) are present, as required by the claims. *Id*. In **every single test** of Fox that addresses this matter, using *bc* and *cc* (in combination with direct links or alone or with each other) has resulted in deterioration of search results:

| Experiment | Result | Experiment | Result |
|---|---|---|---|
| 8.8-CACM (*bc*) | **-43.5%** (vs *ln*) | 8.11-CACM (*bc+cc*) | **-4.1%** (vs *ln*) |
| 8.8-CACM (*cc*) | **-26.7%** (vs *ln*) | 8.12-CACM (*bc*) | **-30%** (vs *ln*) |
| 8.11-CACM (*bc*) | **-7.4%** (vs *ln*) | 8.12-CACM (cc) | **-32.4%** (vs *ln*) |
| 8.11-CACM (*cc*) | **-6%** (vs *ln*) | | |

JA12713-JA12714; JA13037; JA12752-JA12759. Accordingly, there is no teaching in the Fox Papers that would have suggested that either *bc* or *cc* would improve results in the context that the claims require, and the Fox Papers' teachings could not suggest the methods of the Reviewed Claims. *Id*. Fox himself reaches this exact conclusion and expressly states that the *cc* and *bc* subvectors should **not** be used if one has other subvectors (which includes the direct relationship subvector "*ln*"):

> [I]t can be inferred, however, that with the other subvectors present *cc* is not really needed and *bc* is probably not either.

JA12713-JA12714. Notably, Fox also explicitly excludes *bc* and *cc* from his proposed "recipe" for the subvectors, and instead teaches using just the direct links subvector as the only non-semantical subvector because of "effectiveness tests":

15

*The recipe proposed is to at least employ terms (tm), some manually assigned categorization scheme (cr), and direct links between documents (ln).* When bibliographic information is only available among articles in a collection the simplest form of that information, references (*ln*) [*i.e.*, the direct links vector], seems to be the most reliable and most useful of all the types considered (bc, ln, cc). *The ln subvectors* are typically longer than the other two and are easier to obtain *so use of them is encouraged by* practicality considerations as well as *effectiveness tests*.

JA12710.

Fox identified the experiment of Table 8.13 as his most complete experiment and compelling case of improvement. JA10399.

Table 8.13: Results of CACM Term Relevance Feedback Using Subvector Combinations With Equal (E) or Regression (R) Based Weights

| | Scaled Subvector Coefficients | | | | | Weight Scheme | Aver. Prec. | % Change vs. Terms Only |
|---|---|---|---|---|---|---|---|---|
| tm | au | cr | bc | ln | cc | | | |
| 1.0 | | | | | | | .3839 | |
| .5 | | | .5 | | | E | .3866 | + 0.7 |
| .5 | | | | .5 | | E | .4352 | + 13.3 |
| .5 | | | | | .5 | E | .3696 | -3.7 |
| .33 | | | .33 | | .33 | E | .3851 | + 0.3 |
| .17 | .17 | .17 | .17 | .17 | .17 | E | .3845 | + 0.1 |
| .235 | | | | .765 | | R | .4876 | + 27.0 |
| .099 | .201 | .372 | .009 | .318 | 0 | R | .4979 | + 29.7 |

JA05603.  The weights above were determined through linear regression analysis (designated "R") of search results meant to determine a weight that optimizes

16

search results.  JA05603; JA12696-JA12699.  Fox achieved his best results by down weighting *cc* to "0" and *bc* to ".009" (less than one percent)—effectively turning off any influence from the indirect relationships on the search results. JA12761.  This is further empirical support from Fox that *bc* and *cc* should not be used to search for objects.

In short, when all the Fox Papers' teachings, including experimental results, are fairly considered, they clearly teach that *bc* and *cc* are highly likely to harm search results and should not be used in the particular arrangement of claim 26 and its dependents.

### 3.    Fox's Methods Using Indirect Relationships Suffer from a Reliability Problem that Makes them Unfit for their Intended Purpose

The Fox experiments as a whole also demonstrate that using citation relationships for search suffered from a reliability problem that made them unfit for computerized search.  The impact of the indirect citation subvectors on search performance across retrieval environments was unpredictable, ranging from 5-6%, a slight improvement, to -62%, a significant degradation in search performance. JA12713-JA12714; JA15057-JA15059.  For any given set of queries, the citation vectors were far more likely to result in degradation of search results than to help them and, consequently, the citation methodology was unsuited for use in automated retrieval.  JA12701-JA12702.

17

It is hardly obvious to deploy methods far more likely to hurt search results than to help them, especially given the extensive, two-year effort required to index a mere 6,000 articles using Fox's hand methods. JA01346. In his 1986 experiments, Dr. Salton addresses how a skilled artisan would interpret data revealing a strong potential for degradation of search results. Dr. Salton sought to test the performance of using bibliographic citations for search across different "retrieval environments" (different queries and documents) to determine whether they could be reliably used in an operational search system. JA11172. His experiments were conducted using bibliographic subvectors on the same CACM and ISI collections used in the Fox Papers.

In his experiments, Dr. Salton notes that he was able to achieve a significant "**30 percent**" **improvement** in precision on the CACM collection:

> The CACM results of [Table 3] show clearly that the addition to the document terms of title words from bibliographically related documents is beneficial, since the retrieval effectiveness improves by *about 30%* on average for the citing+cited method….

JA11175. However, when trying to apply the same method to the ISI collection, he experienced a **1-7 percent deterioration**:

> Unfortunately, this optimistic conclusion is not maintainable when the CISI results of Table 4 are considered. In that case, *none* of the bibliographic expansion method *proved beneficial* for the more effective tf x idF weighting system*, the deterioration in effectiveness ranging from about 1 percent to as much as 7 percent for the citing+cited method*.

18

JA12701-JA12702. Thus, the same methods that seemed to be effective on the

CACM queries actually degraded the results when applied to different queries of

the ISI collection. *Id*. When Dr. Salton is confronted with a method that

sometimes results in positive results (+30 percent) and sometimes results in

negative results (-7 percent deterioration), he ultimately concludes that the method

in unsuited for its intended purpose of computerized search:

> ***Since no obvious way exists for distinguishing the positive from the negative effects,*** the citation methodology cannot be recommended for inclusion in practical retrieval environments.
>
> ***
>
> Overall, the procedure is not sufficiently reliable to warrant incorporation into operational automatic retrieval systems.

*Id*.

Salton's conclusion is direct and compelling evidence of what a skilled

artisan would conclude in face of the evidence of Fox experiments' unpredictable,

disparate experimental results that reveal *bc* and *cc* are likely to harm search

results. JA12700-JA12702. Unlike Petitioners, Salton did not seize one positive

result and ignore all the negative results; rather he looked at the range of outcomes

and concluded that the citation methodology was too unreliable for searching

because of the strong potential for harming search results. This same problem of

extreme variation and potential harm to search results that led Dr. Salton to this

conclusion was also apparent in Fox's 1983 experimental work. JA12700-

JA12702; JA15057-JA15059. Indeed, Fox's data suggests a far worse reliability problem than that in Salton's tests. One skilled in the art would see the following test results with respect to the CACM collection for *bc* and *cc*:

| Experiment | Result | Experiment | Result |
|---|---|---|---|
| 8.8-CACM (*bc*) | **-62%** (vs terms) | 8.12-CACM (*bc*) | **-26.5%** (vs terms) |
| 8.8-CACM (*cc*) | **-51%** (vs terms) | 8.12-CACM (cc) | **-29%** (vs terms) |
| 8.11-CACM (*bc*) | **-6.3%** (vs terms) | 8.13-CACM (*bc*) | **-11.1%** (vs *ln*) |
| 8.11-CACM (*cc*) | **-1.4%** (vs terms) | 8.13-CACM (*cc*) | **-3.7%** (vs terms) |
| 8.11-CACM (*bc+cc*) | **-2.9%** (vs terms) | 8.13-CACM (*bc+cc*) | **-11.5%** (vs *ln*) |
| 8.11-CACM (*bc*) | **-7.4%** (vs *ln*) | 8.13-CACM (all subvectors regression) | undetermined but less than +2.1% divided among *au*, *cr*, *bc*, and *cc* (no positive contribution from indirect relationships because *bc* and *cc* weighed at less than 1% and 0% respectively) |
| 8.11-CACM (*cc*) | **-6%** (vs *ln*) | | |
| 8.11-CACM (*bc+cc*) | **-4.1%** (vs *ln*) | | |

JA12987-JA12988; JA12752-JA12757. As reflected above, the impact of *bc* and *cc* for the CACM range from -62% degradation to potentially +2.1% improvement (but likely to be "0"[2]).

| Experiment | Result |
|---|---|
| 8.2-ISI (*cc*) | **-37%** (vs terms) |
| 8.2-ISI (*cd*) | **-54%** (vs terms) |
| 8.3-ISI (*cc*+terms) | **-6.2%** (vs terms) |
| 8.3-ISI (*cc*+other subvectors) | **-7.8%** (vs terms) |
| 8.3-ISI (*cc*+terms) | +4.5 to 6.1% (vs terms) |
| 8.7-ISI (*cc*+terms regression) | +5 to 6% (vs terms) |

---

[2] JA12755.

JA13040; JA12752-JA12757.  With respect to the ISI, *bc* and *cc* ranged from negative -54% deterioration to potentially +6% percent improvement. *Id*.  Thus, Fox's CACM and ISI results actually show far more extreme degradation (-54% and -62% (Fox) vs. -1% to -7% (Salton)) and far less beneficial results (+6% (Fox) v. +30% (Salton)) than the variation of results that led Dr. Salton, then the most prominent researcher in the world, to conclude that the citation methodology was unfit for its intended purpose.  JA12702; JA15057-JA15059.  Likewise, a skilled artisan would also view Fox's results as indicating that Fox's method pertaining to *bc* and *cc* suffered from a serious reliability problem making it unfit for use in search.  Consequently, the skilled artisan would not be motivated to use this method in any search system, much less modify one for the claimed database relationships.

### 4.    The Art of Record as a Whole Confirms that It Was Not Obvious to Use Indirect Relationships for Search

The negative experimental results of Fox must be viewed in the larger context of the art of record.  The Petitioners' belief that the successful use of indirect relationships in a search system was a "predictable result," or obvious to one of ordinary skill in the art, is factually unsupported.  JA12707-JA12723.  To the contrary, despite nearly 40 years of testing citations, the prior art as a whole indicates a field that struggled with finding any empirically-supported use of

indirect relationships for search until after the Patent. *Id*. Accordingly, a skilled artisan would be skeptical of any method that used citation relationships and would demand strong empirical evidence supporting its utility for search—a feature lacking in the experimental results of the Fox method concerning *bc* and *cc*.

Dr. Jacobs sets forth a timeline of work done on citation relationships. JA12707-JA12723. The little work that had been done prior to the '352 Patent consisted of a few isolated experiments using small-scale, prepared data (such as the CACM collection). *Id*. This work is replete with negative or inconclusive experiments and explicit skepticism by the leading experts. The utility of citation relationships for search remained an open question studied by leading research experts for nearly 15 years after the work of Fox that the Petitioners allege rendered using indirect relationships obvious to persons of ordinary skill. *Id*.

Dr. Jacobs's timeline included experiments on citations from Salton, Fox's thesis advisor and creator of the vector space model used by Fox. JA12700-JA12708. Salton noted that the "initial reaction must clearly be one of <u>skepticism</u>" toward using bibliographic citation vectors and that "[b]ecause of these and other variations, citation and reference lists have not generally been used as an indication of document content." JA12708. On pages 445-46 of his paper, Salton lists many potential reasons why citations may be an unreliable indicator of document content

including self-selection, survey article problem, and availability of relevant works; thereby demonstrating that the outcome is not "predictable" or "obvious" to ordinary practitioners. *Id*. Salton ultimately concludes that his experiments fail to establish the utility of using citations for search:

> ***Clearly no proof*** has been presented in this study that citations do in fact play a significant role in automatic document retrieval systems.

JA12709. In 1986, after conducting additional experiments with citation relationships, Dr. Salton stated three years *after* the Fox thesis:

> Since no obvious way exists for distinguishing the positive from the negative effects, the citation methodology cannot be recommended for inclusion in practical retrieval environments.
> \*\*\*
> ***Overall, the procedure is not sufficiently reliable to warrant incorporation into operational automatic retrieval systems***.

JA12715-JA12717. Others in the field made similar comments about using bibliographic relations. JA12710 ("What they [Tapper's experimental results] do not, and cannot, demonstrate is… whether or not [his methodology] can be developed into a component part of an operational commercial system.").

In 1987, four years after the Fox experiments, Fox's graduate student Gary Nunn further analyzed the original 1983 Fox data. JA12703-JA12704. Nunn attempted to determine if Fox's method could be extended to other collections. Nunn described his results as "disappointing" because the results obtained on one

23

half of the CACM and ISI collections could not generalize to the other half of the same collection. These results demonstrated that the isolated cases where citation links showed improvement to search could <u>not</u> be replicated on other queries made on a different part of the <u>same</u> collection. JA12703. Ultimately, Nunn concludes that Fox's methods were not generalizable to other collections and suggests further research is needed to find coefficients that could work on other collections:

> The author of this study would like to suggest that further research might be pursued along two paths…. The purpose of this … [would be] to try to develop coefficients that *could be* generalized to other collections.

JA12703-JA12704; JA11230.

In 1992, the year before the '352 application was filed, Frei and Steiger continued to discourage using citation relationships for search: "Retrieval experiments in a collection of bibliographic references showed that following citations – a kind of referential links—***produces ambiguous results…. The hope is that our semantic links*** contain the information necessary…."

JA12720. That same year, Ledwith also expressed skepticism at the reliability of Fox's 1983 methods:

> [D]espite the significant efforts to explore and develop these models, ***there remain concerns about the models' utility for the searching of large scientific databases***. Using the p-norm retrieval experiment described in ***<u>Fox (1983)</u>*** as an example, I will present my three major concerns ***… the <u>reliability</u> of extrapolating the performance of research systems that use the collection to a system to search a file over 750 times larger than the collection is <u>highly questionable</u>***…

24

JA12720-JA12721.

The negative experimental results and skepticism by experts towards using citation relationships for years after Fox is objective evidence that the Fox Papers did not render obvious using indirect relationships for computerized search. To this day, no empirical test confirmed that using *bc* and *cc* alone (without other higher-order citation relationships like Egger's) improves search results in a reliable fashion. Defendants made no attempt in their papers to address these teachings, nor did the Board in its decision comment substantively on the unreliability evidence.

### 5. The Objective Evidence Confirms that the Fox Methods Concerning *bc* and *cc* did Not Render Searching with Indirect Relationships Obvious

In 1963, Dr. Salton first experimented with indirect citation relationships. JA12708. Fox's experiments occurred in 1983. JA12710. In the 35 years since these relationships were initially studied (and 15 years since the Fox experiments allegedly rendered obvious using indirect relationships), no non-research system used indirect relationships for search prior to 1998 (except the '352 patent invention). JA12718; JA12855. Indeed, since the SMART system was only used to analyze relationships in paper copies, no system at all was used to analyze indirect relationships of a computer databases as claimed prior to the '352 Patent. *Id*.

25

The absence of any use of the claimed method for 35 years from Salton (and 15 years from Fox) is compelling evidence that the Fox experiments did not render using indirect relationships obvious.  JA12707-JA12723.  This absence also strongly corroborates Dr. Jacobs's testimony that the skilled artisan would understand from Fox's results (and others) that indirect relationships such as *bc* and *cc* actually harm search results.  JA12707.  Neither the Petitioners in their papers nor the Board in its decision address this compelling fact or offer any reason to explain this absence.

Furthermore, the inference of nonobviousness from this absence of use is even stronger here, where the analysis of the claimed non-semantic computer database relationships was considered a major breakthrough 15 years after the Fox Papers allegedly rendered their use obvious.  JA12865-JA12866; JA12875-JA12884; JA12870-JA12871.  Licensed embodiments of the claimed invention using indirect relationships would later revolutionize the search industry.

In 1998, Google, a '352 Patent licensee, was the first commercial search system to analyze citation relationships in computer databases.  JA12846-JA12851.  Google and third-party writers considered the unexpected results obtained from analyzing link relationships in a computer database to be a "major innovation," revolutionary, and breakthrough technology that changed the way searches were conducted.  JA12865-JA12866; JA12875-JA12884; JA12870-JA12871.  Within a

few years, Google's use of indirect relationships for search enabled the company to dominate the search industry. JA12862-JA12866. In contrast to the 35 and 15 year absence of any actual use after the Salton and Fox papers, within just two years after Google actually demonstrated the utility of analyzing indirect relationships, every major search engine began analyzing citations in computer databases. JA12873-JA12874. Today, 99% of the search industry has licensed the '352 Patent for substantial royalties in the multiple tens of millions of dollars. JA12885.

Critically, the evidence concerning the unexpected results does not center on the PageRank algorithm specifics or even whether PageRank infringes the claims. Rather, third-party commentators and Google itself note that just the very idea of using non-semantic "links" of computer databases **at all** to improve search results was novel:

> Stephen Levy [longtime technology writer and critic] describes how at the time "***no one at the web search companies mentioned using links***. *The links were the reason that a research project running on a computer in a Stanford dorm room had become the top performer.*"

> Stanford computer science professor Rajeev Motwani describes the shift from content or text-only analysis to link analysis: "***Before this, people were only looking at the content. They were completely ignoring the fact that people were going to the effort of putting a link from one page to another and that there must be a meaning to that***."

JA12885-JA12886. In other words, the field leaders did not appreciate that the non-semantic relationships of a computer database had "meaning" that could be

27

used to enhance search.  JA12860-JA12861; JA12857; JA12851-JA12861.

Google's founder elaborates on the fact that the discovery that the links were

"meaningful" to search was by "accident" rather than a predictable outcome of

known research:

> We originally developed page rank[] kind of playing around with studying all the links on the web.  And that too was a pretty ***revolutionary idea*** though it seems very simple that you could even just collect [the links of the web and] ***do <u>anything</u> meaningful*** ….
> I really credit Larry pursuing ***that idea that it's even worth collecting the graph.*** And then that you could ***run <u>any</u> kind of processing*** on it.

JA11280; JA12722.

> And we decided that for queries that really return a lot of results that we could do something more reasonable. ***And we sort of <u>stumbled</u> upon a way to do that by studying links***… But what we found was we—kind of ***<u>by accident</u>*** almost-- we found that this processing of the link structure of the web, we could create a search that was better in important ways. ***In ways that these search engines had ignored.***

JA11280; JA11284; JA12723. *See* JA12851-JA12861 for discussion of the

unexpected results achieved by web citation analysis.

This evidence is very important to the obviousness query regardless of

whether PageRank bears a nexus with the patented claims or whether its success

could be attributed to the patented invention.  The lack of appreciation in 1998 that

citation links in computer databases could be used under "any" algorithm to

"meaningfully" improve search is independently relevant to the obviousness query.

JA12860-JA12861; JA12857; JA12851-JA12861.  This lack of appreciation is

fundamentally inconsistent with the idea that the widely published Fox Papers demonstrated that the claimed analysis of citations in a computer database was obvious. If it was a "revolutionary" idea to run "**any** kind of processing" on the citations of a computer database to enhance search in a "meaningful" way in 1998, it certainly was not an obvious idea in 1993. JA01351-JA01352. It is clear that in 1998 the field leaders did not appreciate the value of analyzing citation relationships of a computer database, despite the work of Fox. Consequently, the claimed method directed at the relationships of such databases is not obvious to those of ordinary skill. The comments cited above come from third-party industry leaders speaking outside the context of litigation and, as such, constitute compelling evidence of nonobviousness.

When the prior art as a whole is considered for what it fairly suggests, it demonstrates that the portions of Fox's method which relied upon the *bc* and *cc* citation relationships was not useful for search. Fox simply used the wrong kind of indirect relationships (*bc* and *cc,* without other higher-order relationships) in a manner that was ineffective at improving search results. JA12854-JA12855. Since his method with respect to just using *bc* and *cc* was ineffective for use in search, the skilled artisan would not be motivated to use his method concerning *bc* and *cc* for search on any type of collection, much less the claimed computer database. *Id*.

### 6.    *Bc* and *cc* Alone Without Higher-Order Relationships Have Never Been Proven Effective for Improving Search

29

Dr. Langville, award winning author on PageRank, testifies that using *bc* and *cc* alone without other higher order relationships would not ever have led to the discovery of the benefits of the claimed invention. JA12854-JA12855. Fox simply focused on the wrong types of relationships using the wrong method. *Bc* and *cc* are the shortest indirect relationships consisting of only two link lengths, and therefore only capture a small amount of information from the link structure of a database. Daniel Egger's second numerical representation embodies an analysis of up to 18 different patterns of relationships simultaneously, and its analysis includes link relationships up to four link lengths long. *Id.* Egger's "cluster link" generator and the licensed "PageRank" algorithm of Google analyzed multiple indirect relationships of any length "N." Thus, unlike Fox's method, the methods disclosed in the specification capture multiple types of empirically useful indirect relationships including higher-order relationships (*i.e.*, of longer link lengths) and therefore capture far more link structure of a database than just *bc* and *cc*. *Id.* To this day, no study of record has ever shown that use of *bc* and *cc* alone (without being used with other, longer citation relationships) is capable of enhancing search in a reliable way.

### 7.    The Fox Papers Fail to Disclose an Analysis of Relationships in a Computer Database

The '352 Patent discloses that the invention is directed to an analysis of direct and indirect relationships between objects in a computer database. For

30

example, claim 1 provides "creating a first numerical representation for each identified object in the database based upon <u>the object's direct relationship with other objects in the database</u>."  Since a direct relationship is "a relationship where one object cites to another object," as construed both by the Board and the District Court, a skilled artisan would understand this claim to require an object to actually refer (*i.e.*, cite) to another object **in a database.**  JA12738-12739.

The Board correctly found that the SMART system did not perform its steps on the claimed database relationships.  JA00021-JA00022.  The database used by SMART was a bibliometric database that only has fields containing information relating to an object but omitting the actual citations from the object.  Thus, none of the objects in the database actually referred to each other.  *Id.*  The analyzed bibliographic relationships were instead obtained by manually looking up the paper copies, which were never stored in any electronic database.  JA12658-JA12659.  Consequently, none of the analyzed relationships constitute database relationships referring to objects in a database, as claimed.

Indeed, the Board acknowledged that "[t]he Fox databases do not contain the full documents, meaning that the databases do not contain the portions of the documents that cite to other documents," and as such, "do not have direct relationships, because they do not contain cites to one another."  JA00021-

JA00022.  Since every step of claim 26 is directed to these database relationships,

none of the steps of claim 26 are actually performed by Fox's method.

## IV.    SUMMARY OF THE ARGUMENT

All claims require using indirect relationships to search for objects in a

database.  JA05042.  SRA provided compelling evidence that indirect relationships

harm search results.  Seven of nine tests performed by Fox himself demonstrated

that the *bc* and *cc* indirect relationships (the only ones relied upon by Petitioners)

harmed search results.  JA15044-JA15045; JA12758-JA12759.  No test

demonstrated an improvement that met Salton's 10% threshold for significant

improvement.  JA12762, *see supra* at 13.  No test showed any improvement by *bc*

and *cc* when used as arranged in the claimed method that first created a direct

relationship numerical representation.  *Supra* at 13-17.

The PTO dismissed this evidence because it believed it could find all the

elements of the claimed invention "without modification" in the Fox Papers (i.e., a

*prima facie* case).  This stated reason itself represents clear error because a *prima*

*facie* case of obviousness does not allow one to disregard evidence of teaching

away or objective indicia of nonobviousness.  *Infra* at 35-39;46-52.  Similarly, the

failure to provide any reasoned explanation as to why one would be motivated to

use indirect relationships in view of the negative empirical evidence and other

teachings in the art represents another clear legal error.  *Infra* at 35-46.  Finally, the

Board also failed to consider multiple objective indicia of nonobviousness. These legal errors regarding the required analysis for finding obviousness mandate that the Board's decision be set aside and given no deference. Had the Board properly conducted its analysis, it would have concluded that the claims are nonobvious.

## V.    ARGUMENT

### A.    Standard of Review

The Board's determination of obviousness is reviewed *de novo* and the factual findings for substantial evidence. *In re Gartside*, 203 F.3d 1305, 1315 (Fed. Cir. 2000). Substantial evidence is less than the weight of the evidence but more than a mere scintilla of evidence. *Id.* at 1312. A review for substantial evidence "involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *Id.* Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

Here the Board's failure to provide any analysis or explanation as to why a skilled artisan would be motivated to use indirect relationships for search when the empirical evidence and the art as a whole demonstrated such use would hurt search results represents clear legal error. As such, the Board's findings of obviousness are not entitled to deference. Indeed, the Board's stated reason for dismissing this

33

evidence in itself represents clear legal error. *Infra* at 35-39. Conclusory findings unsupported by analysis are not entitled to deference. *In re Klein*, 647 F.3d 1343, 1350-51 (Fed. Cir. 2011).

The broadest reasonable claim construction standard, normally used in IPR proceedings, does not apply here because the Patent is expired. In construing the expired patent, the Board must apply district court claim construction principles including adopting a reasonable construction supported by the record that upholds the validity of the patent if presented with one. *Ex parte Papst-Motoren*, 1 U.S.P.Q.2d 1655, 1656 (B.P.A.I. 1986); *Ex parte Katz*, 2010 WL 1003878, at *3 (P.T.A.B. 2010); *In re Rambus Inc.*, 694 F. 3d 42, 46 (Fed. Cir. 2012) (citing *Phillips v. AWH Corp.*, 415 F. 3d 1303, 1316 (Fed. Cir. 2005)). In *Papst-Motoren*, the Board held that in case of an expired patent "a policy of liberal construction…should be applied. Such a policy *favors a construction of a patent claim that will render it valid,* i.e., a narrow construction, over a broad construction that would render it invalid." 1 U.S.P.Q.D.2d at 1656. Here, the Board repeatedly ignored this axiom when construing the Patent.

### B. The Board Erred by Failing to Provide an "Explanation" as to Why One Skilled in the Art Would Use Indirect Relationships to Search in View of the Empirical Evidence and Explicit Teachings that Demonstrate Such Relationships Harm Search Results

All Reviewed Claims require using indirect relationships to search for objects. SRA presented compelling evidence that demonstrated that using *bc* and

*cc* indirect relationships in Fox's method (1) overwhelmingly harmed search

results and (2) was so unpredictable that it was not fit for its intended purpose.

*Supra* at 10-22. In rendering its decision, the Board did not address, provide

weighing analysis, or otherwise make findings on the merits of these two

arguments. For example, it did not identify any flaws in SRA's interpretation of

the data, nor did it identify any other evidence that contradicts SRA's claims.

JA00025. There is simply no analysis or other attempt to provide a reasoned

explanation with respect to the merits of this very important evidence.

Rather, the Board's opinion finds that because the Fox Papers "without

modification" teach the missing feature of an "electronic database that has

references to objects in the database," one does not have to consider the teachings

in Fox or anywhere else that indirect relationships degrade search results:

> Patent Owner also contends that the inclusion of indirect relationships
> into search "degrades results," and therefore provides a teaching away
> from the invention. As Patent Owner acknowledges, its evidence of
> degraded results does not teach away from the *combination* of the Fox
> Papers, but rather from the *modification* of the teachings of the Fox
> Papers to incorporate "an electronic database that has references to the
> objects in the database." We found above, however, that the Fox
> Papers teach this feature. In addition, to the extent modification of
> Fox Papers is necessary to meet claim 26, we have found that
> modification is expressly suggested by the Fox Papers themselves.
> The record is insufficient to establish a teaching away.

JA00025. The Board is arguing that since all the elements of the claimed invention

including the missing one can be found among the Fox papers (i.e., a *prima facie*

case), it does not matter that Fox experiments indicate that the claimed use of indirect relationships harms search performance using his method.  Consequently, the Board found it unnecessary to make findings or otherwise address the merits of these issues.

The Board's reasoning is clearly erroneous.  It is well established that the mere fact all the elements of the claimed invention can be found "without modification" among a group of references (i.e., that *prima facie* obviousness may be found), does not permit dismissal of other contrary teachings of the art or objective evidence of nonobviousness.  *In re Sullivan*, 498 F.3d 1345, 1351 (Fed. Cir. 2007) ("Evidence rebutting a prima face case of obviousness can include… '*evidence 'that the prior art* teaches *away from the claimed invention in any material respect,'*… and evidence of secondary considerations...'"); *Apple Inc. v. Int'l Trade Comm'n,* 725 F.3d 1356, 1365 (Fed. Cir. 2013) (it is axiomatic that "[t]he establishment of a *prima facie* case... is *not* a conclusion on the ultimate issue of obviousness.").

The obviousness question is not merely whether it is obvious to have an electronic database with objects that cite to each other.  Rather, the issue is whether it is obvious to have such a database and then perform the remaining steps of the claimed method using indirect relationships of such database.  Based on the evidence of unreliable and harmful results presented by SRA, it would not be.

36

Critically, "the question[for obviousness] is not simply whether the prior art 'teaches' the particular element of the invention, but whether it would 'suggest the *desirability*, and thus the obviousness, of making the combination.'" *Alco Standard Corp. v. Tenn. Valley Auth.*, 808 F.2d 1490, 1498 (Fed. Cir. 1986). There is no more important evidence to the question of the "desirability" of using indirect relationships for search than the actual empirical results of Fox's (and others') experiments using these relationships. Those results overwhelmingly demonstrate that using the *cc* and *bc* indirect relationships for search harms search results in the claimed arrangement. *Supra* at 13-17. Consequently, the Board was required to provide a reasoned explanation why a skilled artisan would incorporate using indirect relationships despite the empirical data demonstrating that such relationships are overwhelmingly likely to harm search results—particularly within the claimed arrangement. *Id.* The Board committed reversible error by failing to provide any "explanation" or other analysis explaining the motivation to perform the claimed invention in view of this evidence. *In re Kahn*, 441 F.3d 977, 986 (Fed. Cir. 2006) ("When the Board does not explain the motivation, or the suggestion or teaching, that would have led the skilled artisan at the time of the invention to the claimed combination as a whole, we infer that the Board used hindsight to conclude that the invention was obvious… By requiring the Board to explain the motivation, suggestion, or teaching as part of its *prima facie* case, the

law guards against hindsight….”); *In re Rouffet*, 149 F.3d 1350, 1357-59 (Fed. Cir. 1998) (“However, the Board reversibly erred… The Board provides no reasons that one of ordinary skill in this art, seeking to minimize handovers due to satellite motion, would combine Ruddy with Rosen and King in a manner that would render the claimed invention obvious…. In other words, the Board *must explain* the reasons one of ordinary skill in the art would have been motivated to select the references and to combine them to render the claimed invention obvious.”); *Apple,* 725 F.3d at 1365 (finding clear error when opinion fails to contain weighing analysis of important evidence, stating: “The ITC, however, never even mentioned, much less weighed as part of the obviousness analysis, the secondary consideration evidence Apple presented…. This is not adequate under our law.”); *Broadcom Corp. v. Emulex Corp.,* 732 F.3d 1325, 1335 (Fed. Cir. 2013) (“An invention is not obvious just ‘because all of the elements that comprise the invention were known in the prior art;’ rather, a finding of obviousness at the time of invention requires a ‘plausible rational [sic] as to why the prior art references would have worked together.’”).  Accordingly, the Board’s failure to provide such an explanation requires reversal of its decision.

### C.    The Board also Erred by Failing to Consider the Prior Art as a Whole and by Failing to Conduct a Weighing Analysis as to the Degree One Teaching May Discredit Another

It is also well established that one must consider what the prior art as a whole fairly suggests:

> *[T]he prior art as a whole must be considered*. The teachings are to be viewed as they would have been viewed by one of ordinary skill… '*It is impermissible* within the framework of section 103 *to pick and choose from any one reference* only so much of it as will support a given position, to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one of ordinary skill in the art.'

*In re Hedges*, 783 F.2d 1038, 1041 (Fed. Cir. 1986). Here, the Board improperly picks and chooses to rely upon Fox's teachings that some search systems support full text searching to conclude that it was obvious to apply Fox's methods to a computer database, but ignores the negative results of Fox experiments and others that demonstrate that Fox's methods concerning indirect relationships should not be used to search any collection at all, much less the claimed computer database. *Supra* at 13-17. Critically relevant to the proper inquiry is whether either the (1) Fox experiments or (2) the prior art as a whole including subsequent experimentation demonstrate that the claimed use of indirect relationships harms search results or is so unreliable that it is not useful for its intended purpose. If either of these propositions are true, then one skilled in the art would not be motivated to use the parts of the Fox combination pertaining to tests using indirect relationships, regardless if one needs to modify Fox's method or not.

Furthermore, the duty to consider the art as a whole is not confined to the

teachings within one reference; rather, the duty applies across all the relevant

references in the art.  Indeed, the Board has a duty to weigh each reference for its

suggestive power to resolve conflicts in the teaching of different art:

> When prior art contains apparently conflicting references, the Board
> ___must___ ___weigh each reference for its power to suggest solutions to an___
> ___artisan of ordinary skill___. The Board must consider all disclosures of
> the prior art… to the extent that the references are, as here, in
> analogous fields of endeavor and thus would have been considered by
> a person of ordinary skill in the field of the invention.  The Board, in
> weighing the suggestive power of each reference, ___must___ ___consider the___
> ___degree to which one reference might accurately discredit another___.

*In re Young*, 927 F.2d 588, 591 (Fed. Cir. 1991).  Despite the fact that the Jacobs

timeline (JA12707-JA12730) puts forth substantial evidence that Fox's

experimentation (as well as *experimentation by other leaders in the field*)

___demonstrated___ that indirect relationships harm search results, the Board's decision

is completely devoid of the required analysis weighing the references for their

suggestive power or otherwise determining the degree that one reference may

discredit another, as required by the Federal Circuit.  This error is particularly

egregious considering the fact that among the evidence presented was that Salton,

Fox's thesis advisor, concluded: "the citation methodology cannot be

recommended for inclusion in practical retrieval environments."  JA12702.  The

Board provides no weighing analysis as to why a skilled artisan would choose to

use follow the alleged teaching of a graduate thesis with negative experimental

results rather than the published academic papers of the leaders of the IR field that explicitly and empirically taught that using citation relationships harm search results. JA00025.  Accordingly, the Board engaged in clear legal error by selectively relying upon one teaching of the art without properly analyzing what the art as a whole fairly suggests.

### D.    Had the Board Complied with its Duty to consider the Prior Art as a Whole It Would Have Found All Claims Nonobvious

Had the Board properly considered the prior art as a whole, it would have been compelled to find nonobviousness.  The mere fact that elements are capable of being combined is not enough to establish obviousness:

> Although predictability is a touchstone of obviousness, the "predictable result" discussed in KSR refers not only to the expectation that prior art *elements are capable of being physically combined*, but also that the ***combination would have worked for its intended purpose***…. ***The opposite conclusion would follow, however, if the prior art indicated that the invention would not have worked for its intended purpose or otherwise taught away from the invention.***

*DePuy Spine, Inc. v. Medtronic SofamorDanek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009); *see also Eurand, Inc. v. Mylan Pharms., Inc.,* 676 F.3d 1063, 1068-69 (Fed. Cir. 2012).  Thus, Petitioners had the burden to prove that searching using the indirect relationships of *bc* and *cc* is fit for its intended purpose of computerized search.  The "opposite conclusion" – nonobviousness – is *compelled*

41

if the art indicates that the combination "would not have worked for its intended purpose." *DePuy*, 567 F.3d at 1326.

Here, the Board relies upon certain statements in Fox Smart that discuss the general capability of that system to run search experiments using *bc* and *cc*. JA01017-JA01018. These teachings merely represent the capability to physically combine certain elements of the invention by the SMART research system—which under *DePuy* is not enough to establish obviousness. Rather, one skilled in the art would ultimately be informed on the fitness of using the *bc* and *cc* subvectors for the intended purpose of computerized search by the actual experimental results of the *bc* and *cc* subvectors reported in the performance tests of the Fox Thesis. *Supra* at 10-18. Dr. Jacobs' analysis of the test results establishes that those tests indicated that using *bc* and *cc* would overwhelmingly harm search results, and, therefore, Fox's method as to the specific data types related to indirect relationships were not fit for the intended purpose of computerized search. *Id*. Neither Petitioners nor the Board challenged the accuracy of this testimony. Jacobs further showed that no test supported using indirect relationships in the arrangement claimed (*i.e.*, when direct relationships representations available for use in searching). *Supra* at 13-17. In all cases, using *bc* and *cc* under this claimed arrangement harmed search performance. **Not one test result showed an improvement over using direct links alone.** *Id*.

42

SRA put on direct evidence of how one skilled in the art would react to the potential deterioration of search results present in the Fox experimental results. *Supra* at 18-22.  It demonstrated that when Dr. Salton was confronted with results in his experiments that contained much less degradation and far greater improvement, he still concluded that the methodology was unfit for its intended purpose: "*Overall, the procedure is not sufficiently reliable to warrant incorporation into operational automatic retrieval systems*."  JA12702.  SRA further showed that no person ever used indirect relationships to analyze the claimed computer databases in a non-experimental system until 15 years after the Fox papers—thereby further corroborating Salton's interpretation of the evidence. *Supra* at 18-22, 26-27.

Petitioners have put forward no plausible explanation that demonstrates that using indirect relationships would be "desirable" in view of Fox's actual test results.  *Alco*, 808 F.2d at 1498 ("the question [for obviousness] is not simply whether the prior art 'teaches' the particular element of the invention, but whether it would 'suggest the *desirability*…'").  Petitioners have failed to identify any test results that support using indirect relationships in a reliable fashion in the manner claimed, nor have they identified any errors in Dr. Jacobs' analysis.  They have made no attempt to explain why there is a multi-decade absence of any use of *bc* and *cc* if it was obvious to use it, nor do they attempt to explain why it was

43

considered a major discovery to analyze links in computer databases to improve search more than 15 years after the Fox Papers allegedly rendered this obvious to the skilled artisan.  JA12718; JA12855.

In *Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 619 F.3d 1329, 1332 (Fed. Cir. 2010), the patent claimed using "raloxifene" to treat "postmenopausal osteoporosis."  The defendant relied upon a reference that noted that its use suffered from "bioavailability concerns" that suggested that it would not ultimately be efficacious in humans.  *Id.* at 1338-39.  Despite the fact that the references explicitly tested raloxifene for treatment of bone loss (*i.e.*, the ***claimed feature***), the Federal Circuit found nonobviousness, stating: "*[the Defendant] points to no evidence from before the time of invention that would teach, suggest, or motivate or **supply any common sense reason** for a person of ordinary skill in the art to **reject the bioavailability concerns** and routinely, simply, or easily arrive at the inventive result*."  *Id.* at 1336-37.  Just like in *Teva*, Petitioners here failed to identify any plausible explanation that would cause a person to reject the reliability concerns identified by Fox and Salton's experimental results and motivate to one routinely, simply, or easily arrive at the inventive result.

Similarly, in *Eli Lilly & Co. v. Actavis Elizabeth LLC*, the patent claimed using "atomoxetine" to treat ADHD. 435 F. App'x 917, 919 (Fed. Cir. 2011).  The patent owner put forward evidence of "negative reports" of potential death from

using atomoxetine; this Court held that because there was "no evidence that the advantageous and effective properties of atomoxetine to treat ADHD, *devoid of the negative effects* of known and similar products," it was impermissible to "pick and choose from any one reference" so the claims were nonobvious. *Id*. at 921. Here, like in *Actavis*, there is no evidence or explanation of a way to take advantage of the benefits of the claimed invention without the "negative effects" of potential search degradation. Indeed, Salton explicitly states:

> Since ***no obvious way exists*** for distinguishing the positive from the ***negative effects***, the citation methodology cannot be recommended for inclusion in practical retrieval environments.

JA12702. Consequently, a finding of nonobviousness is similarly compelled.

Accordingly, when all the teachings of the prior art are considered, Petitioners failed to meet their burden to demonstrate that a skilled artisan would be motivated to use Fox's methods as they may pertain to indirect relationships. Nor have they demonstrated that using *bc* and *cc* is fit for the intended purpose of computerized search. As such, the "opposite conclusion" of nonobviousness is "compelled" under *DePuy*, 567 F.3d at 1326.

### E.    The Board Erred by Failing to Analyze Important Objective Evidence of Nonobviousness

The Federal Circuit mandates "that all evidence pertaining to the objective indicia of nonobviousness must be considered before reaching an obviousness conclusion," and that "[t]he significance of this fourth *Graham*

45

factor cannot be overlooked or be relegated to 'secondary status.'" *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1355 (Fed. Cir. 2013). Indeed, "[o]bjective indicia 'can be the most probative evidence of nonobviousness in the record, and enables the court to avert the trap of hindsight.'" *Leo Pharm. Prodr., Ltd. v. Rea*, 726 F.3d 1346, 1358 (Fed. Cir. 2013).

With the exception of commercial success and licensing, the Board's decision and the Petitioners' papers are devoid of any analysis of SRA's objective evidence of nonobviousness. The Board ignored the following indicators presented by SRA: lack of actual use, unexpected results (of link analysis), skepticism, failure of others, long-felt need, and praise of the industry. Under this Court's jurisprudence, all objective evidence of nonobviousness must be considered before it is legally permissible to conclude that a claim is obvious. *Ashland Oil, Inc. v. Delta Resins & Refractories*, 776 F.2d 281, 307 (Fed. Cir. 1985) (failing to consider nonobviousness evidence constitutes an "error as a matter of law."). The failure to address this evidence alone constitutes reversible error. *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 617 F.3d 1296, 1305 (Fed. Cir. 2010) (reversing the district court stating "[t]o be clear, a district court must always consider any objective evidence of nonobviousness presented in a case"). The Board's conclusion of obviousness is strongly contradicted by nearly every category of objective evidence:

**Lack of Actual Use:** SRA showed an absence of any use of any indirect relationship in a non-experimental system for 15 years after the Fox Papers and 35 years after testing on citation relationships began. *Supra* at 22-26. This 15/35 year long absence of use is strong evidence of nonobviousness. *Leo Pharm.*, 726 F.3d at 1356-59 (reversing where there was a delay of 14 and 22 years between the prior art's teachings and actual use of the claimed method—stating that the intervening time "speaks volumes to the nonobviousness of the ... patent.").

**Unexpected Results (of link analysis)**: SRA provided evidence that showed that the very idea of analyzing citation relationships in a computer database to improve search was not appreciated until 15 years after the Fox Papers. Leaders of the field expressed surprise in 1998 that the hyperlink citation links in web documents could be used in "any meaningful" way. JA12860-JA12861; JA12857; JA12851-JA12861. If the appreciation of analyzing these computer database relationships, such as hyperlink citations, to improve search was "revolutionary" in 1998 to the leaders of the industry, it could not have been rendered obvious to those of ordinary skill by Fox in 1983.

**Skepticism by Experts:** Jacobs's testimony showed that the prior art as a whole overwhelmingly discouraged using indirect relationships. *Supra* at 22-26. Dr. Salton explicitly noted that the "**initial reaction must clearly be one of skepticism**" toward using bibliographic citation vectors. JA12708. Experts as late

47

as 1992 (the year before the filing of patents) were criticizing the Fox methodology as being unreliable, as well as noting that analysis of citation produces "ambiguous results." JA12720-JA12721. No less than four empirical studies (Salton '63, Fox '83, Salton '86 and Nunn '87) largely demonstrated that indirect relationships harm search results and failed to prove that citations can be used in a reliable way. JA15074. No study of record empirically demonstrates that *bc* and *cc* alone can be used to improve search in a reliable way. *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.,* 688 F.3d 1342, 1367 (Fed. Cir. 2012) (invention properly found nonobvious where "leading experts in the field were skeptical that [it] could work"); *In re Dow Chem. Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988) (reversing PTO finding of obviousness where experts were skeptical despite five to six years of research).

**Failure of Others/Long-Felt Need:** Jacobs's timeline establishes a 35-year period beginning with Salton '63 where the art of record discusses the need for improvement of search results and began testing potential solutions to the problem. JA12707-JA12730. Despite nearly 35 years since testing began, the prior art as a whole indicates a field that struggled with finding any empirically supported use of indirect relationships that could be fashioned into a successful search method until well after the '352 Patent's filing. SRA provided a solution to this long-felt problem by analyzing multiple types of indirect relationships (18 different patterns

48

and higher order relationships of length "N") that capture more of the link structure than the tested patterns of *bc* and *cc* (focused on by the prior art) and therefore reliably improved search.  JA12854-JA12855.  This testimony was unrebutted. Such unrebutted testimony shows that the invention was a nonobvious solution. *Alco*, 808 F.2d at 1500-01 (finding "strong secondary considerations indicating nonobviousness" where the evidence showed that "'for well over a decade the industry had searched for a reliable method of detecting discontinuities in rotor forgings,' [and] (b) that 'major turbine manufacturers had tried and failed to develop a reliable method'"); *Eurand*, 676 F.3d at 1081 ("'[T]here can be little better evidence negating an expectation of success than actual reports of failure….' In such circumstances, 'evidence of failed attempts by others could be *determinative* on the issue of obviousness.'").  The repeated failures of Fox, Salton, and others in the art to develop an empirically effective search method using indirect relationships is compelling evidence of nonobviousness.

Similarly, the analysis of citation relationships of a computer database to enhance search was another solution to the long felt need to improve search ranking.  JA12886-JA12888.  This solution was ignored until SRA's licensees demonstrated its utility in 1998 and revolutionized the search industry. All major search engines now license and use Egger's solution.  *Supra* at 27-28.

**Industry Acquiescence:** SRA showed industry acquiesce to the validity of the patents based upon pervasive licensing of the patents.  99% of the search industry have taken licenses under the Patent for over $30 million, with at least half of that amount being paid by Google.  JA12885.  This widespread licensing for millions of dollars supports the nonobviousness of the claimed invention. *See, e.g., Institut Pasteur & Universite Pierre et Marie Curie v. Focarino,* 738 F.3d 1337, 1347 (Fed. Cir. 2013) (licensing of the patent is "probative and cogent evidence" of nonobviousness).  Despite the large sums of money being paid, which indicate merit of the claims, the Board erroneously dismissed this evidence because the licenses were done in the context of litigation.  *Rambus Inc. v. Rea*, 731 F.3d 1248, 1254-55, 1257 (Fed. Cir. 2013) (reversing the Board's finding that Rambus's licensing evidence lacked a nexus because competitors may take licenses for reasons including litigation).

**Unexpected Results, Praise and Commercial Success of PageRank:** SRA put on substantial evidence that PageRank, a licensed embodiment, produced unexpected results that "revolutionized" the search industry.  JA12851-JA12861.  Further, Google's dramatic takeover of the search industry using the licensed PageRank points to the nonobviousness of the claimed invention.  JA12862-JA12865.  Although the PTO did not find commercial success, it made a number of errors that caused it to reach the wrong conclusion.  *Infra* at 60-65.

Each of the above objective indicators is irreconcilable with the Petitioners' position that the Fox experiments rendered using indirect relationships for search obvious. Each of these indicators confirm and corroborate Dr. Jacobs' testimony that the Fox methods regarding *bc* and *cc* harmed search results and were considered too unreliable for use in computerized search. *Supra* at 10-22. When the experimental results of Fox are considered in the context of the prior art as a whole and the objective evidence of nonobviousness, it is clear that the Board erred in its ultimate legal conclusion of obviousness.

### F.   The Board Erred by Finding that All the Elements of Claim 26 Are Suggested

The Board's decision appears to rest on the notion that the three Fox papers taken as a whole expressly disclose the claimed inventions without any "modification" so that one does not need to consider evidence of degradation of the search results. JA00025. The Board also erred in finding the steps of the claims are expressly disclosed in the three papers taken together.

The Board explicitly found that the SMART system, which is the subject of the Fox Papers, did not analyze relationships of databases and that the databases it did use did not contain citations to other objects in a database, as claimed. JA00021-JA00022. Nevertheless, the Board ruled that the following sentence in the introduction of the Fox Thesis discloses an analysis of relationships in electronic databases:

51

> Some [Information Retrieval] systems store the full text of the
> various documents or other items being manipulated. In
> addition to being able to locate documents of interest, the user
> may be able to retrieve and/or examine paragraphs, passages,
> sentences, or single word occurrences (in context).

JA00022; JA05352. The above statement is found in a general background section that summarizes the history and work of others in the field. To find obviousness, the Fox Papers not only have to disclose all the elements of the claim, but they must also teach or suggest these elements as arranged in the claim. It is not enough to note that full textual databases exist that may or may not contain citations to other objects in the work of others. One must show that the combination suggested that one should perform the steps of the claim with respect to $bc$ and $cc$ on the citation relationships of that database to create the claimed numerical representations used for searching. Merely noting that full text databases exist and then constructing a database that lacks the claimed citation relationships is not an express teaching to perform the steps of the claim on such a database. Indeed, Fox's deliberate choice to construct a database of objects excluding the claimed relationships is, if anything, an affirmative teaching to use his method in a manner that does not practice the claimed invention.

The Board alternatively stated that the Fox Papers suggest the modification necessary to disclose the claims:

> The Fox Papers suggest inclusion of full text documents in the
> databases. With such a modification, the databases would have –even

52

> prior to creation of Raw_data–objects with direct relationships.  The ***subsequently-created*** Raw_data relation would be based on those objects, thus satisfying the first numerical representation element of claim 26.

JA00023.  However, nowhere in the Fox Papers does it actually teach placing the objects in a full text database and then "subsequently" performing the steps of his method to those database relationships for searching.  This teaching is completely absent and given that the SMART system does not require such a database to perform Fox's method, nor does it have display features that support such a modification, such a step would be superfluous to the method actually disclosed.  Fox never attempted to apply his method to the claimed databases, nor did anyone else.  JA12653-JA12659.

### G.    The Board Erred by Finding Claim 32 Obvious

The Board erred in finding that the Fox thesis disclosed the elements of claim 32.  JA00028.  Claim 32 depends from claim 26 and further requires "the step of analyzing further comprises the step of weighing, wherein some indirect relationships are weighed more heavily than other indirect relationships."  JA05042(36:46-49).  This claim is directed to the patterner disclosure that weighs different types of indirect relationships differently.  JA05031(13:34-51); JA05032(15:19-16:6).

The "step of analyzing" of independent claim 26 is used to generate the second numerical representation:

> analyzing the first numerical representations for indirect relationships existing between or among objects in the database;
>
> generating a second numerical representation of each object <u>based on the analysis</u> of the first numerical representation;

JA05042(35:42-47). Thus, the explicit language of the claim requires that the "step of weighing" be part of the "step of analyzing" which is then used to generate the second numerical representation—thus, the step of weighing <u>must</u> occur before and be used to generate the second numerical representation. JA12614. The Board concluded that the Fox Thesis's disclosure of "assigning weights to subvectors such as "*bc*" and "*cc*" during linear regression data analysis of already conducted search results, correspond" to this claim element:

> Fox Thesis at 257 (Table 8.13) ("bibliographic coupling indirect relationships (*bc*) are weighted at .009, more heavily than co-citation indirect relationships (*cc*), weighted at 0.").

JA00028. The sole second numerical representation, however, relied upon by Petitioners in their papers are the *bc* and *cc* subvectors themselves. JA01016-JA01017. **There is no disclosure that these weights are used to generate the *bc* and *cc* subvectors**. This weighting occurs during the linear regression data analysis of *search results that have already been conducted* using *bc* and *cc* as shown by the "R" designation in Table 8.13. JA05603; JA05590. The weights are applied <u>to</u> the *bc* and *cc* relationships found in the *bc* and *cc* subvectors (the second numerical representation) after they have already been generated and, therefore,

cannot meet the explicit language of the claim which requires the step of weighing be performed (1) prior to the generation of the second numerical representation and (2) be used to generate the second numerical representation.  Inspection of the raw data of the subvectors themselves further show that they are unweighted:



JA13109.  Thus, the relied upon combination does not disclose the explicit elements of claim 32 and cannot invalidate the claim.

Still further, the fact that *cc* is ultimately weighted "0" in the relied upon combination of Table 8.13 is a teaching that one should not use *cc* at all.  Why

would a person then be motivated from these teachings to spend an extensive amount of human effort generating the *cc* subvector using the Fox method only to weight it at "0" so that it is not used and has no influence on search results? JA12758.  Indeed, Fox explicitly states this conclusion in regard to this very experiment in Table 8.13: "[I]t can be inferred, however, that with the other subvectors present ***cc is not really needed*** and *bc* is probably not either." JA12696.  Without using *cc*, the Fox method in 8.13 does not suggest searching using multiple types of indirect relationships with different weights, as claimed.

### H.    The Board Erred by Finding Claim 34 Obvious

Claim 34 is directed to the novel paragraph patterner found at col. 16:43.  A subset is a textual object that's also a portion of another textual object and paragraphs are identified as an example.  JA05030(12:1-6;19-22).  The paragraph patterner marks subsets with IDs so that a particular paragraph can be displayed as an individual search result, rather than the document as a whole.  JA05030(12:7-30); JA05031-JA05032(14:51-52); JA05037(25:6-24,26:18-37).  The paragraph patterner then creates numerical representations based upon citation relationships of the individual paragraph subset.  JA05031(14:65-67).  The system then searches paragraph objects using the numerical representations of that particular paragraph object and displays individual paragraphs as search results.  JA05037(25:6-24,26:18-37).

Claim 34 depends from claim 26 and further requires "objects in the database [] be divided into subsets and wherein ***the marking step [of claim 26] includes the step of marking subsets of objects*** in the database and wherein relationships exist between or among subsets of objects in the database." JA05042-JA05043(36:45-37:2).

The referenced "marking step" of claim 26 requires: "marking objects in the database ***so that each marked object may be <u>individually identified</u> by a computerized search*.**" JA05042(35:33-35). Together, these claim elements require a marking that allows the subset object to be "individually identified" as a search result. JA12773-JA12775.

SRA explained to the Board that "the Fox Papers do not teach or suggest marking subsets of objects in the database" because the markings disclosed by the Fox Papers are not "usable by a computerized search to individually identify a specific subset of an object in a computer database as a search result." JA12775. In dismissing appellant's argument, the Board stated:

> Claim 26, however, only requires that the "marked object . . . be individually identified by a computerized search." The subsets of claim 34 are marked, ***but this marking does not transform the subsets into objects as recited in claim*** 26.

JA00030-JA00031.

Claim 34, however, does not just state that subsets must be marked, but rather explicitly states the marking step of claim 26 must mark subsets. Claim

57

26's marking step requires a marking that allows the marked object to "be individually identified by a computerized search." Since the marking of subsets, which are objects, is part of the step of marking of claim 26, the subset object too must be marked so that it may be individually identifiable by a search. The Board's conclusion that subsets are not "objects" is directly contradicted by the specification which explicitly states that the subsets of claim 34 are themselves objects:

> Cases are full textual objects that are not subsets of other textual objects.[] ***Textual objects*** other than full textual objects ***may be subsets of full textual objects*** and of each other. For example, a section, page, or paragraph of text taken from a longer text may be ***<u>treated as a textual object</u>***. Phrases and words are treated as a special kind of textual object… Any two textual objects may be related to each other through a myriad of "patterns."

JA05030(12:1-33). Therefore, the marked subsets constitute marked objects that must be individually identifiable by a search. JA12775. This interpretation is in accord with the preferred embodiment which analyzes the link relationships of individual paragraphs so that the marked paragraphs can be individually identified and returned as a search results. *Id.*

Since this is an expired patent, the broadest reasonable construction standard does not apply, and a reasonable construction supported by the specification must be adopted if it supports validity. *Supra* at 35. SRA's interpretation of the claim in view of the specification disclosure with respect to

58

the paragraph patterner meets this requirement and as such must be adopted.

Fox admitted in testimony that the Fox Papers do not teach marking subsets

to be individually identifiable by a search:

> Q:    Did you create IDs for portions of a document so that a
> specific portion could be provided as an individual search result?
> A.     In one publication I did that, yes.
> Q.    Which publication was that?
> A:    *It's not one in the record.*
> Q:    Okay.
> A:    It's in my CV, but *it's not something we have been
> discussing.*

JA12775.  This alone renders the claim nonobvious.

In addition, the putative marked subset must have direct and indirect

relationships to other objects in the database.  The ISI and CACM collections

exclude citations from their electronic databases and the objects do not cite to other

objects in the database.  JA00021-JA00022.  Even if one placed the articles of the

CACM collection into a full text database, the Fox papers still lack any teaching to

further divide the electronic files into marked subsets that contain the citations.

JA12775.  The subsets would likely be content paragraphs in the body of the article

outside the bibliography and have no citations.  Thus, there is no teaching of a

marked subset that has relationships with other objects in the database.

## I.    The Board Erred by Concluding that SRA Failed to Provide a Nexus

The Board erred in concluding that SRA failed to provide evidence of a nexus between the claims and Google's success. "Once the patentee demonstrates a *prima facie* nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger." *Crocs, Inc. v. ITC,* 598 F.3d 1294, 1311 (Fed. Cir. 2010). If the defendants assert that market forces unrelated to the patent may influence commercial success, the defendants "must make a convincing case that those market forces indeed were the likely cause of the success." *Id*. The petitioners failed to do so.

The Board contends that Appellant did not show commercial success because "we could not determine whether the alleged success of PageRank is due to its non-semantical aspects, its semantical aspects, or some combination of both." JA00027.

First, the Board misunderstands PageRank as containing a semantical analysis. As shown by its disclosed algorithm, PageRank analyzes hyperlink citation relationships, rather than words, and, consequently, is a purely non-semantical analysis. JA11577; JA12238; JA12847-JA12848. Although PageRank itself does not contain any semantical analysis, it is used in conjunction with other semantical factors of the Google search engine. JA12229 ("each page[] has a popularity score [PageRank], which is computed *solely* from the structure index….

This popularity score is then combined with the content score [semantic factors]…

to create an overall score for each relevant page.").

Second, the Board does not address SRA's unrebutted evidence that

establishes that non-semantical PageRank ***instead of semantical analysis*** of the

search engine was the reason for Google's success.  Both Google and third party

observers have publicly called PageRank *the* reason for Google's success:

> ***"The reason** why my system works so well* is that it decides which
> documents to return, and in what order, by using an approximation to
> how well cited or 'important' the matching documents are.  I will call
> this approximation to importance ***PageRank*** from now on."
> (Lawrence Page, CEO Google).

> "The approach used by the search engines in 1996 [i.e., semantical
> search] would not have gotten us to today.  They would not have
> gotten us here.  ***What got us here was an insight that Larry, mostly
> Larry, but Larry and Sergey had together called PageRank."***
> (Douglas Merril, Google VP of Engineering).

> "PageRank was the <u>backbone</u> of the Google success."

> "Google's breakthrough in search, which quickly made it the
> undisputed search market leader, was PageRank."

> "Google [is] built around Page and Brin's breakthrough PageRank
> algorithm.  Even more telling, an estimated 99% of its profit [is] too."

JA12875-JA12885.  This was unrebutted by Petitioners.

Third, in 1998, all search engines used semantical factors for search.  The

Board does not identify any semantical technology of Google that its competitors

did not also have.  The one technology that the other search engines did not have

was the non-semantical analysis of PageRank. JA12851; JA12875. As repeatedly stated by Google and others, this technology provided a competitive advantage to Google that allowed it to significantly outperform the purely semantical search engines of 1998. JA12875-JA12885. Indeed, in the test described at para. 55 of the Langville declaration showed that the skeletal test system of Google called BackRub, which used PageRank and just the terms in the title of the documents, significantly outperformed the top established search engines of AltaVista, Yahoo! and Excite.com, which then had the most advanced semantical technology in the world. The Petitioners failed to identify any specific semantical factor not used by the other search engines that could have given Google an advantage. The clear difference between Google and the other search engines was the link analysis performed by PageRank. JA12856-JA12857. This evidence was unrebutted by Petitioners, and entirely ignored by the Board.

Moreover, the Board ignored evidence provided by the award-winning author on PageRank, Langville, who provided detailed claim charts showing infringement of the '352 Patent by Google's use of PageRank. She testified that the algorithm disclosed in Google's publications, patents and source code set forth in the claim charts is a recursive analysis of indirect relationships:

$$PR(A) = (1-d) + d (PR(T1)/C(T1) + ... + PR(Tn)/C(Tn))$$



**Indirect Relationship**

$$r(A) = \frac{\alpha}{N} + (1 - \alpha)\left(\frac{r(B_1)}{|B_1|} + \cdots + \frac{r(B_n)}{|B_n|}\right),$$



Figure 3: Simplified PageRank Calculation

JA11414; JA11410; JA11418. Contrary to the Board's opinion, these charts are not based on vague evidence, but instead, rely on publications by Google's founders disclosing Google's PageRank algorithm. *Id*.

Finally, Langville testified that Google and every other search engine using

PageRank obtained a license to the '352 Patent for its use.  Google paid an eight-digit settlement which is far above nuisance value. JA12885-JA12886. This further corroborates Langville's assertion that using PageRank infringes the '352 Patent. *Transocean*, 617 F.3d at 1353 (holding that, "from [evidence] regarding the value of the licenses relative to litigation costs . . . a reasonable jury could [find] that licenses reflect the value of the claimed invention and are not solely attributable to litigation").

Accordingly, SRA met its burden of establishing a *prima facie* case by showing that PageRank was the reason for Google's success and that its use falls within the ambit of the claims.  *See Crocs,* 598 F.3d at 1311.  In contrast, Petitioners provided no rebuttal evidence.  Instead, Petitioners generally assert, ***without any supporting evidence***, that Langville failed to consider other factors that *may* have caused the success of Google. JA01424.  These unsupported arguments speculating that factors other than link analysis may have contributed to Google's success are simply insufficient in view of SRA's *prima facie* nexus. Petitioners failed to provide the requisite evidence to establish a "***convincing case***" that these factors were in fact the likely cause of Google's success.  *Crocs,* 598 F.3d at 1311 (the defendants "must make a convincing case that those market forces indeed were the likely cause of the success.").

64

## **CONCLUSION**

For these reasons, the Court should reverse the Board's decision cancelling

claims 26, 28-30, 32, 34, and 39 of the '352 Patent.

Dated:  July 27, 2015                    Respectfully submitted,

*/s/Minghui Yang*
Martin M. Zoltick
Rothwell, Figg, Ernst & Manbeck, P.C.
607 14th Street, N.W., Suite 800
Washington, DC 20005

Victor Hardy
Minghui Yang
DiNovo Price Ellwanger & Hardy LLP
7000 North MoPac Expy, Suite 350
Austin, TX 78731

*Attorneys for Appellants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of July, 2015, the foregoing BRIEF OF APPELLANT was filed electronically with the U.S. Court of Appeals for the Federal Circuit by means of the Court's CM/ECF system. I further certify that the foregoing was served by means of electronic mail as well as by the Court's CM/ECF system, which should have sent a Notice of Docket Activity, upon the following counsel of record for Cross-Appellants:

Heidi L. Keefe, Esq.
Mark R. Weinstein, Esq.
Cooley LLP
1299 Pennsylvania Ave., N.W., Suite 700
Washington, DC 20004
Ph: 650-843-5001
Fx: 650-849-7400
E-mail: hkeefe@cooley.com
mweinstein@cooley.com

*Counsel for Appellee Facebook, Inc.*

David Silbert, Esq.
Asim M. Bhansali, Esq.
Sharif E. Jacobs, Esq.
Keker & Van Nest LLP
633 Battery Street
San Francisco, CA 94111
Ph: 415-391-5400
Fx: 415-397-7188
E-mails: djs@kvn.com
abhansali@kvn.com
sjacob@kvn.com

*Counsel for Appellees LinkedIn Corp. and Twitter, Inc.*

66

*/s/Minghui Yang*

Minghui Yang

DiNovo Price Ellwanger & Hardy LLP

7000 North MoPac Expressway

Suite 350

Austin, Texas 78731

Telephone:  512-539-2626

Facsimile:  512-539-2627

E-mail:  myang@dpelaw.com

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Federal Rule of

Appellate Procedure 32(a)(7)(B) because this brief contains 13,994 words,

excluding the parts of the brief exempted by Federal Rule of Appellate Procedure

32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of

Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of

Appellate Procedure 32(a)(6) because this brief has been prepared in

proportionally spaced typeface using Microsoft Word in 14-point Times New

Roman font.

Date:  July 27, 2015                    Respectfully submitted,

                                        */s/Minghui Yang*
                                        Minghui Yang
                                        DiNovo Price Ellwanger & Hardy LLP
                                        7000 North MoPac Expressway
                                        Suite 350
                                        Austin, Texas 78731
                                        Telephone:  512-539-2626
                                        Facsimile:  512-539-2627
                                        E-mail:  myang@dpelaw.com

**ADDENDUM 1**

Final Written Decision – 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73,
*Facebook, Inc. et al. v. Software Rights Archive, LLC*, Case IPR2013-00478
(P.T.A.B. February 2, 2015) (Paper 58)

JA00001 – JA00042

2015-1648

SOFTWARE RIGHTS ARCHIVE, LLC
v.
FACEBOOK, INC., LINKEDIN CORPORATION, TWITTER, INC.

Trials@uspto.gov                                          Paper 58
352.272.7822                                  Entered: February 2, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

FACEBOOK, INC., LINKEDIN CORP., and TWITTER, INC.,
Petitioner,

v.

SOFTWARE RIGHTS ARCHIVE, LLC,
Patent Owner.

_____

Case IPR2013-00478
Patent 5,544,352

_____

Before SALLY C. MEDLEY, CHRISTOPHER L. CRUMBLEY, and
BARBARA A. PARVIS, *Administrative Patent Judges.*

CRUMBLEY, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

## I.    BACKGROUND

*A. Introduction*

On July 30, 2013, Facebook, Inc., LinkedIn Corp., and Twitter, Inc.
(collectively "Petitioner") filed a Petition requesting an *inter partes* review
of claims 26, 28–30, 32, 34, and 39 of U.S. Patent No. 5,544,352 (Ex. 1001,
"the '352 patent").  Paper 1 ("Pet.").  On February 3, 2014, we instituted

IPR2013-00478
Patent 5,544,352

trial on all challenged claims, on certain of the grounds of unpatentability alleged in the Petition.  Paper 17 ("Decision to Institute" or "Inst. Dec.").

After institution of trial, Software Rights Archive, LLC ("Patent Owner"), filed a Patent Owner Response ("PO Resp.").  Paper 34.  Petitioner also filed a Reply.  Paper 43 ("Reply").

A consolidated oral hearing for IPR2013-00478, IPR2013-00479, IPR2013-00480, and IPR2013-00481, each involving the same Petitioner and the same Patent Owner, was held on October 30, 2014.  The transcript of the consolidated hearing has been entered into the record.  Paper 57, "Tr."

We have jurisdiction under 35 U.S.C. § 6(c).  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Petitioner has shown by a preponderance of the evidence that claims 26, 28–30, 32, 34, and 39 of the '352 patent are unpatentable.

## B.  Related Proceedings

Petitioner and Patent Owner both indicate that the '352 patent is involved in the following co-pending district court proceedings:  *Software Rights Archive, LLC v. Facebook, Inc.,* Case No. 12-cv-3970; *Software Rights Archive, LLC v. LinkedIn Corp.,* Case No. 12-cv-3971; and *Software Rights Archive, LLC v. Twitter, Inc.,* Case No. 12-cv-3972, each pending in the United States District Court for the Northern District of California.  Pet. 1; Paper 8, Patent Owner's Mandatory Notice, 2.

In addition, we instituted trial on Petitioner's petitions on related patents including:  (1) IPR2013-00479 and IPR2013-00480, *inter partes* reviews of U.S. Patent No. 5,832,494 (the "'494 patent"); and (2) IPR2013-00481, an *inter partes* review of U.S. Patent No. 6,233,571 (the "'571 patent").  The '352 patent issued from the parent of the application that

2

IPR2013-00478
Patent 5,544,352

issued as the '494 patent. The '571 patent issued from an application that

was a divisional of the application that issued as the '494 patent. The '352

patent was the subject of Reexamination No. 90/011,010.

## C. The '352 patent

The '352 patent relates to computerized research on databases. Ex.

1001, 1:7–11. The '352 patent discloses that it improves search methods by

indexing data using proximity indexing techniques. *Id*. at 3:42–55.

According to the '352 patent, proximity indexing techniques generate a

quick-reference of the relations, patterns, and similarity found among the

data in the database. *Id*. at 3:53–55.

Figure 2 of the '352 patent illustrates the high-level processing of

software for computerized searching (*Id*. at 8:7–8) and is reproduced below:



*Fig. 2*

Figure 2 depicts software system 60 comprising Proximity Indexing
Application Program 62, Computer Search Program for Data Represented by
Matrices ("CSPDM") 66, and Graphical User Interface ("GUI") program 70.

3

IPR2013-00478
Patent 5,544,352

*Id*. at 10:53–60.

Processing of software system 60 begins with Proximity Indexing Application Program 62 indexing a database. *Id.* at 11:4–5. Then, CSPDM 66 searches the indexed database and retrieves requested objects. *Id.* at 11:6–10. CSPDM 66 relays the retrieved objects to GUI program 70 to display on a display. *Id*. at 11:10–13.

Software system 60 runs on a computer system comprising, for example, a processor of a personal computer. *Id.* at 9:39–44. The system comprises a display, which displays information to the user. *Id.* at 10:4–7. Exemplary displays include computer monitors, televisions, LCDs, or LEDs. *Id*.

The processor is connected to a database to be searched. *Id*. at 9:46–47. The database contains cases—also called full textual objects—that contain citations to other objects within the database. *Id*. at 12:1–10. Each full textual object is assigned a number corresponding to its chronological order in the database. *Id*.

The '352 patent discloses that any two textual objects in the database may be related through a number of "patterns." *Id*. at 12:31–32. For example, object A may cite B, or the two objects may cite the same object C. *Id*. at 12:46–61. The Proximity Indexing Application (discussed above) applies algorithms to these relationships to create a matrix of pattern vectors that represent the relationships between the various objects in the database. *Id*. at 12:62–13:3, 14:18–20. The CSPDM is used to search the indexed database. *Id*. at 14:20–21.

4

*D. Illustrative Claim*

Of the challenged claims, only claim 26 is independent, whereas claims 28–30, 32, 34, and 39 depend, directly or indirectly, from claim 26.  Claim 26 is illustrative of the claimed subject matter and is reproduced below:

26.    A non-semantical method for numerically representing objects in a computer database and for computerized searching of the numerically represented objects in the database, wherein direct and indirect relationships exist between objects in the database, comprising:

marking objects in the database so that each marked object may be individually identified by a computerized search;

creating a first numerical representation for each identified object in the database based upon the object's direct relationship with other objects in the database;

storing the first numerical representations for use in computerized searching;

analyzing the first numerical representations for indirect relationships existing between or among objects in the database;

generating a second numerical representation of each object based on the analysis of the first numerical representation;

storing the second numerical representation for use in computerized searching; and

searching the objects in the database using a computer and the stored second numerical representations, wherein the search identifies one or more of the objects in the database.

Ex. 1001, 35:28–54.

IPR2013-00478
Patent 5,544,352

*E. The Prior Art References Upon Which Trial Was Instituted*

Yahiko Kambayashi et al., *Dynamic Clustering Procedures for Bibliographic Data*, Kyoto Univ., Dep't of Inf. Sci., 90–99 (1981) ("Kambayashi") (Ex. 1004).

Colin F.H. Tapper, *Citation Patterns in Legal Information Retrieval*, 3 DATENVERARBEITUNG IM RECHT 249–75 (1976) ("Tapper 1976") (Ex. 1005).

Colin Tapper, *The Use of Citation Vectors for Legal Information Retrieval*, 1 J. OF LAW AND INFO. SCI. 131–61 (1982) ("Tapper 1982") (Ex. 1006).

Edward A. Fox, *Characterization of Two New Experimental Collections in Computer and Information Science Containing Textual and Bibliographic Concepts* (Sept. 1983) (Ph.D. dissertation, Cornell Univ. Dep't of Comp. Sci.) ("Fox Collection") (Ex. 1007).

Edward A. Fox, *Some Considerations for Implementing the SMART Information Retrieval System under UNIX* (Sept. 1983) (Ph.D. dissertation, Cornell Univ. Dep't of Comp. Sci.) ("Fox SMART") (Ex. 1008).

Edward A. Fox, *Extending the Boolean and Vector Space Models of Information Retrieval with P-Norm Queries and Multiple Concept Types* (Aug. 1983) (Ph.D. dissertation, Cornell Univ. Dept. of Comp. Sci.) ("Fox Thesis") (Ex. 1009).

The parties do not dispute the prior art status of the references.

6

IPR2013-00478
Patent 5,544,352

### F. The Pending Grounds of Unpatentability

| Reference(s) | Basis | Claims instituted |
|---|---|---|
| Kambayashi | § 102 | 26, 28–30, 32, 39 |
| Fox Thesis, Fox SMART, and Fox Collection | § 103 | 26, 28–30, 32, 34, 39 |
| Tapper 1976 and Tapper 1982 | § 103 | 26, 28–30, 32, 34, 39 |

## II.    ANALYSIS

### A. Claim Construction

#### 1.    Principles of Law

Petitioner asserts, and Patent Owner does not dispute, that the '352 patent expired on August 6, 2013. Pet. 6. The Board's interpretation of the claims of an expired patent is similar to that of a district court's review. *See In re Rambus, Inc.*, 694 F.3d 42, 46 (Fed. Cir. 2012). We, therefore, are guided by the principle that the words of a claim "are generally given their ordinary and customary meaning," as understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) (citation omitted). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17). There is a "heavy presumption," however, that a claim term carries its ordinary and customary meaning. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (citation omitted).

7

IPR2013-00478
Patent 5,544,352

2.    *Overview of the Parties' Positions*

In the Decision to Institute, we found it instructive to construe the claim terms *direct relationships*, *indirect relationships*, *pool-similarity searching*, and *pool-importance searching*.  Inst. Dec. 10–14.  Our constructions are set forth in the table below.

| Claim Term or Phrase | Construction |
|---|---|
| *direct relationships* | "relationships where one object cites to another object"  Inst. Dec. 13. |
| *indirect relationships* | "relationships where at least one intermediate object exists between two objects and where the intermediate object(s) connect the two objects through a chain of citations"  Inst. Dec. 13. |
| *pool-similarity searching* | "identifying at least one object based on degree of similarity to a selected pool of objects"  Inst. Dec. 14. |
| *pool-importance searching* | "identifying at least one object based on the importance of the object to a selected pool of objects"  Inst. Dec. 14. |

Petitioner does not challenge any of our constructions.  Reply 1–2.  Patent Owner appears to agree with many of our constructions, and states that it uses our constructions for the purpose of evaluating patentability of the challenged claims of the '352 patent.  PO Resp. 12–14.  Based on the complete record now before us, we discern no reason to change our prior constructions.

Additionally, Patent Owner addresses the following phrases or terms: 1) *objects in a computer database*; 2) *computerized searching*; 3) *non-semantical method*; 4) *some indirect relationships are weighed more heavily than other indirect relationships*; and 5) *relationships exist between or among subsets of objects*, which are discussed below.  *Id*. at 9–14.

8

IPR2013-00478
Patent 5,544,352

Petitioner's Reply further addresses *database* and *numerical representation*, but otherwise does not contest Patent Owner's proposed constructions of these terms.  Reply 2.

### 3.    *numerical representation*

Patent Owner's Response does not proffer an explicit construction of *numerical representation*, but appears to interpret the term to exclude strings that may include letters.  PO Resp. 21 (distinguishing prior art as having "non-numerical character strings).  At oral argument, Patent Owner confirmed that its construction of *numerical representation* is something "represented only by digits," or in other words "expressed by numbers, not by letters."  Tr. 85.

Petitioner responds that *numerical* includes "any representation of binary or digital data that can be processed and analyzed by a computer," and means simply "of or relating to numbers."  Reply 1; Tr. 13.  Petitioner's construction is, therefore, not limited to representations consisting only of numbers.  At oral argument, Petitioner argued that the inclusion of a single number into a string is sufficient to make that string a *numerical representation*.  Tr. 25.

Petitioner's proffered construction is overly broad and unsupported by the specification.  While one dictionary definition of *numerical* is "of or relating to a number or series of numbers," it may also refer to "expressed in or counted by numbers."  THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (2000) (Ex. 3001); *see also* COLLINS ENGLISH DICTIONARY (2000) (Ex. 3002) ("measured or expressed in numbers").

The specification of the '352 patent uses *numerical* consistent with this latter interpretation.  In the Initial Extractor Subroutine, the "full textual

9

IPR2013-00478
Patent 5,544,352

objects" of the database are numbered "with Arabic numbers from 1 through n." Ex. 1001, 14:49–50. These numbers are used to create vectors and matrices, which are then run through various algorithms such as the Opinion Patterner Subroutine. *Id.* at 14:55–15:22. "Numerical factors" are then "calculated" to determine "values." *Id.* at 15:19–22; 18:63–67. This emphasis on calculation, values, and on processing by computer algorithms, leads us to conclude that *numerical representation*, as used in the '352 specification, must refer to solely numbers, so that a computer can process the representations using mathematical algorithms.

Petitioner's attempt to link the *numerical representation* of the specification to the West "key number" system is unpersuasive. Reply 2. While the specification of the '352 patent does discuss the key number system, and such "key numbers" include letters, there is no indication that the patentee intended to link the *numerical representation* of the claims to the West key number system discussed—and distinguished—in the background portion of the specification. Ex. 1001, 2:38–43 ("such a numbering process is subjective and is prone to error").

Nor do we find persuasive Petitioner's argument that *numerical* is somehow distinct from "numeric," in that the latter term means only numbers but the former may encompass letters. Tr. 13. Not only was this argument advanced for the first time at oral hearing,[1] but it is unsupported by any evidence of record. Indeed, the two terms are used interchangeably in dictionary definitions. *See* Ex. 3001 (entry for "numerical also numeric"); Ex. 3002 (entry for "numerical or numeric").

---

[1] Our Rules do not permit arguments to be raised for the first time at oral hearing. 37 C.F.R. § 42.70(a) (permitting oral argument only on "an issue raised in a paper.").

10

IPR2013-00478
Patent 5,544,352

For these reasons, we construe *numerical representation* as "representation consisting exclusively of numbers or a set of numbers."

### 4.    *objects in a computer database and computerized searching*

Patent Owner addresses the terms *objects in a computer database* and *computerized searching*, both of which appear in claim 26. PO Resp. 9–11. Rather than proffer a construction for either term, however, Patent Owner discusses the general concept of computerized searching in the '352 patent. *Id*. It is not clear what construction Patent Owner wishes us to adopt, and we are not persuaded that either term requires an explicit construction.

### 5.    *non-semantical method*

Patent Owner asks that we interpret *non-semantical method* to mean "a method that uses the direct relationships between one database object and another and does not otherwise account for words and phrases in a textual object." PO Resp. 11. We note that Petitioner raised a similar construction in the Petition, but the Board declined to construe the term expressly in the Decision to Institute. Pet. 6–7; Inst. Dec. 11. We also note that we adopted a similar construction for "non-semantically" in the related case IPR2013-00481. We consider the proffered construction to be reasonable and consistent with the specification of the '352 patent, and adopt it herein.

### 6.    *some indirect relationships are weighed more heavily than other indirect relationships*

Patent Owner asks that we construe this phrase as "some *types* of indirect relationships are weighed more heavily than others." PO Resp. 13 (emphasis in original). To support this interpretation, Patent Owner cites the specification of the '352 patent, which discloses that the different "patterns," which include direct and indirect relationships, are assigned various weights.

11

Ex. 1001, 13:34–38.  Petitioner does not dispute this construction.  We consider the proffered construction to be reasonable and consistent with the specification of the '352 patent, and adopt it herein.

     7.     *relationships exist between or among subsets*

     Patent Owner does not set forth an express construction for this phrase which appears in claim 34, but instead states that the "relationships" are the direct and indirect relationships of claim 26, and that subsets are a portion of a textual object.  PO Resp. 13–14.  Patent Owner has not persuaded us that an express construction of this phrase is necessary.

     *B. Anticipation of Claims 26, 28–30, 32, and 39 by Kambayashi*

     We instituted trial to determine whether claims 26, 28–30, 32, and 39 are unpatentable under 35 U.S.C. § 102 as anticipated by Kambayashi.  Dec. Inst. 19–20.  To establish anticipation, Petitioner must prove that each and every element in a claim, arranged as is recited in the claim, may be found in a single prior art reference.  *Net MoneyIN, Inc. v. VeriSign, Inc*., 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001).  We determine that Petitioner has not shown by a preponderance of the evidence that claims 26, 28–30, 32, and 39 are unpatentable as anticipated by Kambayashi.

     *1. Kambayashi*

     Kambayashi describes a method for clustering, which is said to be "an important tool for efficient retrieval of documents in bibliographic database systems."  Ex. 1004, Abstract.  The reference discloses the creation of "Direct Reference Matrix R," defining direct reference as "when a paper A refers to a paper B."  *Id*. at 91–92.  Kambayashi also discloses a set of pairs

12

IPR2013-00478
Patent 5,544,352

(ID, IDF) where ID and IDF are the identification codes of the papers and (ID, IDF) means that paper ID cites paper IDF. *Id*. at 93.

Kambayashi also discloses the creation of two secondary matrices, "Bibliographic Coupling Matrix B" (papers with one or more citation in common) and "Co-citation Matrix C" (citations frequently cited together). *Id*. at 92. These secondary matrices consist of vectors derived from the (ID, IDF) pairs noted above. *Id*. at 93–34. A "Similarity Matrix S" may then be created via weighted summation of matrices R, B, and C. *Id*. at 92.

    2.    *Claim 26*

We focus our analysis herein on two steps required by the method of claim 26: "creating a first numerical representation for each identified object in the database based upon the object's direct relationship with other objects in the database," and "analyzing the first numerical representations for indirect relationships existing between or among objects in the database." Petitioner contends that Kambayashi discloses both of these steps in two alternative embodiments.

First, Petitioner directs us to Kambayashi's disclosure of (ID, IDF) pairs, and their use in creating the B and C matrices. Petitioner asserts that deriving the (ID, IDF) pairs may be considered to be creating a first numerical representation, and that they represent direct relationships between documents ID and IDF. Pet. 24–25; Tr. 22. The (ID, IDF) pairs are then analyzed for indirect relationships, leading to B and C matrices which Petitioner contends are second numerical representations. Pet. 25–26.

Second, Petitioner identifies Kambayashi's Direct Reference Matrix R as a first numerical representation that represents direct relationships. Pet. 24–25; Tr. 22. As noted above, Matrix R is used—along with matrices B

13

IPR2013-00478
Patent 5,544,352

and C—to generate a Similarity Matrix S.  Petitioner contends that if Matrix R is considered to be the first numerical representation, then Matrix S would be a second numerical representation within the scope of claim 26.  Tr. 22.

Upon review of the disclosure of Kambayashi, we find neither of these arguments persuasive.  First, in the case of the (ID, IDF) pairs that are used to derive the B and C matrices, Patent Owner argues that ID and IDF are *strings* that contain letters.  PO Resp. 21.  This is supported by the disclosure of Kambayashi, which discloses identification codes such as EVER7404 and GARDL7710.  Ex. 1004, 96.  The testimony of Dr. Jacobs, Patent Owner's declarant, explains how Kambayashi's source database shows that identification codes begin with the first four letters of the first author's name.  Ex. 2113 ¶¶ 100–103 (citing Ex. 2023).  Because, as discussed above, the proper construction of *numerical representation* is a representation that contains only numbers, Kambayashi's (ID, IDF) pairs cannot be the first numerical representation of claim 26.

Nor do we find that the Direct Reference Matrix R / Similarity Matrix S system of Kambayashi meets the limitations of claim 26.  Petitioners assert, and we agree, that Matrix R is an array of numbers that represents direct relationships between the objects in the Kambayashi database.  Pet. 24–25; Ex. 1004, 92 (values $r_{ij}$ of matrix R are either 0 or 1).  This conclusion is supported by the fact that, in order to derive Matrix S, Matrix R is multiplied by a constant $w_R$.  Ex. 1004, 92.  It would not make sense to multiply a matrix containing strings of letters by a constant.

Matrix S, however, cannot be the second numerical representation of claim 26.  The claim requires that the representation be created by "analyzing the first numerical representations for indirect relationships

14

IPR2013-00478
Patent 5,544,352

existing between or among objects in the database." Matrix S, however, is generated according to the following formula:

$$S = w_R*R + w_B*B' + w_C*C' \quad (Id.)$$

Patent Owner argues that multiplying matrix R by a constant is not *analyzing*, as that term is used in claim 26. PO Resp. 21. We agree. While Matrix S does take into account indirect relationships between objects, those relationships are not derived from an analysis of Matrix R (the first numerical relationship). Rather, the indirect relationships are accounted for in Matrix S by the inclusion of Matrices B (which tracks bibliographic coupling) and C (which tracks co-citation). *Id*. The indirect relationships reflected in the B and C matrices, in turn, are not derived from Matrix R, but rather from the (ID, IDF) pairs, which we have determined above cannot be the first numerical relationship. For these reasons, Matrix S of Kambayashi does not meet the second numerical representation limitation of claim 26, because it is not generated by analyzing the first numerical representation.

We, therefore, conclude that Kambayashi fails to disclose an embodiment having all elements of claim 26, as arranged in the claim. Kambayashi does not anticipate claim 26.

### 3.    *Dependent Claims*

The remaining instituted claims all depend, directly or indirectly, from claim 26, and incorporate claim 26's requirements of a first numerical representation, and second numerical representation. We, therefore, find that Kambayashi does not anticipate the dependent claims, for the same reasons discussed above with respect to claim 26.

15

IPR2013-00478
Patent 5,544,352

### C. Obviousness of Claims 26, 28–30, 32, 34, and 39 Over Fox Papers

We instituted trial to determine whether claims 26, 28–30, 32, 34, and 39 are unpatentable under 35 U.S.C. § 103 as having been obvious over the combined disclosures of Fox Thesis, Fox SMART, and Fox Collection (collectively, "the Fox Papers"). Inst. Dec. 14–19. In support of the asserted ground of unpatentability, Petitioner sets forth the teachings of the cited prior art, provides detailed claim charts, and cites to the declaration of Dr. Fox (Ex. 1016 ¶¶ 68–145), explaining how each limitation is taught in the cited prior art combination. Pet. 9–23.

The claim chart persuasively reads all elements of each of claims 26, 28–30, 32, 34, and 39 onto the teachings of the Fox Papers, taken together. Despite the counter-arguments in Patent Owner's Response, and the evidence cited therein, which we have also considered, Petitioner has shown by a preponderance of the evidence that each of claims 26, 28–30, 32, 34, and 39 of the '352 patent are unpatentable, under 35 U.S.C. § 103, as they would have been obvious over the combination of Fox Thesis, Fox Collection, and Fox SMART.

#### 1. Fox Thesis

Fox Thesis describes improving query and document representation schemes for information retrieval. Ex. 1009, 261. In particular, useful types of bibliographic data are incorporated into a model to test clustering and retrieval functions. *Id.* at 164. Bibliographic connections between articles are illustrated for an exemplary set "O" of documents, which are represented by letters A through G. *Id.* at 165–66, Fig. 6.2. This exemplary set "O" includes direct and indirect citation references. *Id.* at 166–67, Table 6.2.

16

IPR2013-00478
Patent 5,544,352

Based on the reference pattern for a set of documents, Fox Thesis describes deriving various measures of the interconnection between the documents. *Id.* at 166. For example, weights are assigned "based upon integer counts" for bibliographically coupled documents. *Id*. at 167. Citation submatrices represent reference or citation information. *Id*. at 169. For example, submatrix *bc* represents bibliographically coupled reference information and submatrix *cc* represents co-citation reference information. *Id*. at 169–72, Figs. 6.3–6.5.

2.    *Fox SMART*

Fox SMART describes the System for Mechanical Analysis and Retrieval of Text ("SMART") as a project for designing a fully automatic document retrieval system and for testing new ideas in information science. Ex. 1008, 3. Fox SMART describes the computer system used to implement the experiments described in the Fox Thesis. Ex. 1016, ¶ 27. The software components of SMART are implemented in the C Programming Language and run under the UNIX™ operating system on a VAX™ 11/780 computer. Ex. 1008, 1, 4.

In SMART, an automatic indexing component constructs stored representations of documents. *Id*. at 3. Bibliographic information is used to enhance document representations. *Id*. at 29. The SMART system may process basic raw data, such as an exemplary N collection of articles and citation data describing which articles are cited by others. *Id*. at 29–30. Data is entered into the SMART system as a set of tuples $\{(d_i, d_j)|d_i{\rightarrow}d_j\}$ which describe the cited and citing documents, as well as the direction of citation. *Id*. at 29. The exemplary input data also includes indirect citation relationships, such as bibliographic coupled and co-citation relationships.

17

IPR2013-00478
Patent 5,544,352

*Id*. at 30–32.  These relationships are used to create extended vectors which can then be clustered and searched to aid document retrieval.  *Id*. at 29.

### 3.    *Fox Collection*

Fox Collection describes collections of data which are said to be useful for investigating the interaction of textual and bibliographic data in retrieval of documents.  Ex. 1007, 1.  According to the testimony of Dr. Edward Fox, Fox Collection was originally part of the same work as Fox Thesis and Fox SMART, and describes the manner in which the data sets were obtained and processed prior to their use in the Fox SMART experiments.  Ex. 1016 ¶ 27.

According to Fox Collection, the experiments were performed on a collection of bibliographic records (title, abstract, author, keywords, etc.) from the *Communications of the ACM*, termed the "CACM collection."  Ex. 1007, 14.[2]  Two individuals then examined printed copies of the articles referenced by the CACM bibliographic records, and citation data was obtained from the articles and entered into a set Raw_data.  *Id*.  The citation data contained pairs of identifiers (citing, cited) which were the document id numbers ("dids") of the citing record and record it cites.  *Id*.  From this Raw_data matrix, secondary matrices such as bc (bibliographic coupling) and cc (co-citation) were derived computationally.  *Id*. at 14–16.

---

[2] Fox Collection also discusses an ISI Collection, but in his Reply Declaration Dr. Fox explains that he cites the ISI collection to "emphasize findings in the prior art about the value of using co-citation data (a non-semantic indirect relationship) in information retrieval, not to fully address all the elements of claims. . . . For the sake of simplicity, the Board should focus on the methodology given in Fox Papers, and the examples of their use with the CACM Collection."  Ex. 1030, ¶ 6.

18

IPR2013-00478
Patent 5,544,352

### 4. Claim 26

Petitioner's claim chart persuasively reads all elements of claim 26 onto the combined teachings of Fox Thesis, Fox SMART, and Fox Collection. Pet. 9–23 (citing Ex. 1007, 14–15, 43, 48; Ex. 1008, 3, 12–13, 16, 18, 25–27, 29–33, 36, 38–39, 41–43, 53; Ex. 1009, 17, 19, 179, 181–82, 195, 199, 203, 211; 1016 ¶¶ 71–108, 122–131). For instance, the combination of Fox Thesis, Fox SMART, and Fox Collection teaches "marking objects in the database" and "creating a first numerical representation for each identified object in the database based upon the object's direct relationship with other objects in the database," as recited in claim 26. In particular, Fox Collection teaches assigning document identification numbers ("dids") to the articles in the CACM collection, which is "marking objects in the database." Ex. 1007, 14. Printed copies of each article with a bibliographic entry in the CACM collection then are reviewed manually, to obtain bibliographic subvectors in the form "Raw_data (cited, citing)." *Id*. This is a first numerical representation created based on the direct relationship between the "cited, citing" pair of bibliographic records.

The combination of Fox Thesis, Fox SMART, and Fox Collection also teaches "analyzing the first numerical representations for indirect relationships existing between or among objects in the database" and "generating a second numerical representation of each object based on the analysis of the first numerical representation," as recited in claim 26. Fox SMART teaches that direct relationships may be represented by tuples called "CITED," which contain a citing document, a cited document, and the direction of the citation. Ex. 1008, 29. These tuples are then processed to

19

IPR2013-00478
Patent 5,544,352

construct submatrices such as *bc* and *cc*, which contain numbers representing indirect relationships.  *Id*. at 30–32 ("construct BC by counting the number of identical tuples of C").  Dr. Fox testifies that the CITED tuples of Fox SMART refer to the Raw_data derived from the CACM collection.  Ex. 1016 ¶ 124.  Because these *bc* and *cc* submatrices are numerical representations, and are generated from the first numerical representations CITED which are based on direct relationships, we find that the Fox Papers together teach "generating a second numerical representation of each object based on the analysis of the first numerical representation."

　　a. *Combination of References*

As to whether Petitioner has satisfied the requirements for combining the teachings of Fox Thesis, Fox SMART, and Fox Collection, we determine that Petitioner has articulated sufficient reasoning with a rational underpinning as to why one of ordinary skill in the art would have combined the retrieval systems taught in Fox Thesis, Fox SMART, and Fox Collection.  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).  Dr. Fox states that the three publications arose from the same thesis project, and were originally one document.  Ex. 1016 ¶ 70.  Furthermore, Dr. Fox notes that Fox Thesis "explain[s] the method and experimental results of [his] information retrieval work," Fox SMART "detail[s] the updated SMART computer system used to execute the experiments," and Fox Collection "describes how the data sets were obtained and processed prior to being used in the experiments."  *Id*.  We give Dr. Fox's statement that one of skill in the art would have been motivated to combine the references because they "describe a complete project with its underlying system and data" (*id*.)

20

substantial weight, because it is consistent with the considerable overlap in
the disclosures of the Fox Papers and their internal references to one another.
*See, e.g.,* Ex. 1009, 343 (Fox Thesis cites to Fox SMART); Ex. 1008, 84
(Fox SMART cites to Fox Thesis).

### b. *Patent Owner's Counterarguments*

We have considered Patent Owner's counterarguments but do not find
them persuasive.  Patent Owner contends that various elements of claim 26
are not taught or suggested by the Fox Papers in combination.  First, Patent
Owner argues that the Fox Papers do not teach a computer database in which
direct and indirect relationships exist between objects in the database.  PO
Resp. 17.  Because the databases of the Fox Papers are bibliographic
databases, they contain certain information about documents such as title,
abstract, author, and publication date.  *See, e.g.,* Ex. 1007, 14 (describing
CACM database).  The Fox databases do not contain the full documents,
meaning that the databases do not contain the portions of the documents that
cite to other documents.  As such, Patent Owner argues, the databases cannot
have objects having direct and indirect relationships, as required by claim
26.  PO Resp. 17–18.

We have construed *direct relationships* to mean "relationships where
one object cites to another object."  Based on this construction, the
bibliographic records of Fox Collection's CACM database do not have
direct relationships, because they do not contain cites to one another.  It is
only after the full documents—which are not in the database—are manually
reviewed, and the first numerical representation (Raw_data) is entered, that
the database contains objects that have direct relationships.  Claim 26,
however, requires that direct and indirect relationships exist between objects

21

in the database first, prior to creating a first numerical representation.  In other words, the Raw_data of the Fox Collection CACM database cannot be both the objects that have relationships, as well as the first numerical representation of those relationships.

Petitioner contends, however, that it would have been "trivial and obvious" to modify the databases of the Fox Papers to contain full text documents.  Reply 10.  Dr. Fox's testimony supports this argument, noting that if storage resources allowed storage of the full text of documents, this would have been understood as preferable.  Ex. 1016 ¶¶ 76, 89.  We credit Dr. Fox's testimony on this point, as it is consistent with the disclosure of Fox Thesis that "some [information retrieval] systems store the full text of the various documents."  Ex. 1009, 6.  Fox Thesis adds that full text permits users to "locate documents of interest," as well as "retrieve and/or examine paragraphs, passages, sentences, or single word occurrences (in context)." *Id*.  These extra capabilities are described as "straightforward generalizations of document retrieval methods."  *Id*.

We, therefore, conclude that the Fox Papers suggested to one of ordinary skill in the art at the time of the invention the modification of the Fox databases to include full text documents.  With such a modification, the databases would contain, as objects, the full text documents.  Therefore, even prior to generation of the Raw_data, the database would contain objects that have direct and indirect relationships due to their citation of one another. Patent Owner's argument to the contrary is unpersuasive.

In the same vein, Patent Owner argues that the Fox Papers do not teach "creating a first numerical representation for each identified object in the database based upon the object's direct relationship with other objects in

IPR2013-00478
Patent 5,544,352

the database." PO Resp. 31. Because, for example, the Raw_data disclosed in the Fox Collection is derived from documents that are not in the CACM database, but rather compiled from full text printed versions of the documents, Patent Owner argues that Raw_data is not *based on* the object's direct relationship with other objects. *Id*. at 32.

We find this argument unpersuasive for the same reasons outlined above for the objects limitation. The Fox Papers suggest inclusion of full text documents in the databases. With such a modification, the databases would have—even prior to creation of Raw_data—objects with direct relationships. The subsequently-created Raw_data relation would be based on those objects, thus satisfying the first numerical representation element of claim 26.

Patent Owner's remaining contentions relate to whether the Petitioner has satisfied the requirements for combining the teachings of Fox Thesis, Fox SMART, and Fox Collection. For example, Patent Owner contends that the systems disclosed in the individual Fox Papers are "narrowly tailored" and would not have been combined merely because of their common authorship. PO Resp. 26.

As indicated above, we determine that Petitioner has articulated sufficient reasoning with a rational underpinning as to why one of ordinary skill in the art would have combined the retrieval systems taught in Fox Thesis, Fox SMART, and Fox Collection. *See KSR*, 550 U.S. at 398. For instance, Dr. Fox wrote each of Fox Thesis, Fox SMART, and Fox Collection. See Ex. 1009, i; Ex. 1008, 1; Ex. 1007, 1.

Patent Owner also contends that the Raw_data relation of Fox Collection could not be combined with the CITED tuples of Fox SMART,

23

IPR2013-00478
Patent 5,544,352

because they are "fundamentally incompatible." PO Resp. 27. In support of this argument, Dr. Jacobs testifies, for example, that CITED does not describe using document ids ("dids") while Raw_data does. Ex. 2113 ¶¶ 170–171. Dr. Fox testifies to the contrary, stating that the CITED tuples of Fox SMART specifically refer to the Raw_data derived from the CACM collection. Ex. 1016 ¶ 124. We give Dr. Fox's testimony on this point substantial weight. Our determination is not only due to Dr. Fox's personal knowledge of the Fox Papers, but also supported by the descriptions of Raw_data and CITED in the references. The references indicate that both Raw_data and CITED contain pairs of document identifiers, with the sole difference being that CITED also contains a third data element that signifies the direction of the citation. Furthermore, while the description of CITED in Fox SMART is silent as to document ids, other portions of the document discuss dids which are an "index in range 1 . . . N." Ex. 1008, 36. We do not consider the combination of Raw_data with CITED, or the combination of the systems of Fox Collection, Fox SMART, and Fox Thesis, to be beyond the level of ordinary skill in the art.

Patent Owner further contends that using indirect relationships in a computerized search system would not have been predictable at the time of the invention of the '352 patent. PO Resp. 50. Patent Owner's contention is based on its view that the combined teachings of Fox Thesis, Fox SMART, and Fox Collection are not sufficient because they do not teach computerized searching of an electronic database. PO Resp. 54; *see also* Tr. 49 ("[T]he Fox papers by themselves don't get you there . . . every one . . . is directed to printed articles, not an electronic database."). According to Patent Owner, the prior art cited by Petitioner teaches experiments that are

24

IPR2013-00478
Patent 5,544,352

not directed to a computer database, "but rather are directed toward limited experimentation with bibliographic relationships existing among paper documents." PO Resp. 1.

We disagree with Patent Owner. For example, Fox SMART teaches an implementation in which software components of SMART are implemented in the C Programming Language and run under the UNIX™ operating system on a VAX™ 11/780 computer. Ex. 1008, 1, 4. In SMART, an automatic indexing component constructs stored representations of documents. *Id*. at 3. In light of the various teachings of Fox Thesis, Fox SMART, and Fox Collection discussed herein, we determine that Fox Thesis, Fox SMART, and Fox Collection, taken together, teach or suggest computerized searching of an electronic database.

Patent Owner also contends that the inclusion of indirect relationships into search "degrades results," and therefore provides a teaching away from the invention. PO Resp. 50. As Patent Owner acknowledges, its evidence of degraded results does not teach away from the *combination* of the Fox Papers, but rather from the *modification* of the teachings of the Fox Papers to incorporate "an electronic database that has references to the objects in the database." Tr. 49–50. We found above, however, that the Fox Papers teach this feature. In addition, to the extent modification of the Fox Papers is necessary to meet claim 26, we have found that modification is expressly suggested by the Fox Papers themselves. The record is insufficient to establish a teaching away.

Patent Owner also asserts objective indicia of non-obviousness, focusing on Google's search engine using its PageRank algorithm. PO Resp. 56–60. As an initial matter, Patent Owner's contentions again appear

25

IPR2013-00478
Patent 5,544,352

to be based on its view that the combined teachings of Fox Thesis, Fox SMART, and Fox Collection are not sufficient because they do not teach computerized searching of an electronic database. *Id.* at 58 ("Link analysis technology applied to the Web, as claimed in the '352 patent and embodied in PageRank, satisfied a long felt need for improved computerized search." (citation omitted)); Tr. 60–61 ("[I]t certainly wouldn't have been obvious to one of ordinary skill based on Fox's work to extend these ideas from this paper collection to electronic databases."). For the reasons discussed above, we disagree with Patent Owner's view and determine that Fox Thesis, Fox SMART, and Fox Collection, taken together, teach or suggest computerized searching of an electronic database.

Furthermore, we note that Patent Owner has not shown that the asserted success of a commercial embodiment of the '352 patent actually resulted from features recited in the claims of the '352 patent. Patent Owner has not provided sufficient evidence to support a nexus between claim 26 and the Google PageRank algorithm. Because Patent Owner has failed to provide the source code of PageRank, or any other detailed information beyond publicly-available, generalized hearsay statements about Google's search (Ex. 2050), the record is insufficient to prove that PageRank uses the method of claim 26.

Even if PageRank's algorithm incorporates the method of claim 26, we cannot determine that Google's success is due to the method of claim 26, as opposed to other elements of the algorithm. Patent Owner's declarant Dr. Amy N. Langville conceded that the Google search technology involves a combination of link analysis (non-semantic) and semantic searching, whereas claim 26 recites a non-semantical method. Ex. 1034, 76:19–21.

26

IPR2013-00478
Patent 5,544,352

Even if we were to conclude that the PageRank algorithm utilized the non-semantical method of claim 26, we could not determine whether the alleged success of PageRank is due to its non-semantical aspects, its semantical aspects, or some combination of both.

Patent Owner also points to Google's license of the '352 patent as evidence of nexus.  PO Resp. 59–60.  Patent Owner, however, admits that this license resulted in the settlement of a lawsuit (*id.*), which without additional contextual evidence, weighs against finding a nexus.

Additionally, we determine that in light of the weak showing of secondary considerations, the evidence of obviousness with respect to Fox Thesis, Fox SMART, and Fox Collection, is sufficient to support the conclusion that claim 26 would have been obvious.  *See Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007).  As discussed above, Petitioner has provided a strong case of obviousness.

Accordingly, even after considering the counter-arguments in Patent Owner's Response, and the evidence cited therein, we find that Petitioner has shown by a preponderance of the evidence that claim 26 is unpatentable as it would have been obvious over the combination of Fox Thesis, Fox SMART, and Fox Collection.

  5.  *Dependent Claims*

Petitioner's claim chart persuasively reads all elements of dependent claims 28, 29, 30, 32, 34, and 39 onto the teachings of Fox Thesis, Fox SMART, and Fox Collection, taken together.  Pet. 16–23 (citing Ex. 1007, 12, 14–15, 43, 48–49; Ex. 1008, 14, 16, 24–25, 29, 30–33, 36–38, 41, 43–52; Ex. 1009, 1, 15, 17, 23, 126, 151, 173–74, 177–79, 181–82, 191–92, 194, 202, 213–18, 224, 232, 234, 238–43, 257; Ex. 1016 ¶¶ 71–108, 110–

27

IPR2013-00478
Patent 5,544,352

121, 124–125, 127–128, 132–135, 137–145). For instance, we determine that Petitioner has shown by a preponderance of the evidence that the combination of Fox Thesis, Fox SMART, and Fox Collection teaches that the first and second numerical representations are vectors that are arranged in first and second matrices, as required by claim 28. Fox SMART teaches CITED, which is a set of tuples indicating a pair of documents linked by a direct relationship, as well as the direction of citation. Ex. 1008, 29. These tuples are vectors, as are the components of the *bc* and *cc* submatrices, which represent indirect relationships. *Id*. at 30–32. Furthermore, the objects in the CACM database are bibliographic records which include publication date (Ex. 1007, 14), and therefore are assigned chronological data as required by claim 28.

We also determine that Petitioner has shown by a preponderance of the evidence that the combination of Fox Thesis, Fox SMART, and Fox Collection teaches weighing, wherein some indirect relationships are weighed more heavily than other indirect relationships, as recited in claim 32. Fox Thesis, for example, discloses assigning weights to subvectors such as *bc* and *cc*, which are different types of indirect relationships. Ex. 1009, 257 (Table 8.13). In one weighting scheme disclosed in Fox Thesis, bibliographic coupling indirect relationships (*bc*) are weighted at .009, more heavily than co-citation indirect relationships (*cc*), weighted at 0. *Id*.

Claim 39 requires both pool-similarity searching and pool-importance searching. As noted above, we construed *pool-similarity searching* as "identifying at least one object based on degree of similarity to a selected pool of objects" and *pool-importance searching* as "identifying at least one object based on the importance of the object to a selected pool of objects."

28

IPR2013-00478
Patent 5,544,352

We determine that the Fox Papers have been shown by a preponderance of the evidence to teach these elements. Fox Thesis and Fox SMART disclose a feedback search in which results are presented to a user, ranked according to importance, and then used to construct a new search. Ex. 1008, 24, Fig. 6; Ex. 1009, 151, Fig. 5.1. This teaches pool-importance searching as required by claim 39. Similarly, Fox SMART discloses a search that "perform[s] exact matches as well as general similarity computations" (Ex. 1008, 37–38), which meets the pool-similarity searching limitation of claim 39.

Additionally, for the reasons discussed above with respect to claim 26, we determine that Petitioner has satisfied the requirements for combining the teachings of Fox Thesis, Fox SMART, and Fox Collection.

Patent Owner argues that Petitioner has not proven by a preponderance of the evidence that all elements of the dependent claims are taught or suggested by the Fox Papers. PO Resp. 35–39. Some of these arguments, for example those made with respect to claims 28, 29, 30, and 34, are based on the fact that the databases of the Fox Papers do not include objects because the bibliographic records do not cite to one another. *Id*. Just as we found such arguments unpersuasive with respect to claim 26, we are not persuaded by them here. The Fox Papers suggest the inclusion of full text documents into the databases, and that such a modification could be beneficial.

Patent Owner also argues that claim 28's limitation that the step of searching comprises the steps of matrix searching of the second matrices and examining the chronological data is not met by the Fox Papers. *Id*. at 35–36. According to Patent Owner, the Fox Thesis discloses a "preliminary clustering experiment" in which chronological data is "summarily dismissed

29

IPR2013-00478
Patent 5,544,352

because of poor results." *Id*. We do not consider this reading of the Fox Thesis accurate. The quotation from the reference provided by Patent Owner, "the clustering result does not seem as good as that of the other methods" (Ex. 1009, 217), is partial and misleading. The full sentence reads: "*If the* clustering result does not seem as good as that of other methods *then a likely explanation is that improper coefficients were chosen and used in computing the combined similarity value*." *Id*. (omitted portion emphasized). Not only does Patent Owner omit the qualifier "if," but also the explanation that the result likely is due to improper weighting coefficients. This is far from the "summary dismissal" of chronological data asserted by Patent Owner.

Indeed, as Petitioner notes, other portions of the Fox Papers expressly disclose searching using indirect relationship matrices in combination with chronological data. Ex. 1008, 41 (p-norm queries include date, as well as bibliographically coupled or co-cited articles). We are not persuaded by Patent Owner's arguments regarding claim 28.

Patent Owner also contends that the Fox Papers do not teach or suggest marking subsets of objects in the database, as required by claim 34. PO Resp. 38. Fox SMART discloses "separate indexing of paragraphs or even sentences." Ex. 1008, 25; *id.* at 80 ("vectors could be computed for smaller items than just documents"). According to Patent Owner, however, the markings "must be usable by a computerized search to individually identify a specific subset of an object in a computer database as a search result." PO Resp. 38. This alleged requirement is drawn from the *marking* limitation of claim 26. *Id*. Claim 26, however, only requires that the "marked object . . . be individually identified by a computerized search."

30

IPR2013-00478
Patent 5,544,352

The subsets of claim 34 are marked, but this marking does not transform the subsets into objects as recited in claim 26. Patent Owner's argument that computerized searching of the marked subsets is required by claim 34 lacks merit.

Finally, Patent Owner argues that the Fox Papers do not teach or suggest pool-importance searching, as required by claim 39. PO Resp. 39. Patent Owner correctly notes that "importance is distinct from similarity," and therefore pool-importance searching is different than pool-similarity searching. *Id*. The Petition, Patent Owner argues, only identifies disclosures of pool-similarity searching in the Fox Papers, and, therefore, fails to establish that all elements are taught or suggested by the prior art. *Id*.

We disagree with Patent Owner's argument. In its claim chart, Petitioner set forth distinct disclosures from the Fox Papers to meet the pool-importance searching and pool-similarity searching elements. Pet. 22–23. For instance, Fox SMART teaches using "general similarity computations," (Ex. 1008, 37–38) which Petitioner contends is pool-similarity searching, as well as a "feedback" search loop in which results are ranked according to importance to a user, and then further results are retrieved (*id*. at 24, Fig. 6), which Petitioner contends is pool-importance searching. As we concluded above, the feedback search function disclosed in the Fox Papers teaches pool-importance searching, as required by claim 39.

For the foregoing reasons, Petitioner has shown by a preponderance of the evidence that claims 28, 29, 30, 32, 34, and 39 of the '352 patent are unpatentable under 35 U.S.C. § 103(a) as they would have been obvious over Fox Thesis, Fox SMART, and Fox Collection.

31

IPR2013-00478
Patent 5,544,352

> D. *Obviousness of Claims 26, 28–30, 32, 34, and 39 Over the Tapper Papers*

We instituted trial to determine whether claims 26, 28–30, 32, 34, and 39 are unpatentable under 35 U.S.C. § 103 as having been obvious over the combined disclosures of Tapper 1976 and Tapper 1982 (collectively, "the Tapper Papers"). Inst. Dec. 21–24.

We have considered Petitioner's arguments and evidence, as well as the counter-arguments in Patent Owner's Response, and the evidence cited therein, and conclude that Petitioner has not shown by a preponderance of the evidence that each of claims 26, 28–30, 32, 34, and 39 of the '352 patent are unpatentable, under 35 U.S.C. § 103, as having been obvious over the Tapper Papers.

> 1. *Tapper 1976*

Tapper 1976 discloses a "citation vector technique" for retrieving legal information that seeks to overcome perceived deficiencies in Boolean search strings. Ex. 1005, 270–71. Rather than characterizing a legal document by the words it contains, vector matching focuses on the citations the document contains. *Id*. at 263. Tapper 1976 also notes that the technique may be used as an adjunct to a full-text retrieval system. *Id*. at 272.

By repeating the vector characterization of the documents, Tapper 1976 discloses that a matrix may be created that shows the similarities between the documents. *Id*. By re-ordering the matrix, the documents may be clustered according to their similarity. *Id*. The reference also discloses that "second generation citations" may be used: "if a case cites cases A', B' and C', and case A' cites a1', a2' and a3', case B' b1', b2' and b3' and case C'

32

c1', c2' and c3' the original case would be represented by a combination of its own vector, and those of cases A', B' and C'." *Id*. at 266.

### 2.    *Tapper 1982*

Tapper 1982 similarly focuses on the drawbacks of full-text searching of legal documents and the alternative use of citation vectors for legal research. Ex. 1006, 135–36. The reference discusses weighting certain citation vectors more heavily than others, for example by the difference in the ages of the citing and cited case. *Id*. at 138.

A pilot project implementing such a citation vector-based system is also described by Tapper 1982. *Id*. at 139. The reference discloses a correlation algorithm used in the pilot project to cluster together vectors with a high degree of association. *Id*. at 143–44. Such clustering is said to permit a document to be retrieved "not only because it is itself closely associated with another target document, but also because both it and the target document are closely associated with a third." *Id*.

### 3.    *Claim 26*

As discussed above, claim 26 requires steps of "creating a first numerical representation for each identified object in the database based upon the object's direct relationship with other objects in the database." We find that this limitation is neither taught nor suggested by the combined Tapper Papers.

Petitioner's claim chart identifies several portions which allegedly teach a first numerical representation. Pet. 47–48. For example, Tapper 1976 is cited as disclosing "quantifiable representation in the form of numerical weighting" *Id*. (citing Ex. 1005, 263). These "quantifiable representations" are of "other characteristics" of the citations, such as age or

IPR2013-00478
Patent 5,544,352

the importance of the court or jurisdiction deciding the case, not the citations (relationships) themselves.  Ex. 1005, 263.

Similarly, Tapper 1982 is cited as disclosing "[a]scription of numerical values to vector elements."  Pet. 48 (citing Ex. 1006, 141).  But Tapper 1982 explicitly defines "vectors" as "the strings [a document] contains and the frequency of their occurrence."  Ex. 1006, 134.  In other words, the "numerical values" of Tapper 1982 are the *frequency* of the appearance of citation *strings*, which as we discussed above, connotes the inclusion of letters.  The Petition provides no citation to either Tapper Paper that teaches representing direct relationships with a first numerical representation.

In its Reply Brief, Petitioner identifies two other disclosures by the Tapper Paper it contends satisfy the *first numerical representation* limitation.  First, Petitioner argues that "the legal citations in Tapper clearly qualify as numerical representations."  Reply 4–5.  The legal citations Petitioner identifies, however, are in the exemplary form of "500 F.2d 411," which includes letters.  As we have construed the term, this is not a numerical representation, but rather the "strings" of the vectors discussed above.

Second, Petitioner notes that the Tapper Papers describe assigning cases in the database a unique ID number.  *Id*. (citing Ex. 1006, 148).  At oral argument, Petitioner's counsel directed our attention to Table 2 of Tapper 1982, which includes in the leftmost column pairs of numbers which signify pairs of documents. Tr. 14; Ex. 1006, 147.  At most, the assignment of these numbers could satisfy the marking step of claim 26 (Ex. 1006, 148 ("[t]he first column gives the numbers allocated to the cases.")); they are not

34

IPR2013-00478
Patent 5,544,352

generating a first numerical representation. The document numbers indicated by Petitioner are numerical representations of *documents*, not of the *relationships* between those documents. Claim 26 requires that the first numerical representations are based on direct relationships in the database. The numbers allocated to the cases of Tapper 1982 cannot satisfy this limitation.

Nor can the document number *pairs* of Table 2 be a first numerical representation, as Tapper 1982 does not disclose that they represent a direct relationship (i.e., one of the documents in the pair citing the second). Rather, the pairs of documents appear to be listed together in the table because of their high "correlation values." Ex. 1006, 148. As Petitioner acknowledges, these correlation values represent indirect relationships between the documents (Reply 6 ("correlation values of cases' indirect relationships")), therefore they cannot be a first numerical representation that represents a direct relationship.

Petitioner argues in the alternative that "there is nothing non-obvious about creating citation vectors consisting solely of numbers." Reply 4–5. At the outset, we note that this argument was presented for the first time in the Reply; the sole modification to the Tapper Papers addressed in the Petition is the combination of the disclosures of the two references. Pet. 45–46. Nor did Petitioner present any testimony with the Petition regarding the Tapper Papers, or how a person of ordinary skill in the art would have modified the references. It would be a proper exercise of our discretion, therefore, to not consider this argument and the Reply Declaration of Dr. Fox (Ex. 1016), which presents testimony on the Tapper Papers for the first

35

IPR2013-00478
Patent 5,544,352

time.[3] *See* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,767 (Aug. 14, 2012) ("a reply that raises a new issue or belatedly presents evidence will not be considered.")

Even if we were to consider Petitioner's Reply and Dr. Fox's Reply Declaration, however, we are not persuaded. Petitioner cites to various portions of the Tapper Papers (Reply 4–5), but none of these citations sufficiently establish a reason to substitute numerical representations for those disclosed in Tapper. For example, Petitioner argues—using pieced-together quotations—that "Tapper [1982] also makes clear that one could 'very easily' use a 'simple conversion table' to map 'extracted' citations to any 'chosen style.'" *Id*. at 5 (citing Ex. 1006, 136). Upon reading the full context from which these quotes are drawn, however, it is clear that Tapper 1982 is discussing "parallel reports of the same decision." Ex. 1006, 136. In other words, Tapper 1982 does not contemplate converting letter-containing case citations into numbers, but rather converting one letter-containing citation into another.

Dr. Fox's Reply Declaration (Ex. 1030 ¶¶ 107–115) relies on the same arguments as Petitioner's Reply, and we find them unpersuasive for the same reasons. Nor are we persuaded by the portions of Dr. Jacobs's cross-examination Petitioner cites (Reply 5 (citing Ex. 1033, 313:7–316:23, 339:3–342:6)), as Dr. Jacobs's testimony was to what a person of ordinary skill would have understood from the '352 patent specification, not the Tapper Papers. *See In re Vaeck*, 947 F.2d 488, 493 (Fed. Cir. 1991) (suggestion to make invention cannot "be founded . . . in the applicant's

---

[3] We address Patent Owner's Motion to Exclude portions of the Reply Declaration below.

36

IPR2013-00478
Patent 5,544,352

disclosure"). The record before us does not support the conclusion that a person of ordinary skill in the art would have modified the combined disclosures of the Tapper Papers to include a first numerical representation.

### 4. Dependent Claims

The remaining instituted claims all depend, directly or indirectly, from claim 26, and thus incorporate claim 26's requirement of a first numerical representation. We, therefore, find that the Tapper Papers do not teach or suggest all elements of these dependent claims.

### E. Motion to Exclude

Patent Owner filed a Motion to Exclude (Paper 47) in which Patent Owner seeks to exclude portions of the Reply Declaration of Dr. Edward A. Fox (Ex. 1030) ("Reply Declaration") submitted with Petitioner's Reply. In particular, Patent Owner identifies three issues with the Declaration, each of which is based on the argument that portions of the Declaration are improper reply evidence.

In its Reply, a Petitioner may only respond to arguments raised in the Patent Owner's Response. 37 C.F.R. § 42.23(a). "A reply that raises a new issue or belatedly presents evidence will not be considered." Office Patent Trial Practice Guide, 77 Fed. Reg. at 48,767 (Aug. 14, 2012). The Practice Guide provides, as indications of improper reply evidence, "new evidence necessary to make out a *prima facie* case for . . . patentability or unpatentability . . ., and new evidence that could have been presented in a prior filing." *Id.*

A motion to exclude evidence under 37 C.F.R. § 42.64(c), however, "normally is not the proper vehicle for resolution of a dispute regarding reply arguments and evidence exceeding the proper scope of a reply." *ABB,*

37

IPR2013-00478
Patent 5,544,352

*Inc. v. Roy-G-Biv Corp.*, Case IPR2013-00063, slip op. 13–14 (PTAB May 16, 2014) (Paper 71); *Corning Inc. v. DSM IP Assets B.V.*, Case IPR2013-00047, slip op 7 n.3 (PTAB May 1, 2014) (Paper 84) (characterizing such motions as "now disfavored"). Rather, when evaluating the record after oral argument, the Board is capable of determining what, if any, evidence exceeds the proper scope of rely, and accordingly disregarding that evidence.

While we, therefore, *deny* Patent Owner's Motion, we also note that even if it were proper, we would dismiss it as moot. With respect to the objected-to portions of the Reply Declaration which discuss the Tapper Papers, we have considered them above, found Dr. Fox's testimony unpersuasive, and found in favor of Patent Owner on the Tapper Papers ground. With respect to the Fox Papers ground, we have found in favor of Petitioner, but did not rely on any of the objected-to portions of the Reply Declaration in so doing. A decision to exclude the Reply Declaration would, therefore, not affect our determinations in this case.

### F. Motions to Seal

Patent Owner filed a Motion to Seal (Paper 35) the Declaration of Dr. Amy N. Langville ("Langville Declaration") filed as Exhibit 2114. Petitioner filed a Motion to Seal (Paper 42) the Transcript of the Deposition of Amy N. Langville, Ph.D. ("Langville Transcript") filed as Exhibit 1034. Both of these motions are unopposed.

Regarding Patent Owner's Motion to Seal, according to Patent Owner paragraphs 25, 112, and 113 of the Langville Declaration makes reference to certain facts about confidential licenses to the patents under review. Paper

38

IPR2013-00478
Patent 5,544,352

35, 3.  Additionally, Patent Owner contends that this information has not been made, and will not be made, public.  *Id.*

Regarding Petitioner's Motion to Seal, according to Petitioner, Patent Owner has designated the transcript as confidential.  Paper 42, 3.  To avoid public disclosure, therefore, Petitioner submits sealing the Langville Transcript is appropriate.  *Id.*

There is a strong public policy in favor of making information filed in *inter partes* review proceedings open to the public.  *See Garmin Int'l v. Cuozzo Speed Techs., LLC*, Case IPR2012-00001 (PTAB Mar. 14, 2013) (Paper 34).  Under 35 U.S.C. § 316(a)(1), the default rule is that all papers filed in an *inter partes* review are open and available for access by the public.[4]  The standard for granting a motion to seal is "good cause." 37 C.F.R. § 42.54.  A moving party bears the burden of showing that the relief requested should be granted.  37 C.F.R. § 42.20(c).

Regarding Patent Owner's Motion to Seal, Patent Owner, as the moving party, has failed to carry its burden.  Patent Owner identifies only three paragraphs in the Langville Declaration that purportedly contain confidential information.  However, Patent Owner has not pointed to proof in the record that any information contained in these paragraphs is confidential.  Additionally, although Patent Owner contends that this information has not been made, and will not be made, public, Patent Owner presented this information during the hearing on October 30, 2014, which

---

[4] Additionally, we note that confidential information subject to a protective order ordinarily would become public 45 days after final judgment in a trial. Office Patent Trial Practice Guide, 77 Fed. Reg. at 48,761.  However, after denial of a petition to institute a trial or after final judgment in a trial, a party may file a motion to expunge confidential information from the record.  37 C.F.R. § 42.56.

39

IPR2013-00478
Patent 5,544,352

was open to the public. *See* Tr. 54:12–25. We, therefore, determine that Patent Owner has not met its burden of proof.

Regarding Petitioner's Motion to Seal, Patent Owner's designation of the transcript as confidential is not sufficient to show that the transcript contains confidential information. We, therefore, determine that Petitioner has not met its burden of proof.

We recognize a denial of the motions to seal would unseal immediately the material that Patent Owner desires to remain confidential and the effect would be irreversible. Therefore, rather than denying the motions at this time, we will provide Patent Owner and Petitioner one week to (1) withdraw the motions to seal and request that we expunge Exhibits 2114 and 1034, or (2) withdraw the motions to seal, request that we expunge Exhibits 2114 and 1034, and replace them with redacted versions that leave out the confidential information. We note that we have not relied on the three paragraphs of the Langville Declaration that Patent Owner identifies as containing allegedly confidential information.

## III.    CONCLUSION

We conclude that Petitioner has shown by a preponderance of the evidence that claims 26, 28–30, 32, 34, and 39 of the '352 patent are unpatentable under 35 U.S.C. § 103, as they would have been obvious over Fox Thesis, Fox SMART, and Fox Collection, taken together.

40

IPR2013-00478
Patent 5,544,352

## IV.    ORDER

For the reasons given, it is

ORDERED that claims 26, 28–30, 32, 34, and 39 of U.S. Patent No. 5,544,352 are determined by a preponderance of the evidence to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude the Reply Declaration of Dr. Edward A. Fox (Exhibit 1030) is denied;

FURTHER ORDERED that Exhibit 2114 and Exhibit 1034 will be made available to the public after 5 PM Eastern five business days after the entry date of this decision, unless prior to that time, each of Patent Owner and Petitioner (1) withdraws the motions to seal and requests that we expunge Exhibits 2114 and 1034, or (2) withdraws the motions to seal, requests that we expunge Exhibits 2114 and 1034, and replaces them with redacted versions that leave out the confidential information; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

41

IPR2013-00478
Patent 5,544,352

FOR PETITIONER:

Heidi L. Keefe
COOLEY, LLP
hkeefe@cooley.com
dcpatentdocketing@cooley.com.

David Silbert
KEKER & VAN NEST, LLP
djs@kvn.com
efiling@kvn.com

FOR PATENT OWNER:

Martin M. Zoltick
Nancy J. Linck
Soumya P. Panda
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
mzoltick@rfem.com
nlinck@rfem.com
SRA-IPR@rfem.com

42

**ADDENDUM 2**

U.S. Patent No. 5,544,352

JA05000 – JA05042

2015-1648

SOFTWARE RIGHTS ARCHIVE, LLC
v.
FACEBOOK, INC., LINKEDIN CORPORATION, TWITTER, INC.

US005544352A

# United States Patent [19]

## Egger

[11] **Patent Number:** 5,544,352

[45] **Date of Patent:** Aug. 6, 1996

[54] **METHOD AND APPARATUS FOR INDEXING, SEARCHING AND DISPLAYING DATA**

[75] Inventor: **Daniel Egger**, Washington, D.C.

[73] Assignee: **Libertech, Inc.**, Durham, N.C.

[21] Appl. No.: **76,658**

[22] Filed: **Jun. 14, 1993**

[51] Int. Cl.[6] .................................................. G06F 17/30

[52] U.S. Cl. .............. **395/600**; 364/419.19; 364/DIG. 1; 364/282.1; 364/283.3

[58] Field of Search ...................... 395/600; 364/419.19, 364/419.13

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,839,853 | 6/1989 | Deerwester et al. ...................... | 395/600 |
| 4,945,476 | 7/1990 | Bodick et al. ....................... | 364/413.02 |
| 5,122,951 | 6/1992 | Kamiya ................................. | 364/419.13 |
| 5,157,783 | 10/1992 | Anderson et al. ...................... | 395/600 |
| 5,206,949 | 4/1993 | Cochran et al. ....................... | 395/600 |
| 5,241,671 | 8/1993 | Reed et al. .............................. | 395/600 |
| 5,243,655 | 9/1993 | Wang ........................................ | 380/51 |
| 5,301,109 | 4/1994 | Landauer et al. ................... | 364/419.19 |
| 5,325,298 | 6/1994 | Gallant .................................. | 364/419.19 |
| 5,418,948 | 5/1995 | Turtle ..................................... | 395/600 |

### OTHER PUBLICATIONS

Agosti, et al., "A Two–Level Hypertext Retrieval Model for Legal Data," SIGIR '91 (1991).

Fowler, et al., "Integrating Query, Thesaurus and Documents Through a Commn Visual Representation," SIGIR '91 (1991).

Rose & Belew, "Legal Information Retrieval: a Hybrid Approach," ICAIL '89 (1989).

Belew, Richard, "A Connectionist Approach to Conceptual Information Retrieval," ICAIL '87 (1987).

Gelbart & Smith, "Beyond Boolean Search: FLEXICON, A Legal Text–Based Intelligent System," ICAIL '91 (1991).

Lin, "A Self–Organizing Semantic Map for Information Retrieval," SIGIR '91 (1991).

Turtle & Croft, "Inference Networks for Document Retrieval," SIGIR '90 (1990).

*Primary Examiner*—Thomas G. Black
*Assistant Examiner*—Wayne Amsbury
*Attorney, Agent, or Firm*—Dorsey & Whitney PLLP

[57] **ABSTRACT**

A computer research tool for indexing, searching and displaying data is disclosed. Specifically, a computer research tool for performing computerized research of data including textual objects in a database and for providing a user interface that significantly enhances data presentation is described. Textual objects and other data in a database are indexed by creating a numerical representation of the data. The indexing technique called proximity indexing generates a quick-reference of the relations, patterns and similarity found among the data in the database. Proximity indexing indexes the data by using statistical techniques and empirically developed algorithms. Using this proximity index, an efficient search for pools of data having a particular relation, pattern or characteristic can be effectuated. The Computer Search program, called the Computer Search Program for Data represented in Matrices (CSPDM), provides efficient computer search methods. The CSPDM rank orders data in accordance with the data's relationship to time, a paradigm datum, or any similar reference. The user interface program, called the Graphical User Interface (GUI), provides a user friendly method of interacting with the CSPDM program and prepares and presents a visual graphical display. The graphical display provides the user with a two dimensional spatial orientation of the data.

**52 Claims, 24 Drawing Sheets**



Facebook Inc. Ex. 1001



**FIG. 1**

Facebook Inc. Ex. 1001



FIG. 2

Facebook Inc. Ex. 1001



FIG. 3A

Facebook Inc. Ex. 1001



FIG. 3B

Facebook Inc. Ex. 1001



FIG. 3C

Facebook Inc. Ex. 1001

FIG. 3D

Facebook Inc. Ex. 1001



**FIG. 4A**

Facebook Inc. Ex. 1001



FIG. 4B

Facebook Inc. Ex. 1001

232



400

RECEIVE SELECTION OF A
SINGLE TEXTUAL OBJECT
FROM RESEARCHER

404

EXAMINE nxn OPINION
CITATION MATRIX AND
OTHER FACTORS

408

RETRIEVE CITED
TEXTUAL OBJECTS

**FIG. 4C**

Facebook Inc. Ex. 1001



FIG. 4D

011
**JA05010**

Facebook Inc. Ex. 1001



FIG. 4E

Facebook Inc. Ex. 1001



FIG. 4F

Facebook Inc. Ex. 1001



248

RECEIVE POOL OF TEXTUAL OBJECTS IDENTIFIED BY RESEARCHER — 428

EVALUATE nxn OPINION PROXIMITY MATRIX FOR POOL OF TEXTUAL OBJECTS — 448

DETERMINE PARADIGM TEXTUAL OBJECT BY CALCULATING THE MEAN OF EUCLIDEAN DISTANCES OF TEXTUAL OBJECTS IN POOL — 452

DETERMINE SIMILARITY BETWEEN PARADIGM TEXTUAL OBJECT AND OTHER TEXTUAL OBJECTS IN POOL — 456

**FIG. 4G**

Facebook Inc. Ex. 1001

428

```
RECEIVE POOL
OF TEXTUAL
OBJECTS
IDENTIFIED BY
RESEARCHER
```

252

448

```
EVALUATE nxn
OPINION MATRIX
FOR POOL OF
TEXTUAL OBJECTS
```

460

```
EVALUATE NUMERICAL
FACTORS AND
RESULTS OF WEIGHING
ALGORITHM
CALCULATED BY THE
OPINION PATTERNER
SUBROUTINE FOR THE
POOL OF TEXTUAL
OBJECTS
```

464

```
DETERMINE
IMPORTANCE
OF EACH
TEXTUAL
OBJECT IN
POOL
```

FIG. 4H

Facebook Inc. Ex. 1001



FIG. 14I

Facebook Inc. Ex. 1001



FIG. 5A

Facebook Inc. Ex. 1001



Fig. 5B

Facebook Inc. Ex. 1001

018
JA05017

Facebook Inc. Ex. 1001

019
JA05018

*Fig. 5C*

SEARCH 1:2

U.S. V. LAM KWONG-WAH, 924 F.2d 298 (D.C. CIR.

ANALYSIS/CASES AFTER

U.S. V. LAM KWENG-WAH
924 F.2d 298
(D.C. CIR. 1991)
YEAR:1991
DATE: JAN. 25
WEIGHT:1

U.S. V. BARRY
U.S. V. BARRY, 938 F.2d 1327 (D.C. CIR. 1991)
DATE: JULY 12   WEIGHT:1
YEAR:1991

...TO OBSTRUCT THE ADMINISTRATION OF JUS
WITH RESPECT TO THE OFFENSE OF CON
OR WHETHER THE TRIAL COURT US PROC
THE ERRONEOUS BELIEF THT 83C11 DOES
REQUIRE SUCH A FINDING. THUS, ALTHOU
IN NO WAY CONDONE BARRYS PERJURY, OR
URGING OF OTHERS TO COMMIT PERJURY,
CONSTRAINED TO REMAND THE SENTENCI
PORTION OF THIS CASE FOR CLARIFICATI
APPLICATION OF THE CORRECT LEGAL ST
SEE UNITED STATES V. CABALLERO, 935 F
1291, 1299-1300 (D.C. CIR. JUNE 21, 1991).
UNITED STATES V. AM. KWONG-WAH, 924
298, 307 (D.C. CIR. 1991).

U.S. V BARRY ALLERO
938 F.2d 1327
(D.C. CIR. 1991)

RELIANCE ON

| | UNDATED | JAN 8 1992 | DEC 9 1991 | NOV 10 1991 | OCT 11 1991 | SEPT 12 1991 | AUG 13 1991 | JULY 14 1991 | JUNE 15 1991 | MAY 16 1991 |
|---|---|---|---|---|---|---|---|---|---|---|

U.S. V MOLINA 952 F.2d 514

U.S. V MCKIE 951 F.2d 399



*Fig. 5D*

Facebook Inc. Ex. 1001

020
JA05019

Facebook Inc. Ex. 1001

021
JA05020



Fig. 5E



Fig. 5F

Facebook Inc. Ex. 1001

022
JA05021



*Fig. 5G*

Facebook Inc. Ex. 1001

023
JA05022

# Fig. 5H



Facebook Inc. Ex. 1001

Schematic Representations of the Eighteen Primary Patterns



FIG. 6

Facebook Inc. Ex. 1001

5,544,352

**1**

## METHOD AND APPARATUS FOR INDEXING, SEARCHING AND DISPLAYING DATA

### TECHNICAL FIELD

This invention pertains to computerized research tools. More particularly, it relates to computerized research on stored databases. Specifically, the invention indexes data, searches data, and graphically displays search results with a user interface.

### BACKGROUND

Our society is in the information age. Computers maintaining databases of information have become an everyday part of our lives. The ability to efficiently perform computer research has become increasingly more important. The area in our society in which this is most evident is the legal profession. A major problem in the legal profession today is the great deal of time spent performing legal research. Many aspects of legal research are tedious and time consuming. Therefore, performing legal research detracts from the amount of time the attorney is able to spend on tasks that actually require him to utilize his legal judgment and reasoning. Recent efforts in the art of computer research have been aimed at reducing the time required to accomplish legal research. Current computer search programs use a text-by-text analysis procedure (Boolean Search) to scan a database and retrieve items from a database. The attorney must input a string of text, and the computer evaluates this string of text. Then the computer retrieves items from the database that match the string of text. The two most popular systems for computerized searching of data used in the legal profession are Westlaw™, a service sold by West Publishing Company, 50 W. Kellogg Blvd., P.O. Box 64526, St. Paul, Minn. 55164-0526, and Lexis™, a service sold by Mead Data Central, P.O. Box 933, Dayton, Ohio 45401.

However, Boolean searches of textual material are not very efficient. Boolean searches only retrieve exactly what the computer interprets the attorney to have requested. If the attorney does not phrase his or her request in the exact manner in which the database represents the textual object, the Boolean search will not retrieve the desired textual object. For example, if the attorney desires to retrieve cases in which a judge decided the issue before the jury could decide it, the attorney may enter "Summary Judgment" as his textual string. However, such a request will not retrieve cases that were decided by the judge under a motion to dismiss. Therefore, the researcher may effectively be denied access to significant cases, statutes, laws or other textual objects that may be crucial to the project on which the attorney is working. A second problem encountered with Boolean searches is that the search retrieves a significant amount of irrelevant textual objects. (It should be noted that in the context of legal research, a textual object could be any type of written legal material such as a judicial opinion, a statute, a treatise, a law review article, etc. The term textual object is used to stress the fact that the present invention applies to all types of databases, and not just legal research databases). The only requirement that a textual object must satisfy in order to be selected by a Boolean search program is that part of the textual object match the particular request of the researcher. For example, if the researcher desires to recover all cases that relate to a Fourth Amendment issue, the researcher may input "search and seizure" as his textual string. However, the computer will retrieve every case that

**2**

happens to mention "search and seizure" one time, even if the case has nothing to do with a Fourth Amendment issue. Since the researcher cannot possibly know all of the groupings of text within all the textual objects in the database, the researcher is unable to phrase his request to only retrieve the textual objects that are relevant.

Aside from the inefficiency of Boolean searches, the present systems for computerized searching of data are inadequate to serve the needs of a researcher for several other reasons. Even if one assumes that all the textual objects retrieved from a Boolean search are relevant, the listing of the textual objects as done by Westlaw™ or Lexis™ does not convey some important and necessary information to the researcher. The researcher does not know which textual objects are the most significant (i.e., which textual object is referred to the most by another textual object) or which textual objects are considered essential precedent (i.e., which textual objects describe legal doctrines).

In addition, both Westlaw™ and Lexis™ have a Shepardizing™ feature that enables the researcher to view a list of textual objects that mention a particular textual object. The shepardizing feature does not indicate how many times a listed textual object mentions the particular textual object. Although the shepardizing feature uses letter codes to indicate the importance of a listed textual object (e.g. an "f" beside a listed textual object indicates that the legal rule contained in particular textual object was followed in the listed textual object), data on whether a listed textual object followed the rule of a particular textual object is entered manually by employees of Shepard's™/McGraw Hill, Inc., Div. of McGraw-Hill Book Co., 420 N. Cascade Ave., Colorado Springs, Colo. 80901, toll free 1-800-525-2474. Therefore, such process is subjective and is prone to error.

Another legal research system that is available is the Westlaw™ key number system. The Westlaw™ key number system has a problem similar to the shepardizing feature on the Lexis™ and Westlaw™ systems. West key numbers are groups of textual objects organized by topic. The West key numbers enable a researcher to search for textual objects on a computerized system via the key numbers. However, the employees of West™ manually determine which cases should be categorized under which key number. Therefore, such a numbering process is subjective and is prone to error. Furthermore, many people in the legal profession have criticized the West key number system because the system is very slow to recognize new topic areas, very rigid and very difficult to keep up to date. In addition, the West™ key number system, like Boolean searches, produces pools of cases that are over-inclusive or under-inclusive.

The video displays of both the West™ and Lexis™ systems are difficult to use. The simple text displays of these systems do not provide a researcher with all the information that is available in the database.

Computerized research tools for legal opinions and related documents are probably the most sophisticated computer research tools available and therefore form the background for this invention. However, the same or similar computer research tools are used in many other areas. For example, computer research tools are used for locating prior art for a patent application. The same problems of inefficiency discussed above exist for computer research tools in many areas of our society.

What is needed is a system for computerized searching of data that is faster than the available systems of research.

What is needed is a system for computerized searching of data that enables attorneys to research in a manner in which they are familiar.

Facebook Inc. Ex. 1001

5,544,352

3

What is needed is a computerized research tool that will reorganize, re-index or reformat the data into a more efficient format for searching.

What is needed are more sophisticated methods to search data.

What is needed is a system for computerized searching of data that will significantly reduce the number of irrelevant textual objects it retrieves.

What is needed is a user friendly computerized research tool.

What is needed is a visual user interface which can convey information to a user conveniently.

What is needed is a system for computerized searching of data that easily enables the attorney himself to classify the textual object according to his or her own judgment.

What is needed is a system for computerized searching of data that provides a visual representation of "lead" textual objects and "lines" of textual objects, permitting a broad overview of the shape of the relevant legal "landscape."

What is needed is a system for computerized searching of data that provides an easily-grasped picture or map of vast amounts of discrete information, permitting researchers (whether in law or other databases) to "zero in" on the most relevant material.

What is needed is a system for computer searching of data that provides a high degree of virtual orientation and tracking, the vital sense of where one has been and where one is going, and that prevents researchers from becoming confused while assimilating a large amount of research materials.

Accordingly, there is an unanswered need for a user friendly computerized research tool. There is a need for "intelligent" research technology that emulates human methods of research. There is a need in the marketplace for a more efficient and intelligent computerized research tool.

The present invention is designed to address these needs.

SUMMARY OF THE INVENTION

This invention is a system for computerized searching of data. Specifically, the present invention significantly aids a researcher in performing computerized research on a database. The invention simplifies the research task by improving upon methods of searching for data including textual objects and by implementing a user interface that significantly enhances the presentation of the data. Simplifying such research reduces the amount of human time that must be allocated to research.

The invention begins with an existing database and indexes the data by creating a numerical representation of the data. This indexing technique called proximity indexing generates a quick-reference of the relations, patterns, and similarity found among the data in the database. Using this proximity index, an efficient search for pools of data having a particular relation, pattern or characteristic can be effectuated. This relationship can then be graphically displayed.

There are three main components to the invention; a data indexing applications program, a Computer Search Program for Data Represented by Matrices ("CSPDM"), and a user interface. Various indexing application programs, CSPDMs, and user interface programs can be used in combination to achieve the desired results. The data indexing program indexes data into a more useful format. The CSPDM provides efficient computer search methods. The preferred CSPDM includes multiple search subroutines. The user

4

interface provides a user friendly method of interacting with the indexing and CSPDM programs. The preferred user interface program allows for easy entry of commands and visual display of data via a graphical user interface.

The method which the invention uses to index textual objects in a database is called Proximity Indexing. Proximity Indexing is a method of preparing data in a database for subsequent searching by advanced data searching programs. Proximity Indexing indexes the data by using statistical techniques and empirically developed algorithms. The resulting search by an advanced data searching program of the Proximity Indexed data is significantly more efficient and accurate than a simple Boolean search.

The Proximity Indexing Application Program indexes the database into a more useful format to enable the Computer Search Program for Data Represented by Matrices (CSPDM) to efficiently search the database. The Proximity Indexing Application Program of the preferred embodiment has several subroutines, including the Extractor, the Patterner, and the Weaver. The Proximity Indexing Application Program indexes data in a locally located database or remotely located database. The database can contain any type of data including text, alphanumerics, or graphical information.

In the preferred embodiment, the database is located remotely from the Computer Processor and contains data in the form of textual objects. The Proximity Indexing Application Program indexes the textual objects by determining how each full textual object (e.g., whole judicial opinion, statute, etc.) relates to every other full textual object by using empirical data and statistical techniques. Once each full textual object is related to each other full textual object, the Proximity Indexing Application Program compares each paragraph of each full textual object with every other full textual object as described above. The Proximity Indexing Application Program then clusters related contiguous paragraphs into sections. Subsequently, the Proximity Indexing Application Program indexes each section and the CSPDM evaluates the indexed sections to determine which sections to retrieve from the database. Such organization and classification of all of the textual objects in the database before any given search commences significantly limits the irrelevant textual objects that the CSPDM program retrieves during the subsequent search and allows retrieval of material based on its degree of relevancy.

Legal research searches on systems like Westlaw™ and Lexis™ only use a series of interrelated Boolean searches of actual text to retrieve textual objects from databases. These searches unnecessarily consume valuable time and retrieve a significant number of irrelevant textual objects.

Again, this method of computerized research can be used for nearly any database including those containing non-textual material, graphical material, newspaper material, data on personal identification, data concerning police records, etc.

The remaining two programs in the present invention are the CSPDM and the GUI Program. The CSPDM has seven subroutines that each search for different pools of textual objects. The GUI Program also has seven subroutines. Each subroutine performs a different type of search. Each of the subroutines of the GUI uses the results of the corresponding subroutine of the CSPDM to create the proper display on the display.

After the Proximity Indexing Application Program indexes a database, the CSPDM application program is used to search the indexed database. The CSPDM program can

Facebook Inc. Ex. 1001

5

either be located in memory that is remote from the Computer Processor or local to the Computer Processor. In addition, the CSPDM program can either be remote or local in relation to the database.

The subroutines of the CSPDM that utilize the matrix coefficients and other data created by the Proximity Indexing Application Program to facilitate its search. However, if the researcher does not have the particular textual object citation available, the researcher can perform a Boolean search to retrieve and organize a pool of textual objects. Alternatively, the researcher can subsequently search for related textual objects by using the Pool-Similarity Subroutine, the Pool-Paradigm Subroutine, the Pool-Importance Subroutine or the Pool-Paradigm-Similarity Subroutine as defined below.

If the researcher already has the citation of a particular textual object available, the researcher can search for related textual objects by utilizing the Cases-In Subroutine, Cases-After Subroutine or Similar-Cases Subroutine. The Cases-In Subroutine retrieves all of the textual objects from the database to which a selected textual object refers. In addition, the subroutine determines the number of times the selected textual object refers to each retrieved textual object and other characteristics of each textual object, including its importance, and degree of relatedness to the selected textual object.

The Cases-After Subroutine retrieves all of the textual objects from the database that refer to the selected textual object. Also, the subroutine determines the number of times each retrieved textual object refers to the selected textual object and other characteristics of each textual object, including its importance, and degree of relatedness to the particular textual object to which it refers.

The Similar-Cases Subroutine determines the degree of similarity between the retrieved textual objects and the selected textual object. Similarity is defined, in the context of legal cases, as the extent to which the two textual objects lie in the same lines of precedent or discuss the same legal topic or concept.

In addition, if the researcher does not know of a certain particular textual object on which to base his or her search, the researcher may execute a Boolean word search. After a standard Boolean word search has been run, the researcher may run the Pool-Similarity Subroutine to retrieve information containing the degree of similarity between each textual object in the pool and a particular textual object selected by the user. Similarly, the Pool-Importance Subroutine can be used to determine the degree of importance (i.e., whether a judicial opinion is a Supreme Court opinion or a District Court opinion) and other characteristics of each textual object retrieved using the Boolean word search.

The Pool-Paradigm Subroutine calculates the geographic center in vector space of the pool of textual objects retrieved by the Boolean word search or other pool generating method. It then orders the retrieved textual objects by their degree of similarity to that center or "paradigm." The researcher can then evaluate this "typical textual object" and utilize it to help him or her find other relevant textual objects. In addition, the researcher can scan through neighboring "typical textual objects" to evaluate legal subjects that are closely related to the subject of the researcher's search.

The Pool-Paradigm-Similarity Subroutine similarly creates a paradigm textual object from the retrieved textual objects. However, the subroutine calculates the similarity of all textual objects in the database to the paradigm textual object in addition to the similarity of the retrieved textual objects to the paradigm textual object.

6

After the CSPDM has retrieved the desired textual objects, the Graphical User Interface (GUI) Program may be used to display the results of the search on the display. The GUI is a user interface program. The GUI Program contains three main subroutines: Cases-In Display Subroutine (CIDS), Cases-After Display Subroutine (CADS) and Similar-Cases Display Subroutine (SCDS). The main subroutines receive information from the corresponding subroutines Cases-In, Cases-After and Similar-Cases of the CSPDM. The GUI Program also contains four secondary subroutines: Pool-Similarity Display Subroutine ("PSDS"), Pool-Paradigm Display Subroutine ("PPDS"), Pool-Importance Display Subroutine ("PIDS"), and the Pool-Paradigm-Similarity Subroutine (PPSDS). The secondary subroutines also receive information from the corresponding subroutines Pool-Similarity Subroutine, Pool-Paradigm Subroutine, Pool-Importance Subroutine and the Pool-Paradigm Similarity Subroutine of the CSPDM.

The CIDS subroutine receives information gathered from the Cases-In Subroutine of the CSPDM. The CIDS subroutine displays user friendly active boxes and windows on the display 38 which represent the textual objects retrieved from the database represented in Euclidean space. The display depicts the appropriate location of textual objects in Euclidean space on a coordinate means. The coordinate means may have one or more axis, but the present embodiment contains two axes. The horizontal axis of the coordinate means represents the time of textual object creation. The vertical axis represents a weighted combination of the number of sections in which that particular retrieved text is cited or discussed, its degree of importance, and its degree of similarity to the host textual object. The CIDS also enables the researcher to open up various active boxes on the display by entering a command into the computer processor with the input means. After entering the proper command, the active box transforms into a window displaying additional information about the selected textual object. These windows can be moved about the display and stacked on top or placed beside each other via the input means to facilitate viewing of multiple windows of information simultaneously. Since the number of textual objects retrieved in a single search may exceed the amount which could be displayed simultaneously, the GUI Program enables the researcher to "zoom in" or "zoom out" to different scales of measurement on both the horizontal and vertical axis.

The CADS receives information gathered by the Cases-After Subroutine of the CSPDM. The CADS creates a display similar to the CIDS display. However, the active boxes representing the retrieved textual objects indicate which textual objects in the database refer to a selected textual object as opposed to which textual objects a selected textual object refers.

The SCDS receives information gathered by the Similar-Cases Subroutine of the CSPDM. The SCDS causes a similar display on the display as the CIDS and the CADS except that the vertical axis indicates the degree of similarity between the retrieved textual objects and the selected textual object.

The GUI Program contains four secondary subroutines: Pool-Search Display Subroutine (PSDS), Pool-Paradigm Display Subroutine (PPDS), Pool-Importance Display Subroutine (PIDS) and the Pool-Paradigm-Similarity Display Subroutine (PPSDS). The PSDS receives the results gathered by the Pool-Search Subroutine of the CSPDM. The PPDS receives the results gathered by the Pool-Paradigm Subroutine of the CSPDM. The PIDS receives the results gathered by the Pool-Importance Subroutine of the CSPDM.

Facebook Inc. Ex. 1001

5,544,352

7

The PPSDS receives the results gathered by the Pool-Paradigm-Similarity Subroutine of the CSPDM. The results of the PSDS, PPDS, PIDS and PPSDS are then displayed in a user friendly graphical manner similar to the results of the CIDS, CADS and SCDS. A researcher can access the PSDS, PIDS, PSDS or PPSDS from any of the three main or four secondary subroutines of the GUI to gather information corresponding to the active boxes that represent the pool of textual objects retrieved by the corresponding subroutine of the CSPDM.

By using the graphical display, the researcher can view immediately a visual representation of trends developing in the law and current and past legal doctrines. In addition, the researcher can immediately identify the important precedent and which textual object serving as the precedent is most important to the project on which the researcher is working. This visual representation is a vast improvement over the current computerized research tools. Furthermore, the researcher using the present invention does not have to rely on the interpretation of another person to categorize different textual objects because the researcher can immediately visualize the legal trends and categories of law. In addition, new topic areas can be recognized without direct human intervention. The current research programs require a researcher to read through the actual text of a number of textual objects in order to determine which textual objects are important, interrelated, or most closely related to the topic at hand and which ones are not.

It is an object of this invention to create an efficient and intelligent system for computerized searching of data that is faster than available systems of research.

It is an object of the invention to integrate the system of computerized searching into the techniques to which researchers are already accustomed.

It is an object of the invention to utilize statistical techniques along with empirically generated algorithms to reorganize, re-index and reformat data in a database into a more efficient model for searching.

It is an object of the invention to utilize statistical techniques along with empirically generated methods to increase the efficiency of a computerized research tool.

It is an object of the invention to create a system of computerized searching of data that significantly reduces the number of irrelevant textual objects retrieved.

It is an object of this invention to create a user friendly interface for computer search tools which can convey a significant amount of information quickly.

It is an object of the invention to enable the researcher to easily and immediately classify retrieved textual objects according to the researcher's own judgment.

It is an object of the invention to provide a visual representation of "lead" textual objects and "lines" of textual objects, permitting a broad overview of the shape of the relevant legal "landscape."

It is an object of the invention to provide an easily-grasped picture or map of vast amounts of discrete information, permitting researchers (whether in law or other databases) to "zero in" on the most relevant material.

It is an object of the invention to provide a high degree of virtual orientation and tracking that enables a researcher to keep track of exactly what information the researcher has already researched and what information the researcher needs to research.

These and other objects and advantages of the invention will become obvious to those skilled in the art upon review

8

of the description of a preferred embodiment, and the appended drawings and claims.

DESCRIPTION OF THE DRAWINGS

FIG. 1 is a high level diagram of the hardware for the system for computerized searching of data.

FIG. 2 is high level diagram of the software for the system for computerized searching of data. The three main programs are the Proximity Indexing Application Program, the Computer Search Program for Data Represented by Matrices (CSPDM) Application Program and the Graphical User Interface (GUI) Program.

FIG. 3A is a flow chart illustrating a possible sequence of procedures that are executed during the Proximity Indexing Application Program.

FIG. 3B is a flow chart illustrating a possible sequence of the specific subroutines that are executed during one stage of the Proximity Indexing Application Program. The subroutines are the Initial Extractor Subroutine, Opinion Patterner Subroutine, the Opinion Weaver Subroutine, the Paragraph Patterner Subroutine (Optional), the Paragraph Weaver Subroutine and the Section Comparison Subroutine.

FIG. 3C is flow chart illustrating a possible sequence of subroutines that are executed after the Section Comparison Subroutine. The Section Comparison Subroutine may comprise the Sectioner-Geographic Subroutine and the Section-Topical Subroutine (Optional). The sequence of subroutines executed after the Section Comparison Subroutine are the Section Extractor Subroutine, the Section Patterner Subroutine and the Section Weaver Subroutine.

FIG. 3D is a high level flow chart illustrating a possible sequence of subroutines that comprise the Boolean Indexing Subroutine which are executed during another stage of the Proximity Indexing Application Program. The first two subroutines, Initialize Core English Words and Create pxw Boolean Matrix, are executed by the Initial Extractor Subroutine. The results are then run through the Pool-Patterner Subroutine, the Pool-Weaver Subroutine, the Pool-Sectioner Subroutine, the Section-Extractor Subroutine, the Section-Patterner Subroutine and the Section Weaver Subroutine.

FIG. 4A is a high level diagram illustrating the flow of various search routines depending on the type of search initiated by the user by inputting commands to the Computer Processor via the input means. The diagram further illustrates the interaction between the CSPDM and the GUI Program.

FIG. 4B is a high level flow chart illustrating the sequence of subroutines in the CSPDM program and user interactions with the subroutines.

FIG. 4C is a high level flow chart for the Cases-In Subroutine.

FIG. 4D is a high level flow chart for the Cases-After Subroutine.

FIG. 4E is a high level flow chart for the Similar-Cases Subroutine.

FIG. 4F is a high level flow chart for the Pool-Similarity Subroutine.

FIG. 4G is a high level flow chart for the Pool-Paradigm Subroutine.

FIG. 4H is a high level flow chart for the Pool-Importance Subroutine.

FIG. 4I is a high level flow chart showing two possible alternate Pool-Paradigm-Similarity Subroutines.

Facebook Inc. Ex. 1001

5,544,352

<table>
<tr><td>9</td><td>10</td></tr>
</table>

FIG. 5A is a high level diagram illustrating the interaction between respective subroutines of the CSPDM and of the GUI Program. The diagram further illustrates the interaction between the GUI Program and the display.

FIG. 5B is an example of the display once the Cases-After Display Subroutine (CADS) is executed.

FIG. 5C is an example of the display after a user selects an active box representing a textual object retrieved by the Cases-After Subroutine and chooses to open the "full text" window relating to the icon.

FIG. 5D is an example of the display once the Cases-In Display Subroutine (CIDS) is executed.

FIG. 5E is an example of the display once the Similar-Cases Display Subroutine (SCDS) is executed.

FIG. 5F is an example of the display after a user chooses to execute the Similar Cases Subroutine for a textual object retrieved by the Similar-Cases Subroutine represented in FIG. 5E.

FIG. 5G is an example of the display after a user chooses to execute the Similar Cases Subroutine for one of the cases retrieved by the Similar-Cases Subroutine represented in FIG. 5F.

FIG. 5H depicts an Execute Search Window.

FIG. 6 Schematic Representations of the Eighteen Primary Patterns.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring now to the drawings, the preferred embodiment of the present invention will be described.

FIG. 1 is an overview of the preferred embodiment of the hardware system 26 for computerized searching of data. The hardware system 26 comprises a Computer Processor 30, a database 54 for storing data, input means, display 38, and RAM 34.

The Computer Processor 30 can be a processor that is typically found in Macintosh computers, IBM computers, portable PCs, clones of such PC computers (e.g. Dell computers), any other type of PC, or a processor in a more advanced or more primitive computing device. Parallel processing techniques may also be utilized with this invention.

The database 54 is connected to the Computer Processor 30 and can be any device which will hold data. For example, the database 54 can consist of any type of magnetic or optical storing device for a computer. The database 54 can be located either remotely from the Computer Processor 30 or locally to the Computer Processor 30. The preferred embodiment shows a database 54 located remotely from the Computer Processor 30 that communicates with the personal computer 28 via modem or leased line. In this manner, the database 54 is capable of supporting multiple remote computer processors 50. The preferred connection 48 between the database 54 and the Computer Processor 30 is a network type connection over a leased line. It is obvious to one skilled in the art that the database 54 and the Computer Processor 30 may be electronically connected in a variety of ways. In the preferred embodiment the database 54 provides the large storage capacity necessary to maintain the many records of textual objects.

The input means is connected to the Computer Processor 30. The user enters input commands into the Computer Processor 30 through the input means. The input means could consist of a keyboard 46, a mouse 42, or both working

in tandem. Alternatively, the input means could comprise any device used to transfer information or commands from the user to the Computer Processor 30.

The display 38 is connected to the Computer Processor 30 and operates to display information to the user. The display 38 could consist of a computer monitor, television, LCD, LED, or any other means to convey information to the user.

The Random Access Memory (RAM 34) is also connected to the Computer Processor 30. The software system 60 for computerized searching of data may reside in the RAM 34, which can be accessed by the Computer Processor 30 to retrieve information from the software routines. A Read Only Memory (ROM), Erasable Programmable Read Only Memory (EPROM), disk drives, or any other magnetic storage device could be used in place of the RAM 34. Furthermore, the RAM 34 may be located within the structure of the Computer Processor 30 or external to the structure.

The hardware system 26 for computerized searching of data shown in FIG. 1 supports any one, or any combination, of the software programs contained in the software system 60 for computerized searching of data. The software system 60 for the computerized searching of data comprises one or more of the following programs: the Proximity Indexing Application Program 62, the Computer Search Program for Data Represented by Matrices (CSPDM 66) and the Graphical User Interface (GUI) Program. The Proximity Indexing Application Program 62 could reside in RAM 34 or in separate memory connected to the database 54. The Computer Processor 30 or a separate computer processor 50 attached to the database 54 could execute the Proximity Indexing Application Program 62. In the preferred embodiment the Proximity Indexing Application Program 62 resides in separate memory that is accessible to the database 54, and a separate computer processor 50 attached to the database 54 executes the Proximity Indexing Application Program 62.

The CSPDM 66 could reside in the RAM 34 connected to the Computer Processor 30 or in the separate memory connected to the database 54. In the preferred embodiment, the CSPDM 66 is located in the RAM 34 connected to the Computer Processor 30. The CSPDM 66 may use the display 38 to depict input screens for user entry of information.

The GUI Program 70 could likewise reside in the RAM 34 connected to the Computer Processor 30 or in separate memory connected to the database 54. In the preferred embodiment, the GUI Program 70 is located in the RAM 34 connected to the Computer Processor 30. The GUI Program 70 also communicates with the display 38 to enhance the manner in which the display 38 depicts information.

FIG. 2 is an overview of the preferred embodiment of the software system 60 for computerized searching of data. The software system 60 for computerized searching of data comprises at least one or more of the following programs: the Proximity Indexing Application Program 62, the Computer Search Program for Data Represented by Matrices (CSPDM 66) and the Graphical User Interface (GUI) Program. Proximity Indexing is a method of identifying relevant data by using statistical techniques and empirically developed algorithms. The Proximity Indexing Application Program 62 is an application program which indexes the database 54 to a proper format to enable the Computer Search Program for Data Represented by Matrices (CSPDM 66) to properly search the database 54. The Proximity Indexing Application Program 62 can index data in a local

Facebook Inc. Ex. 1001

5,544,352

11

database **54** or a remote database **54**. The Proximity Indexing Application Program **62** is shown in more detail in FIGS. 3A to 3D.

After the Proximity Indexing Application Program **62** indexes the database **54**, the CSPDM **66** application program can adequately search the database **54**. The CSPDM **66** program searches the database **54** for textual objects according to instructions that the user enters into the Computer Processor **30** via the input means. The CSPDM **66** then retrieves the requested textual objects. The CSPDM **66** either relays the textual objects and other information to the GUI program in order for the GUI program to display this information on the display **38**, or the CSPDM **66** sends display commands directly to the Computer Processor **30** for display of this information. However, in the preferred embodiment, the CSPDM **66** relays the textual objects and other commands to the GUI Program **70**. The CSPDM **66** is described in more detail in FIGS. 4A to 4I.

After the CSPDM **66** has retrieved the textual objects, the Graphical User Interface (GUI) Program, which is a user interface program, causes the results of the search to be depicted on the display **38**. The GUI Program **70** enhances the display of the results of the search conducted by the CSPDM **66**. The GUI Program **70**, its method and operation, can be applied to other computer systems besides a system for computerized searching of data. The GUI Program **70** is described in more detail in FIGS. 5A to 5H.

FIGS. 3A to 3D depict examples of the preferred procedures and subroutines of a Proximity Indexing Application Program **62**, and possible interactions among the subroutines. FIG. 3A depicts a sequence of procedures followed by the Proximity Indexing Application Program **62** to index textual objects for searching by the CSPDM **66**. FIG. 3B depicts specific subroutines that the Proximity Indexing Application Program **62** executes to partition full textual objects into smaller sections. FIG. 3C depicts subroutines executed by the Section Comparison Routine of FIG. 3B and subsequent possible subroutines to format and index the sections. FIG. 3D depicts a sequence of subroutines of the Proximity Indexing Application Program **62** which first sections and then indexes these sections of "core english words" **140** contained in the database **54**. "core english words" **140** are words that are uncommon enough to somewhat distinguish one textual object from another. The word searches of the CSPDM **66** search these sections of core English words to determine which textual objects to retrieve.

Before describing the Proximity Indexing Application Program **62** in detail, a preliminary description of the Proximity indexing method would be helpful.

"Proximity indexing" is a method of indexing that uses statistical techniques and empirically generated algorithms to organize and categorize data stored in databases. The Proximity Indexing Application Program **62** applies the Proximity indexing method to a database **54**. The preferred embodiment of the present invention uses the Proximity Indexing Application Program **62** to Proximity index textual objects used for legal research by indexing objects based on their degree of relatedness—in terms of precedent and topic—to one another.

Applying the method to legal research, the "Proximity indexing" system treats any discrete text as a "textual object." Textual objects may contain "citations," which are explicit references to other textual objects. Any legal textual object may have a number or different designations of labels. For example, 392 U.S. 1, 102 S.Ct 415, 58 U.S.L.W. 1103, etc. may all refer to the same textual object.

12

Cases are full textual objects that are not subsets of other textual objects. Subsets of a full textual object include words, phrases, paragraphs, or portions of other full textual objects that are referred to in a certain full textual object. (The system does not treat textual objects as subsets of themselves.)

Every case, or "full" textual object, is assigned a counting-number "name"—designated by a letter of the alphabet in this description—corresponding to its chronological order in the database **54**. Obviously, textual objects may contain citations only to textual objects that precede them. In other words, for full textual objects, if "B cites A," (i.e. "A is an element of B" or "the set 'B' contains the name 'A'"), textual object A came before B, or symbolically, A<B. Every textual object B contains a quantity of citations to full textual objects, expressed as $Q(B)$, greater than or equal to zero, such that $Q(B)<B$.

Textual objects other than full textual objects may be subsets of full textual objects and of each other. For example, a section, page, or paragraph of text taken from a longer text may be treated as a textual object. Phrases and words are treated as a special kind of textual object, where $Q(w)=0$. Sections, pages, and paragraphs are generally subsets of only one full textual object, and may be organized chronologically under the numerical "name" of that full textual object. For purposes of chronology, phrases and words are treated as textual objects that precede every full textual object, and can generally be treated as members of a set with name "0," or be assigned arbitrary negative numbers.

Any two textual objects may be related to each other through a myriad of "patterns." Empirical research demonstrates that eighteen patterns capture most of the useful relational information in a cross-referenced database **54**. A list of these eighteen patterns, in order of importance, is attached as Appendix #1. (For a discussion on probability theory and statistics, see Wilkinson, Leland; SYSTAT: The System for Statistics; Evanston, Ill.: SYSTAT Inc., 1989 incorporated herein by reference.) Some patterns occur only between two full textual objects, and others between any two textual objects; this distinction is explained below. Semantical patterning is only run on patterns number one and number two of Appendix #1. For purposes of explaining how patterns are used to generate the Proximity Index, only the two simplest patterns are illustrated.

The simplest, Pattern **#1**, is "B cites A." See Appendix No. 1. In the notation developed, this can be diagramed: a b c A d e f B g h i where the letters designate textual objects in chronological order, the most recent being on the right, arrows above the text designate citations to A or B, and arrows below the text designate all other citations. The next simplest pattern between A and B, Pattern **#2**, is "B cites c and A cites c," which can also be expressed as "there exists c, such that c is an element of (A intersect B)." See Appendix No. 1. This can be diagramed: a b c A d e f B g h i. For every textual object c from 0 to (A–1), the existence of Pattern #2 on A and B is signified by 1, its absence by 0. This function is represented as P#2AB(c)=1 or P#2AB(c)=0. The complete results of P#1AB and P#2AB can be represented by an (A)×(1) citation vector designated X.

The functions of some Patterns require an (n)×(1) matrix, a pattern vector. Therefore it is simplest to conceive of every Pattern function generating an (n)×(1) vector for every ordered pair of full textual objects in the database **54**, with "missing" arrays filled in by 0s. Pattern Vectors can be created for Pattern #1 through Pattern #4 by just using the

Facebook Inc. Ex. 1001

5,544,352

13

relationships among textual object A and the other textual objects in the database 54 and among textual object B and the other textual objects in the database 54. Pattern Vectors for Patterns #5 through #18 can only be created if the relationship of every textual object to every other textual object is known. In other words, Pattern Vectors for Patterns #1 through #4, can be created from only the rows A and B to the Citation Matrix but Pattern Vectors for Patterns #5 through #18 can only be created from the whole Citation Matrix. (See Appendix #1):

(total textual objects c) / (theoretical maximum textual objects c) $[(x)(x)^T/\text{TMax}]$,

(total textual objects c) / (actual maximum textual objects c) $[(x)(x)^T/\text{AMax}]$ frequency of object c per year [f], and

the derivative of the frequency [f].

In pattern #2, given that A<B, the theoretical maximum ("TMax") number Q(A intersect B)=A minus 1. The actual maximum possible ("AMax"), given A and B,is the lesser of Q(A) and Q(B). The ratios "$\underline{X(X)}^T$/TMax" and "$\underline{X}$ ( $\underline{X})^T$/AMax," as well as the frequency of occurrence of textual objects c per year, f2(A, B), and the first derivative f2(A, B), which gives the instantaneous rate of change in the frequency of "hits," are all defined as "numerical factors" generated from patterns #1 and #2. These are the raw numbers that are used in the weighing algorithm.

For Pattern #2, the total number of possible textual objects c subject to analysis, (i.e. TMax) is A−1 (one) and is only for the years at issue which are those up to the year in which A occurred. However, a relationship may remain "open," that is, it may require recalculation of f(x) and f'(x) as each new textual object is added to the database 54, (for a total of n cases subject to analysis).

The "numerical factors" for all eighteen patterns are assigned various weights in a weighing algorithm used to generate a scalar F(A, B). The function F generates a scalar derived from a weighted combination of the factors from all eighteen patterns. The patterns are of course also weighted by "importance," allowing Supreme Court full textual objects to impose more influence on the final scalar than District Court full textual objects, for example. The weighing of the more than 100 factors is determined by empirical research to give results closest to what an expert human researcher would achieve. The weighing will vary depending upon the type of material that is being compared and the type of data in the database 54. (See Thurstone. The Vectors of Mind, Chicago, Ill.: University of Chicago Press, 1935, for a description of factor loading and manipulating empirical data incorporated herein by reference.) In a commercial "Proximity Indexer" it will be possible to reset the algorithm to suit various types of databases.

A scalar F(A, B) is generated for every ordered pair of full cases in the database 54, from F(1, 2) to F(n−1, n). F(z,z) is defined as equal to 0.

The full results of F(A,B) are arranged in an (n)×(n) matrix designated F. Note that F(B, A) is defined as equal to F(A, B), and arrays that remain empty are designated by 0. For every possible pairing of cases (A,B), a Euclidean distance D(A,B) is calculated by subtracting the Bth row of Matrix F from the Ath row of Matrix F. In other words:

$$D(A,B)=[(F(1, A)-F(1, B))^2+(F(2, A)-F(2, B)^2+ \ldots +(F(n, A)-F(n, B))^2]^{1/2}.$$

A function designated D(A,B) generates a scalar for every ordered pair (A,B), and hence for every ordered pair of textual objects (A,B) in the database 54. The calculations

14

D(A,B) for every ordered pair from D(1,1) to D(n,n) are then arranged in an (n)×(n) "proximity matrix" D. Every column vector in D represents the relationship between a given case A and every other case in the database 54. Comparing the column vectors from column A (representing textual object A) and column B (representing textual object B) allows one to identify their comparative positions in n-dimensional vector space, and generate a coefficient of similarity, S(A,B), from 0–100%, which is more precise and sophisticated than F(A,B) or D(A,B) alone. A similarity subroutine can run directly on F(A,B). However, the real power of the Proximity Matrix D is that it allows one to identify "groups" or "clusters" of interrelated cases.

Through factor loading algorithms, the relationships represented by D for "n" cases can be re-represented in a vector space containing fewer than "n" orthogonal vectors. This knowledge can be reflected in S(A,B).

The Proximity Indexing Application Program 62 is an application program that applies the above techniques and algorithms to index and format data to be searched by the CSPDM 66. FIG. 3A describes the overall procedure of the Proximity Application Indexing Program 72. The first stage initializes the data 74 in the database 54. The second stage determines the relationships between full textual objects 78. The third stage determines the relationships between paragraphs of each textual object and each full textual object 80. The fourth stage clusters related paragraphs using factor loading and empirical data and then groups the paragraphs into sections based on such data 84. The fifth stage determines the relationships between the sections 88. In the final stage, the sectioned textual objects are not further processed until commands are received from the CSPDM Routine 92.

The following description of FIG. 3B and FIG. 3C elaborates on this general procedure by describing specific subroutines of the preferred Proximity Application Indexing Program. The following is a step by step description of the operation of the Proximity Index Application Program.

Section A Initial Extractor Subroutine 96:

FIG. 3B describes subroutines for the first portion of the preferred Proximity Indexing Application Program 62. The first subroutine of the Proximity Indexing Applications Program is the Initial Extractor Subroutine 96. The Initial extractor subroutine 96 performs three primary functions: Creation of the Opinion Citation Matrix, creation of the Paragraph Citation Matrix, and creation of Boolean Word Index.

The following steps are performed by the Initial extractor subroutine 96.

1. Number all full textual objects chronologically with arabic numbers from 1 through n.

2. Number all paragraphs in all the full textual objects using arabic numbers from 1 through p.

3. Identify the page number upon which each paragraph numbered in step two above begins.

4. Create Opinion Citation Vectors (X). By comparing each full textual object in the data base to every other full textual object in the data base that occurred earlier in time.

5. Combine Opinion Vectors to create the bottom left half portion of the n×n Opinion citation matrix.

6. Create a mirror image of the bottom left half portion of the Opinion citation matrix in the top right half portion of the same matrix, to complete the matrix. In this manner only n²/2 comparisons need to be conducted. The other ½ of the comparisons are eliminated.

7. Create the p×n Paragraph Citation Vectors by comparing each paragraph to each full textual object that occurred at an earlier time. This will require (n/2)p searches.

Facebook Inc. Ex. 1001

5,544,352

**15**

8. Create a Paragraph Citation Matrix by combining Paragraph Citation Vectors to create the bottom left half portion of the matrix.

9. Complete the creation of the Paragraph Citation Matrix by copying a mirror image of the bottom left half portion of the matrix into the top right half portion of the matrix.

10. Initialize the Initial extractor subroutine **96** with a defined set of core English words.

11. Assign identification numbers to the core English words. In the preferred embodiment 50,000 English words are used and they are assigned for identification the numbers from −50,000 to −1.

12. Create a Boolean Index Matrix **144** with respect to the core English words by searching the database **54** for the particular word and assigning the paragraph number of each location of the particular word to each particular word. This procedure is described in greater detail in FIG. **3D**.

Section B Opinion Patterner Subroutine **100**:

The Opinion Patterner Subroutine **100** performs three primary functions: Pattern analysis on matrices, calculation of the numerical factors and weighing the numerical factors to reach resultant numbers.

13. Process the Opinion Citation Matrix through each of the pattern algorithms contained in appendix #1 for each ordered pair of full textual objects to create opinion pattern vectors for each pattern and for each pair of full textual objects. The pattern algorithms determine relationships which exist between the ordered pair of textual objects. (See Appendix #1) The first four pattern algorithms can be run utilizing just the Opinion Citation Vector for the two subject full textual objects. Each pattern algorithm produces a opinion pattern vector as a result. The fifth through eighteenth pattern algorithms require the whole Opinion Citation Matrix to be run through the Opinion Patterner Subroutine **100**.

14. Calculate total hits (citation) for each pattern algorithm. This can be done by taking the resultant opinion pattern vector (OPV) and multiplying it by the transposed opinion pattern vector $(OPV)^T$ to obtain a scalar number representing the total hits.

15. Calculate the theoretical maximum number of hits. For example, in the second pattern of Appendix #1, the theoretical maximum is all of the full textual objects that occur prior in time to case A (A−1).

16. Calculate the actual maximum number of hits. For example, in the second pattern of Appendix #1, the actual maximum possible number of hits is the lesser of the number of citations in full textual object Q(A) or full textual object Q(B).

17. Calculate the total number of hits (citations) per year. This is labeled f(A,B).

18. Calculate the derivative of the total change in hits per year. This is the rate of change in total hits per year and is labeled f′ (A,B).

19. Calculate the ratio of total hits divided by theoretical max $[(oPV)(oPV)^{T/TMAX}]$.

20. Calculate the ratio of the total hits divided by the actual maximum $[(oPV)(oPV)^T_{/AMAX}]$.

21. Calculate a weighted number F(A,B) which represents the relationship between full textual object A and full textual object B. The weighted number is calculated using the four raw data numbers, two ratios and one derivative calculated above in steps 14 through 20 for each of the 18 patterns. The weighing algorithm uses empirical data or loading factors to calculate the resulting weighted number.

22. The Opinion Patterner Subroutine **100** sequence for the Opinion Citation Matrix is repeated n−1 times to com-

**16**

pare each of the ordered pairs of full textual objects. Therefore, during the process, the program repeats steps 13 through 21, n−1 times.

23. Compile the Opinion Pattern Matrix by entering the appropriate resulting numbers from the weighing algorithm into the appropriate cell locations to form an n×n Opinion Pattern Matrix.

Section C The Opinion Weaver Subroutine **104**:

The Opinion Weaver Subroutine **104** performs two primary tasks: calculation of the Opinion Proximity Matrix and calculation of the Opinion Similarity Matrix. The Opinion Proximity Matrix D is generated by calculating the Euclidean Distance between each row A and B of the Opinion Pattern Matrix (D(A,B)) for each cell DC(A,B ). The Opinion Similarity Matrix is generated by calculating the similarity coefficient from 0 to 100 between each row A and B of the Opinion Proximity Matrix (S(A,B)) in each cell SC(A,B) in matrix S.

24. Calculate the n×n Opinion Proximity Matrix. To calculate D(A,B) the program takes the absolute Euclidian distance between column A and column B of the n×n Opinion Pattern Matrix. The formula for calculating such a distance is the square root of the sum of the squares of the distances between the columns in each dimension, or:

$$D(A,B)=[(F(1,A)-F(1,B))^2+(F(2,A)-F(2,B))^2+ \ldots +(F(N,A)F(N,B))^2]^{1/2}$$

The Opinion Proximity Matrix created will be an n×n matrix. The smaller the numbers in the Opinion Proximity Matrix the closer the relationship between full textual object A and full textual object B.

25. Create n×n Opinion Similarity Matrix. To calculate the Opinion Similarity Matrix each scalar number in the Opinion Proximity Matrix is processed through a coefficient of similarity subroutine which assigns it a number between 0 and 100. By taking the coefficient of similarity, the program is able to eliminate full textual objects which have Euclidian distances that are great. (For example, a Euclidean distance that is very large and is run through the coefficient of similarity would result in a very low coefficient of similarity. Euclidean distances resulting in similarities below four are eliminated in the preferred embodiment).

Section D Paragraph Patterner Matrix Subroutine **108** (Optional):

26. Obtain the p×n Paragraph Citation Matrix calculated by the Initial extractor subroutine **96**.

27. Run each ordered pair of rows of the p×n Paragraph Citation Matrix for an individual full textual object i through the pattern algorithms number one and two (see appendix #1) and determine the resultant Paragraph Pattern Vector.

28. Calculate the various numerical factors (AMax, TMax, etc.) by evaluating the values in the Paragraph Pattern Vector.

29. Run the Paragraph Pattern Vector and the numerical factors through the weighing algorithm to determine the appropriate value for each cell of the $c_i$×n Partial Paragraph Pattern Matrix where $c_i$ is the number of paragraphs in full textual object i.

30. Repeat steps 27 through 29 for each full textual object i where i=1 to n, to create the p×n Paragraph Pattern Matrix.

Section E Paragraph Weaver Subroutine **112**:

31. Calculate the Euclidean distance of each ordered pair of rows of either the p×n Paragraph Citation Matrix or the p×n Paragraph Pattern Matrix for a single full textual object i.

32. Place the resultant Euclidean distance values in the appropriate cell of the $c_i$×$c_i$ Paragraph Proximity Matrix

Facebook Inc. Ex. 1001

**17**

where $c_i$ is the number of paragraphs in full textual object i, where $0 < i < n+1$.

33. Repeat steps 31 through 32 n times in order to calculate n different Paragraph Proximity Matrices (one for each full textual object i).

34. The Section Comparison Subroutine **116** clusters all p paragraphs in the database **54** into sections. Then the sections are compared and indexed in the database **54**. This procedure is described in greater detail in FIG. 3C.

FIG. **3C** depicts possible subroutines that the Section Comparison Subroutine **116** comprises. The subroutines are the Sectioner Geographical Subroutine **120**, the Sectioner Topical Subroutine **124** (Optional), the Section Extractor Subroutine **128**, the Section Patterner Subroutine **132** and the Section Weaver Subroutine **163**.

Section F Sectioner Geographical Subroutine **120**:

35. For each full texual object i, the Sectioner Geographical Subroutine **120** uses the corresponding $c_i \times c_i$ Paragraph Proximity Matrix and a contiguity factor for each paragraph to determine which paragraphs may be clustered into sections. Sections are made up of continuous paragraphs that are combined based upon weighing their Euclidean distances and contiguity.

36. Repeat step 35 for all n full textual objects until all p paragraphs are grouped into q sections.

Section H Sectioner Topical Subroutine **124** (Optional):

37. The Sectioner Topical Subroutine **124** provides additional assistance to the Sectioner Geographical Subroutine **120** by considering the factor of topical references to determine the q sections.

38. For the total number of discrete references "z" to each full textual object in a particular full textual object, a $z \times z$ Citation Proximity Matrix is formed by comparing the Euclidean distances between each reference to a full textual object contained in each paragraph and calculating the topical weight given to each paragraph.

Section I Section Extractor Subroutine **128**:

39. The Section Extractor Subroutine **128** numbers each section created by the Sectioner Subroutines from 1 to q.

40. The Sectioner Extractor Subroutine **128** creates a $q \times q$ Section Citation Matrix by determining which sections refer to every other section.

Section J Section Patterner Subroutine **132**:

41. The Section Patterner Subroutine **132** then calculates 18 Section Pattern Vectors corresponding to each row of the $q \times q$ Section Citation Matrix using the 18 pattern algorithms in appendix #1.

42. From the Section Pattern Vectors, the numerical factors (AMax, TMax, etc.) are calculated.

43. The weighing algorithm evaluates the numerical factors and the Section Pattern Vectors and determines the values for each cell of the $q \times q$ Section Pattern Matrix.

Section K Section Weaver Subroutine **163**:

44. The Section Weaver Subroutine **163** calculates the Euclidean distances between each row of the $q \times q$ Section Pattern Matrix and creates a $q \times q$ Section Proximity Matrix.

45. The Section Weaver Subroutine **163** then creates a $q \times q$ Section Similarity Matrix with coefficients 0 to 100 using the values of the Section Proximity Matrix and empirical data and factor loading.

Section L Semantical Clustering of a Boolean Index Routine:

FIG. 3D depicts a possible Semantical Clustering of a Boolean Index Routine. (See Hartigan, J. A. *Clustering Algorithms*. New York: John Wiley & Sons, Inc., 1975, for detailed description of clustering algorithms incorporated herein by reference.) The Semantical Clustering routine

**18**

indexes the textual objects according to the similarity of phrases and words contained within each textual object in a database **54**. The routine comprises seven possible subroutines: the Opinion Extractor Subroutine, the Pool Patterner Subroutine **152**, the Pool Weaver Subroutine, the Pool Sectioner Subroutine **160**, the Section Extractor, the Section Patterner Subroutine **132** and the Section Weaver Subroutine **163**. In fact, it is quite possible, using only semantical statistical techniques, to "Proximity-index" documents that do not refer to one another at all based on their Boolean indices.

Section M Opinion Extractor Subroutine:

46. As described in steps 10 and 11, the Opinion Extractor Subroutine initializes a set of core English words and assigns each word a number. The preferred embodiment uses 50,000 discrete core English words and assigns each discrete core English word a number from $-50,000$ to $-1$.

47. The Opinion Extractor Subroutine then converts the core English words into a $p \times w$ matrix. The number of columns (w) represents the number of discrete core English words in the database **54** and the number of rows (p) represents the number of paragraphs in the database **54**.

48. The Opinion Extractor Subroutine fills the $p \times w$ matrix by inserting a "1" in the matrix cell where a certain paragraph contains a certain word.

Section N Pool Patterner Subroutine **152**:

49. The Pool Patterner Subroutine **152** creates two pattern algorithm vectors for only the first two patterns in appendix #1 and determines values for the total number of hits, the theoretical maximum number of hits, the actual maximum number of hits, the total number of hits per year and the derivative of the total number of hits per year.

50. The weighing algorithm of the Pool Patterner Subroutine **152** uses empirical data and factor loading to determine values to enter into a $p \times w$ Paragraph/Word Pattern Matrix.

51. The Pool Patterner Subroutine **152** creates a $p \times w$ Paragraph/Word Pattern Matrix by filling the appropriate cell of the Matrix with the appropriate value calculated by the weighing algorithm.

52. The Pool Patterner Subroutine **152** creates a $p \times w$ Paragraph/Word Proximity Matrix taking the Euclidean distance between the rows of the Paragraph/Word Pattern Matrix.

Section O Pool Sectioner Subroutine **160**:

53. The Pool Sectioner Subroutine **160** evaluates the Euclidean distances in the Paragraph/Word Proximity Matrix and the contiguity factor of each paragraph to cluster the paragraphs (p) into a group of (v) sections and create a $v \times w$ Preliminary Cluster Word Matrix.

Section P Section Extractor Subroutine **128**:

54. The Section Extractor Subroutine **128** numbers each section chronologically and creates a $v \times v$ Section Word Citation Matrix.

Section Q Section Patterner Subroutine **132**:

55. The Section Patterner Subroutine **132** evaluates the $v \times v$ Section Word Citation Matrix to create two word pattern vectors for only the first two patterns algorithms in appendix #1 and determines numerical factors for the total number of hits, the theoretical maximum number of hits, the actual maximum number of hits, the total number of hits per year and the derivative of the total number of hits per year.

56. The Weighing algorithm uses empirical data and factor loading to weigh the numerical factors created from the word pattern vectors and uses the numerical factors and the word pattern vectors to determine values to enter into a $v \times v$ Section Word Pattern Matrix.

Facebook Inc. Ex. 1001

5,544,352

**19**

Section R Section Weaver Subroutine **136**:

57. The Section Weaver Subroutine **136** creates a vxv Section Word Proximity Matrix by taking the Euclidean distance between the rows of the Section Word Pattern Matrix and placing the appropriate Euclidean distance value in the appropriate cell of the Section Word Proximity Matrix.

58. The Section Weaver Subroutine **136** create a vxv Section Word Similarity Matrix by evaluating the Euclidean distances from the Section Word Proximity Matrix and empirical data, and calculating the similarity coefficient for each ordered pair of sections, and places the value in the appropriate cell of the Section Word Similarity Matrix.

59. The Pool Searches of the CSPDM **66** evaluate the Section Word Similarity Matrix as well as other matrices to determine whether or not to retrieve a full textual object.

FIGS. 4A and 4B are high level flow charts that illustrate the general flow of the subroutines of the CSPDM **66**. FIG. 4A illustrates that the flow of various search routines depend on the type of search initiated by the researcher. The diagram further illustrates the interaction between the CSPDM **66** and the GUI Program **70**. FIG. 4B illustrates the sequence of subroutines in the CSPDM **66** program and the user interactions with the subroutines. FIG. 4B further shows that the researcher can access the different search subroutines and use information that the researcher has already received to find new information.

FIG. 4B provides a high level flow chart illustrating the sequence of subroutines in the CSPDM **66** program and the researcher's interactions with the subroutines. Assuming that the database **54** the researcher desires to access has been proximity indexed, the researcher must log on **260** to the database **54**. By entering the appropriate information into the Computer Processor **30** via the input means, the researcher electronically accesses **264** the database **54** and enables the CSPDM **66** to search **208** the database **54**.

FIGS. 4A and 4B both show the preliminary options that the researcher can choose from before selecting one of the searching subroutines of the CSPDM **66**. The CSPDM **66** questions the researcher on whether the researcher has identified a pool of textual objects **204**. If the researcher has selected a pool of textual objects **204**, then the researcher is able to choose one of the pool search **208** subroutines **212**. If the researcher has not selected a pool of textual objects, the CSPDM **66** questions the researcher on whether the researcher has selected a single textual object **216**. If the researcher has selected a single textual object **216**, then the researcher is able to choose one **220** of the textual object searches **224**. If the researcher has not selected either a pool of textual objects **204** or a single textual object **216**, then the researcher must execute a Boolean Word Search or alternate Pool-Generation Method **228** to retrieve textual objects **268**, **272**.

After CSPDM **66** subroutine has executed a particular search, the CSPDM **66** retrieves the appropriate data from the database **54**, analyzes the data, and sends the data to the GUI Program **70** in order for the GUI Program **70** to display the results of the search on the display **38**.

FIG. 4B illustrates that after the CSPDM **66** has completed the above procedure, the researcher has the option to exit the CSPDM **66** by logging off, executing a search based on the results of a previous search, or executing a new search.

FIGS. 4A and 4B also depict the seven subroutines of the CSPDM **66**. There are three textual object search subroutines **224** and four pool search subroutines **212**. The three textual object search subroutines **224** are: the Cases-In Subroutine **232**, the Cases-After Subroutine **236** and the

**20**

Cases-Similar Subroutine **240**. The four pool search subroutines **212** are the Pool-Similarity Subroutine **244**, the Pool-Paradigm Subroutine **248**, the Pool-Importance Subroutine **252**, and the Pool-Paradigm-Similarity Subroutine **256**. Each of these subroutines are described in more detail in FIGS. 4C to 4I. The following is a step by step description of the subroutines **224**, **212** of the CSPDM **66**.

Section A Cases-In Subroutine **232**:

FIG. 4C is a high level flow chart for the Cases-In Subroutine **232**.

1. The researcher must select a single textual object **400**.

2. The researcher selects the Cases-In Subroutine **232** option.

3. The Cases-In Subroutine **232** examines the nxn Opinion Citation Matrix and other matrices **404** created by the Proximity Indexing Application Program **62** and retrieves the textual objects to which the selected textual object refers **408**, data relating to the number of times the selected textual object refers to the retrieved textual objects, data relating to the importance of each textual object, and other relevant data.

Section B Cases-After Subroutine **236**:

FIG. 4D is a high level flow chart for the Cases-After Subroutine **236**.

4. The researcher must select a single textual object **400**.

5. The researcher selects the Cases-After Subroutine **236** option.

6. The Cases-After Subroutine **236** examines the nxn Opinion Citation Matrix and other matrices **412** created by the Proximity Indexing Application Program **62** and retrieves the textual objects that refer to the selected textual object **416**, data relating to the number of times the retrieved textual objects refer to the selected textual object, data relating to the importance of each textual object, and other relevant data.

Section C Similar-Cases Subroutine **240**:

FIG. 4E is a high level flow chart for the Similar-Cases Subroutine **240**.

7. The researcher must select a single textual object **400**.

8. The researcher selects the Similar-Cases Subroutine **240** option.

9. The Similar-Cases Subroutine examines the qxq Section Similarity Matrix and other matrices **420** created by the Proximity Indexing Application Program **62** and retrieves the textual objects that are similar to the selected textual object **424**, data relating to the degree of similarity between the selected textual object and the retrieved textual objects, data relating to the importance of each textual object, and other relevant data. In order to be retrieved, a textual object must have a similarity coefficient with respect to the selected textual object of at least a minimum value. The preferred embodiment sets the minimum similarity coefficient to four percent (4%).

Section D Pool-Similarity Subroutine **244**:

FIG. 4F is a high level flow chart for the Pool-Similarity Subroutine **244**.

10. The researcher must select a pool of full textual objects **428**.

11. The researcher must then select a single full textual object **400** to compare with the pool of full textual objects. It should be noted that the researcher can select the single textual object from the selected pool of textual objects, or the researcher can select a textual object from outside of the pool **432**.

12. The Pool-Similarity Subroutine **244** examines the nxn Opinion Similarity Matrix and other matrices **436** and values created by the Proximity Indexing Application Program **62**

Facebook Inc. Ex. 1001

21

for the selected full textual object and the pool of full textual objects.

13. The Pool-Similarity Subroutine **244** determines the degree of similarity of other full textual objects in the pool to the selected full textual object **440**.

Section E Pool-Paradigm:

FIG. 4G is a high level flow chart for the Pool-Paradigm Subroutine **248**.

14. The researcher must select a pool of full textual objects **428**.

15. The Pool-Paradigm Subroutine **248** examines the n×n Opinion Proximity Matrix, the n×n Opinion Similarity Matrix and other matrices and values created by the Proximity Indexing Application Program **62** for the pool of full textual objects **448**.

16. The Pool-Paradigm Subroutine **248** determines the Paradigm full textual object by calculating the mean of the Euclidean distances of all the textual objects in the pool **452**.

17. The Pool-Paradigm Subroutine **248** determines the similarity of the other full textual objects in the pool to the Paradigm full textual object **456**.

Section F Pool-Importance Subroutine **252**:

FIG. 4H is a high level flow chart for the Pool-Importance Subroutine **252**.

18. The researcher must select a pool of full textual objects.

19. The Pool-Importance Subroutine **252** examines **448** the n×n Opinion Citation Matrix, the n×n Opinion Similarity Matrix, numerical factors and other matrices and values created by the Proximity Indexing Application Program **62** for the pool of full textual objects **460**.

20. The Pool-Importance Subroutine **252** then ranks the importance of each of the full textual objects in the pool **464**.

FIG. 4I is a high level flow chart showing two possible alternate Pool-Paradigm-Similarity Subroutines **256**.

Section G Pool-Paradigm-Similarity Subroutine **256** (Option 1) **256**:

21. The researcher must select a pool of k full textual objects where k equals the number of full textual objects in the pool **428**.

22. For each of the k full textual objects, the Pool-Paradigm-Similarity Subroutine **256** selects a n×1 vector from the corresponding column of the n×n matrix **468**.

23. The Pool-Paradigm-Similarity Subroutine **256** creates an n×k matrix by grouping the n×1 vector representing each of the k full textual objects beside each other **45**.

24. The Pool-Paradigm-Similarity Subroutine **256** calculates the mean of each row of the n×k matrix and enters the mean in the corresponding row of an n×1 Paradigm Proximity Vector **472**.

25. The Pool-Paradigm-Similarity Subroutine **256** combines the n×1 Paradigm Proximity Vector with the n×n Opinion Proximity Matrix to create an (n+1)×(n+1) Paradigm Proximity Matrix **476**.

26. From the (n+1)×(n+1) Paradigm Proximity Matrix, the Pool-Paradigm-Similarity Subroutine **256** evaluates the Euclidian distances and empirical data to create an (n+1)×(n+1) Paradigm Similarity Matrix **480**.

27. The Pool-Paradigm-Similarity Subroutine **256** searches the row in the (n+1)×(n+1) Paradigm Similarity Matrix that corresponds to the Paradigm full textual object and retrieves the full textual objects that have a maximum degree of similarity with the Paradigm lull textual object **500**.

Section H Pool-Paradigm-Similarity Subroutine **256** (Option 2):

28. The researcher must select a pool of k full textual objects where k equals the number of full textual objects in the pool **428**.

22

29. For each of the k full textual objects, the Pool-Paradigm-Similarity Subroutine **256** selects an n×1 vector from the corresponding column of the n×n matrix **484**.

30. The Pool-Paradigm-Similarity Subroutine **256** creates an n×k matrix by grouping the n×1 vector for each of the k full textual objects beside each other.

31. The Pool-Paradigm-Similarity Subroutine **256** calculates the mean of each row of the n×k matrix and enters the mean in the corresponding row of an n×1 Paradigm Pattern Vector PF **488**.

32. The Pool-Paradigm-Similarity Subroutine **256** combines the n×1 Paradigm Pattern Vector PF with the n×n Opinion Pattern Matrix to create a (n+1)×(n+1) Paradigm Pattern Matrix **492**.

33. From the (n+1)×(n+1) Paradigm Pattern Matrix, the Pool-Paradigm-Similarity Subroutine **256** evaluates the Euclidean distances between the rows of the Paradigm Pattern Matrix and creates an (n+1)×(n+1) Paradigm Proximity Matrix **496**.

34. From the (n+1)×(n+1) Proximity Matrix, the Pool-Paradigm-Similarity Subroutine **256** evaluates the Euclidean distances between the rows of the (n×1)×(n×1) Paradigm Proximity Matrix and empirical data to create an (n+1)×(n+1) Paradigm Similarity Matrix **480**.

35. The Pool-Paradigm-Similarity Subroutine searches the row in the (n+1)×(n+1) Paradigm Similarity Matrix that corresponds to the Paradigm full textual object and retrieves the full textual objects that have a minimum degree of similarity with the Paradigm full textual object **500**.

Application of the Proximity Indexing Technique.

The above Proximity Indexing Application Program **62** and CSPDM **66** have a number of different applications and versions. Three of the most useful applications are described below.

The first type of Proximity Indexing Application Program is for use on very large databases. The matrices generated by this type of Proximity Indexer are "attached" to the database **54**, along with certain clustering information, so that the database **54** can be searched and accessed using the Cases-In Subroutine **232**, Cases-After Subroutine **236**, Cases-Similarity Subroutine, Pool-Similarity Subroutine **244**, Pool-Paradigm Subroutine **248**, Pool-Importance Subroutine **252** and Pool-Paradigm-Similarity Subroutine **256** of the CSPDM **66**.

The second type of Proximity Indexing Application Program **62** is a Proximity Indexer that law firms, businesses, government agencies, etc. can use to Proximity Index their own documents in their own databases. The researcher can navigate through the small business's preexisting database **54** using the Cases-In Subroutine **232**, Cases-After Subroutine **236**, Cases-Similarity Subroutine, Pool-Similarity Subroutine **244**, Pool-Paradigm Subroutine **248**, Pool-Importance Subroutine **252** and Pool-Paradigm-Similarity Subroutine **256** of the CSPDM **66**. In addition, this type of Proximity Indexer Application Program will be designed to be compatible with the commercial third-party databases which are Proximity Indexed using the first type of program. In other words, the researcher in a small business may "weave" in-house documents into a commercial database **54** provided by a third party, so that searches in the large database **54** will automatically bring up any relevant in-house documents, and vice versa.

The third type of Proximity Indexing Applications Program involves the capacity to do Proximity indexing of shapes. Each image or diagram will be treated as a "textual object." The various matrix coefficients can be generated purely from topological analysis of the object itself, or from

Facebook Inc. Ex. 1001

5,544,352

23

accompanying textual information about the object, or from a weighted combination of the two. The text is analyzed using the Proximity Indexing Application Program 62 as explained above. Shapes are analyzed according to a coordinate mapping procedure similar to that used in Optical Character Recognition ("OCR"). The numerical "maps" resulting from scanning the images are treated as "textual objects" that can be compared through an analogous weighing algorithm to generate a proximity matrix for every ordered pair of "textual objects" in the database 54. A similarity matrix can then be generated for each ordered pair, and the results organized analogous to a database 54 totally comprised of actual text.

This third type of Proximity indexing applications program can provide "Proximity Indexed" organization access to many different types of objects. For example, it can be used to search patent diagrams, or compare line drawings of known pottery to a newly discovered archeological find. It can be used to scan through and compare police composite drawings, while simultaneously scanning for similar partial descriptions of suspects. It can be used to locate diagrams of molecular structures, appraise furniture by comparing a new item to a database 54 of past sales, identify biological specimens, etc., etc.

FIG. 5A is a high level drawing that depicts the GUI Program 70 and its interaction with both the CSPDM 66 and the display 38. The GUI Program 70 has one or more display subroutines. The preferred embodiment contains seven display subroutines. The seven subroutines comprise three textual object display subroutines 504 and four pool display subroutines 508. The three textual object display subroutines 504 are the Cases-In Display Subroutine (CIDS) 512, the Cases-After Display Subroutine (CADS) 516 and the Similar-Cases Display Subroutine (SCDS) 520. The four pool display subroutines 508 are the Pool-Similarity Display Subroutine (PSDS) 524, the Pool-Paradigm Display Subroutine (PPDS) 528, the Pool-Importance Display Subroutine (PIDS) 532 and the Pool-Paradigm-Similarity Display Subroutine (PPSDS) 536. The three textual object display subroutines receive data from the corresponding textual object search subroutine of the CSPDM 66. Similarly, the four pool display subroutines 508 receive data from the corresponding pool search subroutine 212 of the CSPDM 66. Once the display subroutines have processed the data received by the search subroutines, the data is sent to the integrator 540. The integrator 540 prepares the data to be displayed in the proper format on the display 38.

FIGS. 5B through 5H depict screens generated by the textual object display subroutines, CIDS 512, CADS 516 and SCDS 520. The three types of screens are the Cases In screen 1000, the Cases After screen 1004 and the Similarity Screen 1008, respectively. The Similarity Screen 1008 provides the most "intelligent" information, but all three screens generated by the textual object display subroutines work in tandem as a system. The other screens created by the pool display subroutines are variances of these three, and also work in tandem with each other and with the three textual object display screens.

FIG. 5B depicts the "Cases After" 1004 Screen created by the CADS 516 for the textual object, Terry v. Ohio, 392 U.S. 1 (1968). The "Cases After" search produces all of the textual objects in the designated field (here D.C. Circuit criminal cases since 1990) that cite Terry. The number "12" in the upper left hand corner indicates that there are a total of 12 such textual objects. The vertical axis 1012 indicates the degree to which a given textual object relied upon Terry. The number "10" immediately below the 12 indicates that

24

the textual object in the field which most relied upon Terry, namely U.S. v. Tavolacci, 895 F.2d 1423 (D.C. Cir. 1990), discusses or refers to Terry in ten of its paragraphs.

The Tear-Off Window 1016 feature is illustrated in FIG. 5B by the Tear-Off Window 1016 for U.S. V. McCrory, 930 F.2d 63 (D.C. Cir. 1991). The four Tear-Off Window active boxes 1020 (displayed on the Tear-Off Window 1016): 1) open up the full text 1104 of McCrory to the first paragraph that cites Terry; 2) run any of the three searches, namely Cases-In Subroutine 232 Cases-After Subroutine 236 or Cases-Similar Subroutine 240 for McCrory itself (the default is to run the same type of search, namely Cases-After Subroutine 236 again); 3) hide the Terry execute search window 1024; and 4) bring the Terry Execute Search window 1024 to the foreground, respectively. The weight numeral 1028 indicates the number of paragraphs in McCrory that discusses or refers to Terry, in this textual object (in this example there is only one).

The "Cases After" screen 1004 for a given Textual object B displays a Textual Object Active Box 1032 representing every subsequent textual object in the database 54 that refers explicitly to Textual object B. The analysis starts with the same pool of material as a Shepards™ list for Textual object B. As well as some additional material not gathered by Shepards. However, the "Cases After" screen 1004 conveys a wealth of information not conveyed by a Shepards™ list.

The horizontal axis 1036 may represent time, importance or any other means of measurement to rank the textual objects. In the preferred embodiment, the horizontal axis 1036 represents time. The Shepards list itself contains no information as to when a case was decided. The vertical axis 1012 similarly may represent any means of measurement to rank the textual objects. In the preferred embodiment, the vertical axis 1012 represents the degree to which the subsequent Textual object C relied upon the original Textual object B. The display 38 makes it obvious when a textual object has received extensive discussion in another textual object, or provides key precedent for a subsequent textual object, or merely mentions the earlier textual object in passing. It also provides guidance as to possible gradations in between extensive, or merely citing.

The "shape" of the overall pattern of active boxes on the "Cases After" screen 1004 provides a rich lode of information to be investigated. For example, a "dip" in citation frequency immediately after a particular textual object suggests that the particular textual object, while not formally overruling Textual object B, has largely superseded it. A sudden surge in citation frequency after a particular Supreme Court case may indicate that the Supreme Court has "picked up" and adopted the doctrine first enunciated in Textual object B. The researcher can instantly determine if the holding of Textual object B has been adopted in some circuits but not in others, if Textual object B is losing strength as a source of controlling precedent, etc. None of this information is now available to lawyers in graphical or any other form.

As with the "Cases In" screen 1000, every Textual Object Active Box 1032 on the "Cases After" screen is active, and includes a Tear-Off Window 1016 that may be moved by dragging on the tear-off window 1016 with a mouse 42, and that tear-off window 1016 becomes a text Tear-Off Window 1040, visible even when one moves on to other searches and other screens. Thus one may "tear off" for later examination every relevant citation to Textual object B, or even for a group of textual objects. The text tear-off windows "tile"; that is, they can be stacked on top of one another to take up less room. There is also a "Select All" feature (not shown),

Facebook Inc. Ex. 1001

5,544,352

25

that creates a file containing the citations of every textual object retrieved in a given search.

In "Cases After" mode, clicking on the expanded-view button 1044 of the text tear-off window 1040 opens the text of the subsequent Textual object C to the first place where Textual object B is cited. A paragraph window 1048 displays a paragraph selection box 1052 indicating what paragraph in Textual object C the researcher is reading, and a total paragraph box 1056 indication how many paragraphs Textual object C contains in total. The user can view paragraphs sequentially simply by scrolling through them, or see any paragraph immediately by typing its number in the paragraph selection box 1052. Clicking on a Next paragraph active box 1060 immediately takes the researcher to the next paragraph in Textual object C where Textual object B is mentioned. Traditional Shepardizing allows the researcher to explore the subsequent application of a doctrine in a range of different factual situations, situations that help to define the outer contours of the applicability of a rule. Combining the expanded-view button functions 1044 and "Next Paragraph" active box 1060 functions allows the researcher to study how Textual object B has been used in all subsequent textual objects, in a fraction of the time the same task currently requires with available searching methods.

Perhaps the most fundamental form of legal research is "Shepardizing." A researcher starts with a textual object known to be relevant, "Textual object B," and locates the "Shepards" for that textual object. The "Shepards" is a list of every subsequent textual object that explicitly refers to Textual object B. The researcher then looks at every single textual object on the list. Shepardizing is often painstaking work. Many subsequent references are made in passing and have almost no legal significance. Although Shepards includes some codes next to its long lists of citations, such as "f" for "followed" and "o" for "overruled," the experience of most lawyers is that such letters cannot be relied upon. For example, the researcher may be citing Textual object B for a different holding than that recognized by the anonymous Shepards reader, interpreting Textual object B differently, or interpreting the subsequent textual object differently. However, for really thorough research, checking a Shepards type of list is essential. The researcher must make absolutely sure that any textual object cited as legal authority in a brief, for instance, has not been superseded by later changes in the law.

Very often, textual objects located on the Shepards list for Textual object B refer back to other important textual objects, some of which may predate Textual object B, all of which may be Shepardized in turn. This "zig-zag" method of research is widely recognized as the only way to be sure that one has considered the full line of textual objects developing and interpreting a doctrine. The real power of the "Cases After" screen 1004 emerges when it is used in conjunction with the "Cases In" screens 1000 and "Similarity" screens 1008. Using the preferred embodiment, the researcher may engage in the same kind of careful "zig-zag" study of a legal doctrine in a much more efficient manner.

For example, consider the following hypothetical search. The researcher reads Textual object B, and makes a list of every Supreme Court textual object it substantially relies upon, perhaps six textual objects. The researcher then Shepardizes Textual object B and reads each of those textual objects, in order to find other Supreme Court textual objects that they relied upon, perhaps eight. One then Shepardizes those fourteen Supreme Court decisions, in order to find any Court of Appeals cases in a selected circuit 1096 within the last three years on the same basic topic. This process would

26

take at least an hour, even using Shepards through an on-line service. The same search can be performed with the present invention using the "Cases In" screens 1000 and "Cases After" screens 1004 in under five minutes.

In order to perform the same search, a researcher can pull up both the "Cases In" screens 1000 and "Cases After" screens 1004 for Textual object B simultaneously. The researcher can then "tear-off" all of the Supreme Court Cases on both lists, run Cases-After Subroutine 236 searches on every Supreme Court Case mentioned on either list, then examine the "Cases In" screens 1000 for all of the Supreme Court cases produced by these searches. The researcher can locate every recent Court of Appeals case from one's circuit 1096 mentioned in any of those Supreme Court cases. Use of the "Similarity" screen 1008 as well, allows the researcher to find the pool of relevant Court of Appeals full textual objects even faster.

FIG. 5C depicts the "Cases After" Screen 1004 for U.S. v. Lam Kwong-Wah, 924 F.2d 298 (D.C. Cir. 1991). FIG. 5C shows a text Tear-Off Window 1040 on a "Cases After" Screen 1004, (in this textual object the Tear-Off Window 1016 for U.S. v. Barry, 938 F.2d 1327 (D.C. Cir. 1991), is opened using the full text active box 1064. A text Tear-Off Window 1040 containing the text of Barry opens, to the first cite of U.S. v. Lam Kwong-Wah at paragraph 15. Clicking on the "Next Paragraph" active box 1060 will open the text of Barry to the next paragraph that cites Lam Kwong-Wah.

The number "34" in the lower-left corner of the total paragraph box 1056 indicates that Barry has a total of 34 paragraphs in the cite U.S. v. Lam Kwong-Wah. Dragging the small squares 1068 to the left and below the text allow the researcher to move within a paragraph, and from paragraph to paragraph, in the text of Barry, respectively. The empty space below the text 1072 would contain the text of any footnote in paragraph 15. The compress window active box now closes the window and replaces it with the corresponding active box.

FIG. 5D depicts the "Cases In" Screen 1000 for U.S. v. North, 910 F.2d 843 (D.C. Cir. 1990). FIG. 5D contains a Textual Object Active Box 1032 representing every textual object with persuasive authority, cited in the text of North. The vertical axis 1012 represents the degree to which North relied upon a given textual object. In this example it is immediately apparent that Kastigar v. United States, 406 U.S. 441 (1972) is the most important precedent, and its Tear-Off Window 1016 has been activated. The weight numeral 1028 indicates that Kastigar is referred to in seventy-seven (77) paragraphs of North.

A highlighted Textual Object Active Box 1076 can be created by clicking on it, as has been done with U.S. v. Mariana, 851 F.2d 595 (D.C. Cir. 1988). The number "212" in the case number box 1080 indicates that citations to two-hundred-twelve distinct texts appear in North. Fewer are visible because the textual object active boxes 1032 "tile" on top of one another; the "Zoom" feature is used to focus on a smaller area of the screen, and ultimately resolves down to a day-by-day level, making all the textual object active boxes 1032 visible.

The unique "Cases In" screen 1000 provides a schematic representation of the precedent from which Textual object A is built. The "Cases In" screen 1000 contains a textual object "active box" 1032 representing every textual object which is relied upon, or even mentioned, in Textual object A. Any citation in textual object A to a textual object that possesses potential persuasive authority, whether a statute, constitutional provision, treatise, scholarly article, Rule of Procedure, etc., is treated as a "textual object." The textual object

Facebook Inc. Ex. 1001

5,544,352

27

active boxes 1032 are color-coded to indicate the court or other source of each textual object. Supreme Court cases are red, Court of Appeals cases are green, District Court cases are blue, and statutes are purple, for example. Each Textual Object Active Box 1032 contains the full official citation 1084 of its textual object. Clicking on any Textual Object Active Box 1032 immediately pulls up a larger window, known as a "tear-off" window, also containing the full citation 1084 to the textual object (Tear-Off Window Citation 1088), its date 1092, its circuit 1096, and its weight numeral 1028 to the textual object being analyzed. The user may then drag the Tear-Off Window 1016 free of the Textual Object Active Box 1032 and release it.

This creates a text Tear-Off Window 1040 that remains visible until the researcher chooses to close it, no matter how many subsequent screens the researcher examines. The text Tear-Off Window 1040 can be moved anywhere by dragging it with the mouse 42. The text Tear-Off Window 1040 contains small text active boxes 1100 allowing the researcher to access or "pull up" the full text 1104 of the textual object it represents with a single click of the mouse 42. This feature also allows the researcher to run Cases-In Subroutine 232 Cases-After Subroutine 236 and Cases-Similar Subroutine 240 searches on the textual object. (See below for a description of the "Similarity" screen).

The organization of the boxes on the screen, including their position on the horizontal axis 1036 and vertical axis 1012, represents the real "intelligence" behind the Cases-In screen 1000. The horizontal axis 1036 in the preferred embodiment represents time, with the left margin 1108 corresponding to the present, i.e., the date 1092 when the search is run. The right margin 1112 represents the date 1092 of decision of the earliest textual object cited in Textual object A. (Certain special materials, such as treatises updated annually, and the U.S. Constitution, are located in a column 1116 to the left of the margin.)

The vertical axis 1012 in the preferred embodiment represents the degree to which Textual object A relied upon each particular textual object it contains. For example, if the Cases In screen 1000 is run on a district court case (Textual object A) which happens to be a "stop and search" textual object that mainly relies upon *Terry v. Ohio*, 392 U.S. 1 (1968), Terry will be at the top of the screen, with all other textual object active box 1032 appearing far below. The researcher can thus access the text of Terry directly without ever reading the text of Textual object A. Of course, the full text 1104 of Textual object A is also instantly available if desired. If the researcher wants to see where Terry "came from," the researchers can instantly, by clicking on a textual active box 1100 within the Terry text Tear-Off Window 1040, run the Cases-In Subroutine 232 for Terry—and so on. There is no limit to the number of "levels" or "generations" the researchers may explore using this technique. It is therefore possible (assuming a sufficient database 54) to find, in a matter of seconds, without having to read through 14 layers of texts, the possibly long-forgotten eighteenth-century precursors to a modern doctrine.

The "Cases In" screen 1000 creates an instant visual summary or "blueprint" of a textual object. The blueprint can help a researcher make a preliminary judgment about whether a particular textual object is worth closer examination. Viewing the "Cases In" screens 1000 for a group of textual objects allows a researcher to recognize whether there are precedents common to that group. The blueprint tells the researcher whether Textual object A is primarily a statutory construction case, a textual object that relies on local Court of Appeals cases without Supreme Court sup-

28

port, a textual object relying on precedent outside the circuit 1096 as persuasive authority, etc.

The initial "Cases In" screen 1000 presents every citation within a given textual object. In a textual object with an unusually large number of citations, the screen will be crowded with textual object active boxes 1032. The GUI therefore contains a "zoom" feature that allows the researcher to expand any small portion of the screen. To get back to the "big picture," the researcher simply selects the "Fit in Window" menu item, or else selects the "zoom out" feature. The same "zoom," "zoom out," and "Fit in Window" functions are present in the "Cases After" screen 1004 and "Similarity" screen 1008 as well.

The routine that calculates "degree to which Textual object A relies upon the cited textual object" clearly ranks major textual objects at the top, textual objects mentioned only in passing at the bottom, and textual objects of potentially greater relevance in between. In addition, the routine can recognize when a highly relevant textual object is mentioned only in passing and give a higher weight to that textual object than it would otherwise receive in the ranking procedure.

The "intelligence" behind the entire GUI is driven by the knowledge that the lawyers do not want the computer to do legal analysis or make judgments for them, but simply guide them through the great mass of irrelevant material to those texts where lawyerly analysis of a problem begins.

The "Cases In" screen 10004 is designed with practical legal research in mind. It is common in legal research to locate a lower court textual object on the correct topic, call it "local Textual object A." However, the researcher desired to find the most persuasive authority available. The aim of this type of research is to find the "lead" textual object or textual objects on a particular topic. The researcher ultimately desires the first textual object, most famous textual object, and most recent textual objects of the Supreme Court (or state Supreme Court in state law issues) that stand for the same principle. ("Lead" textual objects also occur at the intermediate and trial court level.)

The standard way to find lead textual objects is to read through the text of a local Textual object A until one finds references to "higher court textual objects," then look up each of those higher court textual objects in turn. The researcher then reads the text of those textual objects until the researcher determines the textual objects they have in common, the textual objects that appear many times. Very often, the lower court textual object from which the researcher started is of no real value to itself—it may well be from a different local jurisdiction—and the researcher reads through it only to find citations within it. Since the GUI quickly locates and schematically diagrams the textual objects, this process is accelerated dramatically using the GUI.

FIGS. 5E through 5G depict multiple "Similarity" searches run in sequence. A "Similarity" Screen for *U.S. v. Caballero*, 936 F.2d 1292 (D.C. Cir. 1991), reveals via the case number box 1080, that 17 textual objects were retrieved by a "similarity" search. The vertical axis 1012 indicates that the textual objects retrieved had similarity coefficients 1120 between 4% and 15% with respect to *U.S. v. Caballero*. Cases with less than 4% similarity are not shown. The vertical axis 1012 represents degree of similarity, or topical relatedness, so that 100% would be two identical texts. The Tear-Off Window 1016 of *U.S. v. Nurse*, 916 F.2d 20 (D.C. Cir. 1990) shows that the textual object has a similarity of 9%.

The "Similarity" screen for a given Textual object C is organized like the "Cases In" and "Cases After" screens,

5,544,352

29

with the same color-coded textual object active boxes representing textual objects, and time on the horizontal axis **1036**. However, the vertical axis **1012** represents the degree to which the represented textual object is related to Textual object C. The system is built on the principle that legal doctrines tend to emerge out of lines of textual objects developing a legal principle. Lines of textual objects contain "lead" textual objects that establish basic rules and subsequent textual objects that do not establish new rules, but apply and re-interpret the pre-existing rules in various circumstances. Some lead textual objects invent new doctrines, while others modify or redirect the law based on earlier precedent.

The routine that operates behind the "Similarity" screen determines which line or lines of textual objects that Textual object C can be grouped. The routine then ranks the textual objects in that line depending on how closely they are related to Textual object C. For example, a typical similarity search starting with a Court of Appeals case in a certain circuit, Textual object D, will find the Supreme Court and Court of Appeals cases that have established the principles followed in Textual object D. The Supreme Court and Court of Appeals case will appear as textual object active boxes whether or not they are cited in Textual object D. Furthermore, the similarity search will find the textual objects decided subsequent to Textual object D that have applied, and possibly modified, those principles, whether or not those textual objects cite Textual object D.

Similarity searches allow a researcher to find textual objects on the same topic that do not share common phrases and might be overlooked by a Boolean word search. Similarity searches also allow researchers, who only have an obscure district court case, to "tap in" to the lead textual objects in any area. By organizing all case law in "conceptual space," the Similarity screens allow one to locate emerging topics that have not been formally recognized by those assigning "key numbers" or otherwise manually classifying textual objects—or even by the authors of the textual objects themselves.

The "shape" of a Similarity Screen **1008** may convey a great deal of information about a particular legal concept. For example, the screen conveys to the researcher whether a certain concept, which is essentially novel, is supported by Supreme Court case law or is an old doctrine that has been recently applied in a new context. The system as a whole gives lawyers the ability to assess what textual objects are "available" on their topic, and to zero in on the textual objects that are most useful. The researcher has the ability to track down every subsequent reference to any particular textual objects by utilizing multiple "Cases After" searches, identifying core precedents through "Cases In" searches, and by running new "Similarity" searches to obtain any textual objects that emerge in closely related topic areas. The "Similarity" algorithm is more "aggressive" then the others, since it contains built-in judgments as to what "relatedness" means. It also judges what is no longer sufficient to display on the screen. The bottom edge of the screen represents a minimum degree of similarity below which the connections are too tenuous to be worth pursuing. In the commercial product, this minimum level can be reset at the preference of the user.

FIG. 5F:

FIG. 5F is the "Similarity Screen **1008**" for *U.S. v. Nurse*. Clicking on the "run search" Tear-Off Window active box **1020**, which is on the Tear-Off Window **1016** for *Nurse* produces FIG. 5F. Clicking on the Textual Object Active Box **1032** for *U.S. v. Jordan*, 951 F.2d 1278 (D.C. Cir. 1991)

30

long enough to pull up its Tear-Off Window **1016**, and then clicking on Jordan's "run search" Tear-Off Window active box **1020** (not shown), produces the Similarity Screen **1008** shown in FIG. 5G.

FIG. 5G:

FIG. 5G shows how multiple tear-off windows can be shown at the same time, here the *U.S. v. Jordan* similarity Tear-Off Window **1016** depicts for the three textual objects most similar to Jordan. Note that *U.S. v. Jordan*, 958 F.2d 1085 (D.C. Cir. 1992), is very closely related, i.e., 41%, to *U.S. v. Jordan*, 951 F.2d 1278 (D.C. Cir. 1991), apparently as it is a subsequent full textual object decision of the same dispute as the first textual object.

FIG. 5H:

FIG. 5H depicts a close-up view of an Execute Search Window. The researcher can input a selected textual object that is either represented or not represented on a display **38** screen as a Textual Object Active Box **1032**. The researcher can title his search by inputing the title in the Search Title box. The researcher can then input the reference to the selected textual object in the reference input boxes. The reference input boxes of the preferred embodiment allow the researcher to refer to the selected textual object by Volume, Category, Page and/or Section by inputing the appropriate values in the volume reference box, category reference box, page reference box, and/or section reference box, respectively.

The researcher can also identify the type of search to be performed on the selected textual object by selecting the appropriate search in the Analysis box.

Once the researcher has inputed all the appropriate values, the researcher executes the search by activating the execute search button.

The PSDS **524**, PPDS **528**, PIDS **532** and PPSDS **536** of the GUI Program 70, also create similar displays to the CIDS **512**, CADS **516**, and SCDS **520** subroutines. The only major difference between the screens created by the three textual object display subroutines and the four pool display subroutines is the information contained in the Execute Search window and the options available in the analysis box.

The options in the analysis box enable a researcher to select a textual object outside the pool of textual objects and compare how the selected textual object relates to the pool of textual objects by selecting to the Pool-Similarity Subroutine 44, the Pool-Paradigm Subroutine 248 or Pool-Importance Subroutine 252 of the CSPDM 66.

The PSDS **524** creates a Pool-Similarity Screen **1008**. The vertical axis **1012** ranks the similarity of the objects in a pool of textual objects with respect to a selected textual object. All of the other aspects of this display **38** are similar to the Similar Cases Screen.

PPDS **528** creates a Pool-Paradigm Screen. The vertical axis **1012** ranks the similarity of the pool of textual objects on the screen with respect to the paradigm textual object. The paradigm textual object is calculated by averaging the mean of all the Euclidean distances of the pool of textual objects on the screen. All of the other aspects of this display **38** are similar to the Similar-Cases Screen.

The PIDS **532** creates a Pool-Importance Screen. The vertical axis **1012** ranks the importance of the pool of textual objects on the screen. All other aspects of the PIDS **532** display **38** are similar to the Cases-In Screen **1000** and Cases-After Screen 1004.

The PPSDS **536** creates a Pool-Paradigm Similarity Screen **1008**. The vertical axis **1012** represents the similarity of all textual objects in the database **54** to the paradigm textual object created by a selected pool of textual objects.

5,544,352

31

All other aspects of the PPSDS **536** display **38** are similar to Similar-Cases Screen.

What is claimed is:

**1.** A research system for computerized searching of textual objects, wherein the textual objects are stored in a database, comprising:

a computer processor for processing commands and manipulating the textual objects stored in the database;

a means, coupled to the computer processor, for entering the commands to be processed by the computer processor;

a means for indexing the textual objects using the computer processor and the entered commands comprising:

a means for creating vectors representing the textual objects wherein the vectors are created using non-semantical relationships that exist among or between the textual objects;

a means for searching the indexed textual objects using the vectors to obtain a pool of textual objects comprising a means for vector searching of the indexed textual objects using the vectors;

a graphical user interface means for converting the pool of textual objects into a graphical view comprising:

a means for forming a box to graphically represent one or more of the textual objects in the pool; and

a display, operably coupled to the graphical user interface means, for showing the graphical view including any of the boxes formed.

**2.** The research system of claim **1** wherein the means for searching the indexed textual objects further comprises:

means for receiving processed commands from the computer processor which identify a pool of textual objects;

means for locating textual objects similar to those textual objects in the pool; and

means for ranking the importance of the textual objects in the pool.

**3.** The research system of claim **1** wherein the means for searching the indexed textual objects further comprises:

means for creating a vector representing a paradigm textual object.

**4.** The research system of claim **1** wherein the graphical user interface means further comprises:

means for selecting one of the boxes;

means for displaying further information on the selected box;

zoom-in means for enlarging the size of a portion of the graphical view; and

zoom-out means for decreasing the size of a portion of the graphical view.

**5.** The research system of claim **1** wherein the textual objects contain core words, the means for entering commands comprises a keyboard, and wherein the means for indexing further comprises:

a means for generating a boolean word index of the core words found in the textual objects; and

wherein the means for searching uses both pattern vectors and the boolean word index and further comprises:

a means for performing boolean word searches of the textual objects using the boolean word index.

**6.** The research system of claim **1** wherein a textual object may be selected using the means for entering the commands and wherein the means for searching the indexed textual objects further comprises:

means for receiving the identity of a selected textual object;

32

cases-after means for identifying textual objects that refer to the selected textual object; and

cases-in means for identifying textual objects to which the selected textual object refers.

**7.** The research system of claim **1** wherein a pool of textual objects may be selected using the means for entering the commands and wherein the means for searching the indexed textual objects further comprises:

means for receiving the identity of the selected pool of textual objects;

pool-similarity means for identifying a similar pool of textual objects wherein the objects in the similar pool are similar to the objects in the selected pool; and

pool-importance means to identify an important pool of textual objects wherein the objects in the important pool are important in relation to the objects in the selected pool.

**8.** The research system of claim **1** wherein the means for creating vectors representing the textual objects further comprises:

extractor means for creating an initial numerical representation of each textual object wherein the initial numerical representations are based on direct non-semantical relationships between the textual objects;

patterner means for analyzing the initial numerical representations of each textual object to find relationships that exist between or among the textual objects comprising:

means for calculating a pattern vector representation for each textual object.

**9.** The research system of claim **8** wherein the means for creating vectors representing the textual objects further comprises:

weaver means for generating proximity vectors based upon the pattern vector representations for each object.

**10.** The research system of claim **9** wherein the weaver means for generating proximity vectors comprises:

a means for calculating euclidean distances between pattern vectors.

**11.** The research system of claim **9** wherein the means for creating vectors further comprises:

means for calculating similarity vectors representing the similarity between textual objects using the proximity vectors.

**12.** A legal research system for computerized searching of textual objects containing core words, wherein the textual objects are stored in a database, comprising:

a computer processor for processing commands and manipulating the textual objects stored in the database;

a keyboard means, coupled to the computer processor, for entering the commands to be processed by the computer processor;

a means for indexing the textual objects using the computer processor and the entered commands comprising:

a means for creating vectors representing the textual objects; and

a means for generating a boolean word index of the core words found in the textual objects;

a means for searching the indexed textual objects using the vectors and the boolean word index to obtain a pool of textual objects comprising:

a means for performing boolean word searches using the boolean word index; and

a means for vector searching of the indexed textual objects using

Facebook Inc. Ex. 1001

5,544,352

33

the vectors, comprising:

means for receiving processed commands from the computer processor which identify a selected textual object;

cases-after means for identifying textual objects that refer to the selected textual object;

cases-in means for identifying textual object to which the selected textual object refers; and

similarity means for identifying textual objects which have similar characteristics to the selected textual object;

a graphical user interface means for converting the pool of textual objects into a graphical view comprising:

a means for forming a box to graphically represent one or more of the textual objects in the pool; and

a display, operably coupled to the graphical user interface means, for showing the graphical view including any of the boxes formed.

**13**. A system for proximity indexing a plurality of data comprising:

storage means, connected to the grouping means, for storing a plurality of data in a database;

a computer processor for manipulating the plurality of data;

means for enabling the computer processor to access the plurality of data stored in the database;

extractor means for creating a numerical representation of each accessed datum;

patterner means for analyzing the numerical representation of the plurality of data for patterns comprising:

means for calculating a pattern representation for each datum based upon that datums relationship to every other datum; and

means for weighing the significance of the pattern representation;

weaver means for generating an index on the proximity of each datum to every other datum comprising:

a means for determining the Euclidian distance between two pattern representations; and

memory for storing the index on the proximity of each datum to every other datum.

**14**. The system of claim **13** wherein each of the purality of data is a non-textual object and wherein the extractor means further comprises:

means for numerically representing with a vector the non-textual objects; and

means for clustering non-textual objects having similar characteristics.

**15**. The system of claim **13** wherein the extractor means further comprises:

means for generating a reference number for each of the plurality of data;

means for determining which of the plurality of data refer to any other of the plurality of data; and

means for creating a core word index.

**16**. The system of claim **13** wherein the patterner means further comprises:

means for analyzing the numerical representation against a plurality of empirically defined patterns, wherein certain of the patterns are more important than others; and

wherein the means for weighing further comprises means for heavily weighing certain patterns.

**17**. The system of claim **13** wherein the weaver means further comprises:

34

means for making a similarity determination based upon the Euclidian distances calculated.

**18**. The system of claim **13** wherein the plurality of data are received in a digital signal, the system further comprising:

means for receiving the digital signals;

means, connected to the receiving means, for interpreting the digital signals into data;

means, connected to the interpreting means and storage means, for grouping the plurality of data into a database format;

means, connected to the memory, for converting the index into a transmission signal; and

means, connected to the converting means, for transmitting the transmission signal representing the index.

**19**. A system for computerized searching of an index which catalogs a database of objects comprising:

key means for entering search commands;

a processor, connected to the key means, for processing the search commands;

means to retrieve the index utilizing the processor;

multiple search means to analyze the index and identify a pool of one or more of the objects based upon a processed search command comprising:

means for interpreting a processed search command as a selection of an object;

means for identifying a pool of objects that have a relation to the selected object;

means for generating a paradigm object; and

means for defining a pool of objects that have non-semantical characteristics similar to the paradigm object; and

a display for viewing the objects in a pool.

**20**. The system of claim **19** further comprising:

means for creating an alphanumeric list of names of the objects in a pool for display.

**21**. A graphical user interface to display a pool of identified objects stored in a database comprising:

means for receiving the identity of objects to be displayed;

means for collecting data indicating a first relationship between objects in the pool and data indicating a second relationship between objects in the pool;

means for determining a coordinate X/Y location for each identified object in the pool based upon the data indicating a first and second relationship comprising:

means for comparing the data indicating the first relationship for determining an X coordinate for each object; and

means for comparing the data indicating the second relationship for determining a Y coordinate for each object;

means for generating a first window with an X axis and Y axis;

means for creating a box for each identified object;

means for placing the box for each identified object in the correct X/Y position in the first window;

means for displaying the first window with one or more boxes; and

means to select a displayed box and obtain further information about the object represented by the displayed box.

**22**. The graphical user interface of claim **21** further comprising:

Facebook Inc. Ex. 1001

5,544,352

35

means for displaying a second window stacked on top of the first window; and

means for moving the second window on the display.

**23.** The graphical user interface of claim **21**, wherein the first relationship is importance and the second relationship is similarity, further comprising:

means to zoom in on a particular portion of the first window; and

means to zoom out to view a greater proportion of the first window.

**24.** The graphical user interface of claim **21** further comprising:

means for requesting a database search comprising:

an active display box;

a mouse for entry of commands by a user based on the display; and

means for converting the mouse entered commands into a database search request.

**25.** The graphical user interface of claim **21**,

wherein the means for displaying further comprises a color monitor;

wherein the means for creating a box further comprises means to color the box;

wherein the means for generating a first window further comprises a means to generate a light colored background and dark lines representing a coordinate grid.

**26.** A non-semantical method for numerically representing objects in a computer database and for computerized searching of the numerically represented objects in the database, wherein direct and indirect relationships exist between objects in the database, comprising:

marking objects in the database so that each marked object may be individually identified by a computerized search;

creating a first numerical representation for each identified object in the database based upon the object's direct relationship with other objects in the database;

storing the first numerical representations for use in computerized searching;

analyzing the first numerical representations for indirect relationships existing between or among objects in the database;

generating a second numerical representation of each object based on the analysis of the first numerical representation;

storing the second numerical representation for use in computerized searching; and

searching the objects in the database using a computer and the stored second numerical representations, wherein the search identifies one or more of the objects in the database.

**27.** The non-semantical method of claim **26**, wherein the objects in the database include words, and semantic indexing techniques are used in combination with the non-semantical method, the method further comprising the step of creating and storing a boolean word index for the words of the objects in the database.

**28.** The non-semantical method of claim **26**, wherein

the first and second numerical representations are vectors that are arranged in first and second matrices;

the direct relationships are express references from one object to another object in the database;

the objects in the database are assigned chronological data; and

36

wherein the step of searching comprises the steps of matrix searching of the second matrices; and examining the chronological data.

**29.** The non-semantical method of claim **26** wherein the step of analyzing the first numerical representation further comprises:

examining the first numerical representation for patterns which indicate the indirect relationships.

**30.** The non-semantical method of claim **29**, given that object A occurs before object B and object c occurs before object A, and wherein the step of creating a first numerical representation comprises examining for the direct relationship B cites A and wherein the step of examining for patterns further comprises the step of examining for the following pattern:

A cites c, and B cites c.

**31.** The non-semantical method of claim **29**, wherein a, b, c, A, d, e, f, B, g, h, and i are objects in the database and given that;

a, b, and c occur before A;

A occurs before d, e, and f, which occur before B; and

B occurs before g, h, and i;

and wherein the step of examining for patterns further comprises the step of examining for one or more of the following patterns:

(i) g cites A, and g cites B;

(ii) B cites f, and f cites A;

(iii) B cites f, f cites e, and e cites A;

(iv) B cites f, f cites e, e cites d, and d cites A;

(v) g cites A, h cites B, g cites a, and h cites a;

(vi) i cites B, i cites f (or g), and f (or g) cites A;

(vii) i cites g, i cites A, and g cites B;

(viii) i cites g (or d), i cites h, g (or d) cites A, and h cites B;

(ix) i cites a, i cites B, and A cites a;

(x) i cites A, i cites e, B cites e;

(xi) g cites A, g cites a, A cites a, h cites B, and h cites a;

(xii) A cites a, B cites d, i cites a, and i cites d;

(xiii) i cites B, i cites d, A cites a, and d cites a;

(xiv) A cites b, B cites d (or c), and d (or c) cites b;

(xv) A cites b, B cites d, b cites a, and d cites a;

(xvi) A cites a, B cites b, d (or c) cites a, and d (or c) cites b.

**32.** The non-semantical method of claim **26**, wherein the step of analyzing further comprises the step of weighing, wherein some indirect relationships are weighed more heavily than other indirect relationships.

**33.** The non-semantical method of claim **26**, wherein the step of analyzing the first numerical representations for indirect relationships further comprises:

creating an interim vector representing each object; and wherein the step of generating a second numerical representation uses coefficients of similarity and further comprises;

calculating euclidean distances between interim vector representations of each object;

creating proximity vectors representing the objects using the calculated euclidean distances; and

using the proximity vectors and using coefficients of similarity to calculate the second numerical representations.

**34.** The non-semantical method of claim **26**, wherein objects in the database may be divided into subsets and wherein the marking step includes the step of marking

Facebook Inc. Ex. 1001

5,544,352

37

subsets of objects in the database and wherein relationships exist between or among subsets of objects in the database.

**35**. The non-semantical method of claim **34** wherein the objects are textual objects with paragraphs and the subsets are the paragraphs of the textual objects, the method further comprising the steps of:

creating a subset numerical representation for each subset based upon the relationships between or among subsets;

analyzing the subset numerical representations;

clustering the subsets into sections based upon the subset analysis; and

generating a section numerical representation for each section,

wherein the section numerical representations are available for searching.

**36**. The non-semantical method of claim **26**, wherein the step of searching the objects comprises the steps of:

selecting an object;

using the second numerical representation to search for objects similar to the selected object.

**37**. The non-semantical method of claim **26**, wherein the step of searching includes the step of graphically displaying one or more of the identified objects.

**38**. The non-semantical method of claim **26**, wherein the step of searching comprises the step of identifying a paradigm object.

**39**. The non-semantical method of claim **26**, wherein the step of searching the objects comprises the steps of:

selecting a pool of objects;

pool-similarity searching to identify a similar pool of textual objects, similar in relation to the objects in marked pool; and

pool-importance searching to identify an important pool of textual objects, important in relation to the objects in the selected pool.

**40**. The non-semantical method of claim **26**, the step of searching comprising the steps of:

identifying a paradigm pool of objects; and

searching for relationships between the objects and the paradigm pool of objects;

wherein the searched for relationship is pool importance or pool similarity.

**41**. A method for the non-semantical indexing of objects stored in a computer database, the method for use in searching the database for the objects, comprising the steps of:

extracting, comprising the steps of:

labeling objects with a first numerical representation; and

generating a second numerical representation for each object based on each object's references to other objects;

patterning, comprising the step of creating a third numerical representation for each object using the second numerical representations, wherein the third numerical representation for each object is determined from an examination of the second numerical representations for occurrences of patterns that define indirect relations between or among objects;

weaving, comprising the steps of:

calculating a fourth numerical representation for each object based on the euclidean distances between the third numerical representations; and

38

determining a fifth numerical representation for each object by processing the fourth numerical representations through similarity processing; and

storing the fifth numerical representations in the computer database as the index for use in searching for objects in the database.

**42**. The method of claim **41** wherein the first through fifth numerical representations are vector representations and further comprises the step of clustering objects having similar characteristics.

**43**. The method of claim **42**, wherein the objects are paragraphs and the step of clustering objects comprises the step of clustering adjacent paragraphs that have similar characteristics.

**44**. The method of claim **41** wherein the step of creating the third numerical representations further comprises the steps of:

analyzing the second numerical representation against a plurality of empirically defined patterns, wherein certain patterns are more important than others; and

weighing the analyzed second numerical representations according to the importance of the patterns.

**45**. A method for searching indexed objects, wherein the index is stored, comprising the steps of:

entering search commands;

processing the search commands with a processor;

retrieving the stored index using the processor;

analyzing the index to identify a pool of objects, comprising the steps of:

interpreting the processed searched commands as a selection of an object;

identifying a group of objects that have a relationship to the selected object, wherein the step of identifying comprises the steps of:

identifying objects that are referred to by the selected object; and

identifying objects that refer to the selected object

quantifying the relationship of the selected object to each object in the group of objects; and

ranking the objects in the group of objects in accordance to the quantified relationship to the selected object; and

presenting one or more objects from the group of objects in ranked order.

**46**. A method for searching indexed objects, wherein the index is stored, chronological information is associated with each object in the group, and a paradigm object may be identified, comprising the steps of:

entering search commands;

processing the search commands with a processor;

retrieving the stored index using the processor;

analyzing the index to identify a pool of objects, comprising the steps of:

interpreting the processed searched commands as a selection of an object;

identifying a group of objects that have a relationship to the selected object;

quantifying the relationship of the selected object to each object in the group of objects;

ranking the objects in the group of objects in accordance to the quantified relationship to the selected object;

chronologically ordering the objects in the group to form a pool of objects;

ordering the objects in the pool by rank based upon their relationship to a paradigm object; and

Facebook Inc. Ex. 1001

5,544,352

## 39

presenting one or more objects from the pool of objects in ranked order.

**47.** A method for graphically displaying and interfacing with a pool of identified objects stored in a database using information indicating relationships, comprising the steps of:

receiving the identity of objects in the pool;

collecting information indicating a first relationship among objects in the pool;

gathering information indicating a second relationship among objects in the pool;

determining a coordinate X/Y position for each identified object in the pool based upon the information indicating a first and second relationship comprising the steps of:

comparing the information indicating the first relationship for determining an X coordinate for each identified object; and

comparing the information indicating the second relationship for determining a Y coordinate for each identified object;

generating a first window with an X axis and Y axis, wherein the X and Y axis are able to accommodate the X and Y coordinate for each object;

creating a graphical box for each identified object, the box having sides and a bottom;

placing a side and the bottom of the graphical box for each identified object in the correct X/Y axis position in the first window;

labeling the placed box;

displaying the first window with one or more labeled boxes; and

selecting a displayed box to obtain further information about the identified object represented by the displayed box.

**48.** The method of claim **47** further comprising further comprising the steps of:

generating a second window stacked on top of the first window; and

moving the second window on the display.

**49.** The method of claim **47**, wherein the first relationship is importance and the second relationship is similarity, and wherein the step of displaying comprises the steps of:

zooming in on a particular portion of the displayed first window; and

zooming out to view a different proportion of the displayed first window.

**50.** The method of claim **47** wherein an active display box is used, further comprising the steps of:

requesting a database search, comprising the steps of:
displaying the active display box;

## 40

entering commands from a user by operation of a mouse on the active display box; and

converting the entered commands into a database search request.

**51.** A system for computerized searching of an index which catalogs a database of objects comprising:

key means for entering search commands;

a processor, connected to the key means, for processing the search commands;

means to retrieve the index utilizing the processor;

multiple search means to analyze the index and identify a pool of one or more of the objects based upon a processed search command comprising:

means for interpreting a processed search command as a selection of an object;

means for identifying a pool of objects that have a relation to the selected object, wherein the means for identifying a pool of objects further comprises:

means for identifying objects that are referred to by the selected object;

means for identifying objects that refer to the selected object; and

means for identifying objects that have a similar characteristic to the selected object;

means for generating a paradigm object; and

means for defining a pool of objects that have characteristics similar to the paradigm object; and

a display for viewing the objects in a pool.

**52.** A system for computerized searching of an index which catalogs a database of objects comprising:

key means for entering search commands;

a processor, connected to the key means, for processing the search commands;

means to retrieve the index utilizing the processor;

multiple search means to analyze the index and identify a pool of one or more of the objects based upon a processed search command comprising:

means for interpreting a processed search command as a selection of an object;

means for identifying a pool of objects that have a relation to the selected object;

means for generating a paradigm object; and

means for defining a pool of objects that have characteristics similar to the paradigm object;

means for chronologically ordering the objects in a pool;

means for rank ordering the objects in a pool based upon their relationship to the selected object;

means for rank ordering the objects in a pool based upon their relationship to the paradigm object; and

a display for viewing the objects in a pool.

\* \* \* \* \*

Facebook Inc. Ex. 1001

US005544352C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (8549th)

# United States Patent
### Egger

(10) **Number:** US 5,544,352 C1
(45) **Certificate Issued:** Sep. 20, 2011

(54) **METHOD AND APPARATUS FOR INDEXING, SEARCHING AND DISPLAYING DATA**

(75) Inventor: **Daniel Egger**, Washington, DC (US)

(73) Assignee: **Software Rights Archive, LLC**, Durham, NC (US)

**Reexamination Request:**
No. 90/011,010, May 24, 2010

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **5,544,352** |
| Issued: | **Aug. 6, 1996** |
| Appl. No.: | 08/076,658 |
| Filed: | Jun. 14, 1993 |

(51) **Int. Cl.**
*G06F 17/30* (2006.01)

(52) **U.S. Cl.** ................................ **707/715**; 707/999.005
(58) **Field of Classification Search** .................... 395/600
See application file for complete search history.

(56) **References Cited**

PUBLICATIONS

Brin, et al., "The Anatomy of a Large-Scale Hypertextual Web Search Engine", Computer Networks and ISDN Systems, vol. 30 (1–7), 1998, pp. 107–117.

Bruandet, "Outline of a Knowledge Base Model for an Intelligent Information Retrieval System", Information Processing & Management, vol. 25, Issue 1, 1989, pp. 89–115.

Garfield, "Citation Indexes for Science", vol. 123, No. 3159, Jul. 1955, pp. 108–111.

Garfield, "The Role of the Medical Librarian in SDI Systems", Bulletin of the Medical Library Association, vol. 57, No. 4, Oct. 1969, pp. 348–351.

Giles, et al., "CiteSeer: An Automatic Citation Indexing System", Third ACM Conference on Digital Libraries, ACM Press, 1998, pp. 89–98.

Matula, "k-Components, Clusters, and Slicings in Graphs", SIAM Journal on Applied Mathematics, vol. 22, No. 3, May 1972, pp. 459–480.

Salton, et al., "Automatic Structuring and Retrieval of Large Text Files", Communications of the ACM, vol. 37, No. 2, Feb. 1994, pp. 97–108.

Salton, et al., "Enhancement of Text Representations Using Related Document Titles", Information Processing & Management vol. 22, No. 5, 1986, pp. 385–394.

Carpenter et al., "Culstering of Scientific Journals" ASIS 24(6):425–436, 1973 (Exhibit B to Defendants' Identification of Prior Art).

Aalbersberg, A Document Retrieval Model Based on Term Frequency Ranks, Springer–Vertag New York, Inc. New York, NY, pp. 164–171, 1994; 11 pgs.

Aho et al., Data Structures and Algorithms, Addison–Wesley Publishing Company, pp. 199–229, pp. 171–223, 1983, 19 pgs.

(Continued)

*Primary Examiner*—Joshua Campbell

(57) **ABSTRACT**

A computer research tool for indexing, searching and displaying data is disclosed. Specifically, a computer research tool for performing computerized research of data including textual objects in a database and for providing a user interface that significantly enhances data presentation is described. Textual objects and other data in a database are indexed by creating a numerical representation of the data. The indexing technique called proximity indexing generates a quick-reference of the relations, patterns and similarity found among the data in the database. Proximity indexing indexes the data by using statistical techniques and empirically developed algorithms. Using this proximity index, an efficient search for pools of data having a particular relation, pattern or characteristic can be effectuated. The Computer Search program, called the Computer Search Program for Data represented in Matrices (CSPDM), provides efficient computer search methods. The CSPDM rank orders data in accordance with the data's relationship to time, a paradigm datum, or any similar reference. The user interface program, called the Graphical User Interface (GUI), provides a user friendly method of interacting with the CSPDM program and prepares and presents a visual graphical display. The graphical display provides the user with a two dimensional spatial orientation of the data.



Facebook Inc. Ex. 1001

## US 5,544,352 C1
Page 2

### PUBLICATIONS

Aho, et al., The Design and Analysis of Computer Algorithms; Addison–Wesley Publishing Company, 1976, 30 pgs.

Baase, Computer Algorithms: Introduction to Design and Analysis, Chapter 3: Graphs & Digraphs, pp. 114–169, Addison–Wesley Publishing Company, 1978, 28 pgs.

Bichteler et al., Comparing Two Algorithms for Document Retrieval Using Citation Links, Journal of the American Society of Information Science, vol. 28, No. 4, pp. 192–195, Jul. 1977, 4 pgs.

Caplinger, Graphical Database Browsing, Bell Communications Research, Room 2A–261, 435 South Street, Morristown, NJ 07960, 1986; pp. 113–118, 6 pgs.

Cowart; Master Windows 3.1, Apr. 2, 1992, pp. 64–76, 867.

Crouch et al., The Automatic Generation of Extended Queries, Department of Computer Science, Duluth, Minnesota, pp. 369–383, 1990, 15 pgs.

Crouch, et al., The Use of Cluster Hierarchies in Hypertext Information Retrieval, Department of Computer Science, Duluth, Minnesota, Hypertext '89 Proceedings, pp. 225–237, Nov. 1989, 14 pgs.

Fritsche, Commission of the European Communities: Automatic Clustering Techniques in Information Retrieval, Joint Nuclear Research Center, Ispra Establishment, Italy 1974, 142 pgs.

Furner et al., Information Retrieval and Hypertext: The Representation and Comparison of Hypertext Structures Using Graphs, Kluwer Academic Publishers, Norwell, Massachusetts, pp. 75–96, 1996, 14 pgs.

Golub et al., Matix Computations, The Johns Hopkins University Press, pp. 1–476, 492 pgs.

Hearst et al., Subtopic Structuring for Full–Length Document Access, Computer Science Division, Berkeley, CA, Proc. 16th SIGIR, pp. 59–68, 1993, 10 pgs.

Horowitz et al., Fundamentals of Data Structures, Chapter 6, Graphs, Computer Science Press, Inc., pp. 282–335, 1976 and 1982, 28 pgs.

Invalidity Claim Chart for U.S. Patent. No. 5,544,362 of Certain Exemplary Combinations, pp. 1–17, 17 pgs.

Kommers, Designing Hypermedia for Learning: Chapter 7, Graph Computation as an Orientation Device in Extended and Cyclic Hypertext Networks, pp. 117–134, Springer–Verlag, Berlin, 1990, 20 pgs.

Kungl, Statskontoret, Citation Index and Measures of Association in Mechanized Document Retrieval Swedish Rationalization Agency, Stockholm, Jan. 1, 1967, 14 pgs.

Libertach, Inc. V–Search™ Integration Toolkit for Folio VIEWS, Beta Release 2.0, User's Manual, Preliminary Draft, Draft 1.0, pp. 1–36, Dec. 6, 1995, 43 pgs.

Libertech, Inc., V–Search™ Publisher's Toolkit, Beta Release 1.0, User's Manual, Draft 2.0, pp. 1–160, Dec. 8, 1995, 171 pgs.

Products in the News: Document Relationships at a Glance, Electronic–Documents, vol. 3, No. 12, 1994, 1 pg.

Salton et al., A Citation Study of the Computer Science Literature, Department of Computer Science, Ithaca, NY, 46 pgs.

Salton et al., Automatic Text Structuring and Retrieval—Experiments in Automatic Encyclopedia Searching, Department of Computer Science, Cornell University, pp. 21–30, 1991, 10 pgs.

Edward Fox,"Extending the Boolean and Vector Space Models of Information Retrieval with P–Norm Queries and Multiple Concept Types." Cornell University, 1983 ("Fox").

Ralph Garner, et al., "A Computer–Oriented Graph Theoretic Analysis Of Citation Index Structures," Three Drexel Information Science Research Studies, Ed. Flood, B., Drexel Press, 1967 ("Garner").

Gerard Salton, "Associative Document Retrieval Techniques Using Bibliographic Information," pp. 440–457, 1963 ("Salton 1963").

Donald B. Cleveland, "An n–Dimensional Retrieval Model," Journal Of The American Society For Information Science, Oct. 1976, vol. 27, No. 6, pp. 342–347 ("Cleveland").

Colin Tapper, "The Use Of Citation Version For Legal Information Retrieval," Journal of Law and Information Science, vol. 1, No. 2, pp. 131–161 (1992) ("Tapper").

Gerard Salton, "Approaches To Text Retrieval For Structural Documents," Dept. of Computer Science, Cornell University, Jan. 1990 ("Salton 1990").

Fazli Can and Esen A. Ozkarahan, "A Dynamic Cluster Maintenance System for Information Retrieval," ACM, vol. 6, p. 123, 1987 ("Can").

Elizabeth Aversa, "Research on Research: Customized Citation Analysis for Governmental, Industrial, and Academic Clients," Current Comments, p. 77, Jun. 8, 1992 ("Aversa").

Facebook Inc. Ex. 1001

US 5,544,352 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **26-42** and **44** is confirmed.

Claim **45** is cancelled.

New claims **53-61** are added and determined to be patent-
able.

Claims 1-25, 43 and 46-52 were not reexamined.

*53. A method for analyzing non-semantical relationships
existing among a set of objects in a database, comprising:*

*labeling, with a computer processor, objects in a first set
of objects using a computer-readable identifier;*

*generating, using a computer processor, a numerical rep-
resentation for individual objects in said first set of
objects based upon said individual object's direct
relationships, if any, with other of said individual
objects in said first set of objects,*

*generating, using a computer processor and said numeri-
cal representations, a value for said individual objects
in said first set of objects, wherein said value accounts
for direct and indirect relationships that exist with
other objects in said first set of objects, wherein said
generating includes quantifying, for a plurality of said
objects in said first set of objects, one or more indirect
relationships, wherein quantifying indirect relation-
ships for said plurality of objects includes scoring the
following three indirect relationships:*

*i) B cites f and f cites A,*

*ii) B cites f, f cites e, and e cites A, and*

*iii) B cites f, f cites e, e cites d, and d cites A,*

*wherein at least one of B, d, e, f, and A are objects in the
set of objects and said scoring of indirect relation-
ships uses weights that are calculated using one or
more of said objects' quantity of outbound direct
relationships;*

*storing the generated values in one or more computer
memories in an index;*

*receiving search commands wherein the search com-
mands are received from an input device, wherein the
received search commands include one or more search
terms;*

*identifying a resultant second set of said objects that are
associated with one or more search terms using at least
a word index and the received search commands;*

*determining a rank for objects in said resultant second set
of objects using said values as a factor in determining
the rank; and*

*sending, for use by a display device, information for dis-
playing identities of two or more objects in said result-*

**2**

*ant second set of objects using the rank as a factor in
determining an order of display.*

*54. The method of claim 53 wherein generating a value
further comprises accounting for shape characteristics of an
image.*

*55. The method of claim 53, further comprising:*

*computerized extraction of information from said objects
and using said information to create said numerical
representation.*

*56. The method of claim 53 wherein storing the generated
values is performed prior to receiving the search commands
and wherein the values are stored in a database.*

*57. The method of claim 53 wherein values are generated
independent from the search commands.*

*58. The method of claim 53 wherein quantifying said
object's indirect relationships further includes weighing,
wherein some types of indirect relationships are weighed
more heavily than others.*

*59. The method of claim 53 wherein said rank is an impor-
tance rank.*

*60. The method of claim 53 wherein said use of objects'
quantity of outbound direct relationships is as a divisor in a
ratio.*

*61. A data processing system for use in analyzing non-
semantic relationships existing among a set of objects,
including indirect relationships between objects in the set,
comprising:*

*one or more computer processors for producing results
and sending results for display configured to execute
instructions to:*

*label objects among the set of objects using a computer-
readable identifier;*

*generate, using a computer processor, a plurality of
numerical representations of individual objects among
the set of objects based upon direct relationships for
said individual objects with other objects in the set of
objects,*

*calculate a value for the individual objects among the set
of objects, the value accounting for direct and indirect
relationships existing among objects, wherein the cal-
culation considers at least the following indirect rela-
tionships for a given object A or B:*

*i) B cites f and f cites A,*

*ii) B cites f, f cites e, and e cites A, and*

*iii) B cites f, f cites e, e cites d, and d cites A, wherein at
least one of B, d, e, f, and A are objects in the first set
of objects and certain indirect relationships contrib-
ute greater value to the value than other indirect
relationships;*

*receive search input including one or more search
terms emanating from an input device; identify, using
the one or more search terms, a word index and the
assigned identifiers, a second set of objects, wherein
the second set of objects is a subset of the first set of
objects having fewer objects;*

*rank a plurality of the objects in the second set of objects,
wherein the value is used as a factor in performing the
ranking; and*

*send search results about the ranked objects for display,
wherein identifying information for two or more of the
ranked objects is sent to be displayed in a ranked order
display;*

*one or more computer memory devices that store data
including:*

*the identification for each object in the first set of
objects,*

**JA05047**

Facebook Inc. Ex. 1001

US 5,544,352 C1

**3**

the values, and
    the word index,
wherein the values are stored in the one or more computer
    memory devices before the one or more computer pro-
    cessors process the received search input; and

**4**

a network for use by the one or more computer proces-
    sors.

\* \* \* \* \*

Facebook Inc. Ex. 1001